914 A.2d 25

Vernon EVANS, Jr.

v.

STATE of Maryland (Three Cases).

Vernon Evans, Jr. et al.

v.

Mary Ann Saar, Secretary et al.

Nos. 107, 122–124 Sept. Term, 2005.

Court of Appeals of Maryland.

Dec. 19, 2006.

Reconsideration Denied Feb. 2, 2007.

Julie Sippel Dietrich (Jeffrey B. O'Toole of O'Toole, Rothwell, Nassau & Steinbach; A. Stephen Hut, Jr., Todd C. Zubler, Kalea Seitz Clark, Ann Harden Tindall and Ann H. Geraghty of Wilmer, Cutler, Pickering, Hale & Dorr, LLP, on brief), Washington, DC, for Appellant in Nos. 107 and 124.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, and Cathleen C. Brockmeyer, Asst. Atty. Gen.; Scott S. Oakley and Michael O. Doyle, Asst. Attys. Gen., Dept. of Public Safety & Correctional Services, on brief), Baltimore, MD, for Appellee in No. 107.

Todd C. Zubler (A. Stephen Hut, Jr., Kalea Seitz Clark, Ann Harden Tindall and Ann H. Geraghty of Wilmer, Cutler, Pickering, Hale & Dorr, LLP; Jeffrey B. O'Toole and Julie Sippel Dietrich of O'Toole, Rothwell, Nassau & Steinbach, on brief), Washington, DC, for Appellants in No. 122.

Scott S. Oakley and Michael O. Doyle, Asst. Attys. Gen., Dept. of Public Safety & Correctional Services (J. Joseph Curran, Jr., Atty. Gen. of MD, Annabelle L. Lisic, and Cathleen C. Brockmeyer, Asst. Attys. Gen., on brief), Baltimore, MD, for Appellees in No. 122.

A. Stephen Hut, Jr. (Todd C. Zubler, Kalea Seitz Clark, Ann Harden Tindall and Ann H. Geraghty of Wilmer, Cutler, Pickering, Hale & Dorr, LLP; Jeffrey B. O'Toole and Julie Sippel Dietrich of O'Toole, Rothwell, Nassau & Steinbach, on brief), Washington, DC, for Appellants in No. 123.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, and Cathleen C. Brockmeyer, Asst. Atty. Gen.; Scott S. Oakley and Michael O. Doyle, Asst. Attys. Gen., Dept. of Public Safety & Correctional Services, on brief), Baltimore, MD, for Appellee in Nos. 123 and 124.

Argued Before BELL, C.J. RAKER, WILNER, HARRELL, BATTAGLIA, GREENE and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

WILNER, Judge.

On April 28, 1983, Vernon Evans, for a fee of $9,000 paid by or on behalf of his friend, Anthony Grandison, walked into the Warren House Motel in Baltimore County and murdered David Piechowicz and Susan Kennedy by shooting nineteen bullets at them. The murder of Ms. Kennedy was a mistake; Evans thought she was Piechowicz's wife, Cheryl. Evans was hired to kill the Piechowiczes in order to prevent them from testifying against Grandison in a pending Federal criminal case that was scheduled for trial a week later.

In May, 1984, a jury in the Circuit Court for Worcester County, to which the case had been removed, convicted Evans

of two counts of first degree murder and sentenced him to death. The judgment was affirmed on appeal, but in 1991, in a post conviction proceeding filed in 1990, Evans was awarded a new sentencing hearing. At his request, the case was removed from Worcester County and, with his concurrence, returned to Baltimore County, where, in November, 1992, a new jury again sentenced him to death. The full procedural history of the case is described in the Appendix attached to this Opinion.

We have before us now four appeals—Nos. 107, 122, 123, and 124—which we have consolidated. In Nos. 107 and 124, two substantive issues are raised:

(1) Whether Evans is entitled to a new sentencing hearing because his attorneys at the 1992 re-sentencing hearing failed to investigate and present mitigating evidence relating to his background, thereby rendering their service, under principles enunciated in *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) and *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), Constitutionally deficient and prejudicial; and

(2) Whether, under *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), he is entitled to a new trial as to guilt or innocence because the State, in selecting a jury at the 1984 trial, exercised peremptory strikes in a racially discriminatory manner.

In No. 107, those issues were presented in a motion to correct an illegal sentence, and the procedural question exists of whether they may properly be raised in such a motion. In No. 124, the two issues were presented in Evans's fourth motion to reopen a 1995 post conviction proceeding. The question there is whether the post conviction court abused its discretion in denying that motion.

The issue in No. 123 is whether the Circuit Court for Baltimore County abused its discretion in denying, without affording discovery, Evans's third motion to reopen the 1995 post conviction proceeding in order to present the complaint that "selective prosecution by the Baltimore County State's

Attorney's Office and systemic statewide racial and geographic discrimination rendered his sentence unconstitutional."

No. 122 arises from an action for injunctive relief filed in the Circuit Court for Baltimore City. Maryland Code, § 3–905 of the Correctional Services Article requires that the manner of executing a sentence of death be by lethal injection. Complementing that statute, the Division of Correction (DOC) has adopted a comprehensive set of execution protocols, including a detailed description of the manner in which the lethal drugs are to be administered. Joined by three co-plaintiffs—the National Association for the Advancement of Colored People (NAACP), the American Civil Liberties Union Foundation of Maryland (ACLU), and Maryland Citizens Against State Executions (CASE)—Evans contended that those aspects of the execution protocol were (1) inconsistent with the statutory requirements, and (2) in the nature of a regulation that was promulgated without compliance with the State Administrative Procedure Act. The appeal is from the Circuit Court's denial of a temporary injunction that would have restrained DOC from using its protocol.

We shall find merit in the second aspect of Evans's complaint in No. 122, but no merit in any of his other complaints. Evans is not entitled to a new sentencing proceeding or to a new trial, but that part of the DOC protocol that directs the manner of administering the lethal injection is ineffective until either (1) it is adopted as a regulation in accordance with the Administrative Procedure Act, or (2) the Legislature exempts it from the requirements of that Act.

## I. NO. 107

Maryland Rule 4–345(a) permits a court to "correct an illegal sentence" at any time. If the sentence is not "illegal," the court's revisory power over it, with exceptions not pertinent here, is limited to a showing of fraud, mistake, or irregularity in the sentence. There has been no contention by Evans, and there is no basis in the record for such a contention, that the 1992 death sentence imposed on him was the

product of fraud, mistake, or irregularity. In order to be entitled to relief under Rule 4–345(a), therefore, Evans must show that the death sentence he is challenging is "illegal."

■ In two of Evans's prior appeals—*Evans v. State,* 382 Md. 248, 855 A.2d 291 (2004) and *Evans v. State,* 389 Md. 456, 886 A.2d 562 (2005)—we confirmed earlier rulings and made clear that "[a] motion to correct an illegal sentence ordinarily can be granted only where there is some illegality in the sentence itself or where no sentence should have been imposed." *Evans v. State, supra,* 382 Md. at 278–79, 855 A.2d at 309; *Evans v. State, supra,* 389 Md. at 463, 886 A.2d at 565. In the more recent of those cases, we flatly held that "there was nothing intrinsically illegal in Evans's sentence; he was properly found to be a principal in the first degree in two first degree murders for which the death penalty could lawfully be imposed, and the court properly found that the aggravating factors proved outweighed any mitigating factors and that death was the appropriate sentence." *Evans v. State, supra,* 389 Md. at 463, 886 A.2d at 565–66, confirming *Evans v. State,* 333 Md. 660, 637 A.2d 117 (1994), *cert. denied,* 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994). Nothing has been presented in these appeals that would cause us to reconsider, much less overrule, that holding.

In Evans's 2004 appeal, *Evans v. State, supra,* 382 Md. at 279, 855 A.2d at 309, we observed that, in *Oken v. State,* 378 Md. 179, 835 A.2d 1105 (2003), *cert. denied,* 541 U.S. 1017, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004), we "appeared to recognize" an exception to that requirement "where, in a capital sentencing proceeding, an alleged error of constitutional dimension may have contributed to the death sentence, at least where the allegation of error is partly based upon a decision of the United States Supreme Court or of this Court rendered after the defendant's capital sentencing proceeding." To the extent that there is such an exception, it is a very narrow one.[1] The

---

1. We did not, in fact, announce any such exception in *Oken,* but, whether deliberately or inadvertently, we did address a complaint

subsequent decision relied upon must constitute "a new judicial interpretation of a constitutional provision." *Baker v. State,* 389 Md. 127, 134, 883 A.2d 916, 920 (2005).

In an effort to squeeze within that limited exception, Evans relies, as to his complaint about the performance of counsel at the re-sentencing hearing, on *Wiggins v. Smith, supra,* and *Rompilla v. Beard, supra,* which he contends constitute new judicial interpretations of a constitutional provision, rendered after he was re-sentenced, and which set new (and retroactive) requirements for counsel in death penalty sentencing proceedings that were not in place in 1992. He makes the same argument with respect to his *Batson* challenge, contending that *Miller–El v. Dretke, supra,* constitutes a new judicial interpretation of the Constitutional prohibition against the use of peremptory challenges in a racially discriminatory manner. We do not agree.

With respect to the Constitutional adequacy of counsel's performance, the seminal case—the "new judicial interpretation of a constitutional provision"—was *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It was *there* that the Supreme Court considered and announced "the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective." *Id.* at 671, 104 S.Ct. at 2056, 80 L.Ed.2d at 683.

The *Strickland* Court began its analysis by confirming that "the right to counsel is the right to the effective assistance of counsel." *Id.* at 686, 104 S.Ct. at 2063, 80 L.Ed.2d at 692, quoting from *McMann v. Richardson,* 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, n. 14, 25 L.Ed.2d 763, 773, n. 14 (1970). It proceeded then to announce that "[t]he benchmark for judging

---

raised in a motion to correct an illegal sentence (which we found substantively to be without merit) that *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), decided long after Oken's sentencing, made the standard for weighing aggravating against mitigating factors set forth in the Maryland Code unconstitutional.

any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington, supra,* 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–93. The heart of the Court's ruling—the announced holding that has remained unchanged since *Strickland*—is in the introductory paragraph to Part III of the Court's Opinion:

> "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

*Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

As to the first prong of the analysis—whether the performance was deficient—the Court adopted an objective standard: "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. In that regard, it made clear that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. The Court directed, however, that judicial scrutiny of counsel's performance be "highly deferential" in order to avoid the *post hoc* second-guessing of decisions simply because they proved unsuccessful, and required that "a court must indulge a strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Thus, the Court concluded, a court deciding an ineffective assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

In examining the prejudice prong, the Court rejected the notion that all a defendant had to show was that counsel's errors "had some conceivable effect on the outcome of the proceeding" and required instead that the defendant show "that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding *would have been different.*" *Id.* at 693–94, 104 S.Ct. at 2068, 80 L.Ed.2d at 697–98. (Emphasis added). A "reasonable probability," the Court added, is "a probability sufficient to undermine confidence in the outcome." *Id.*

Nothing in *Wiggins* or *Rompilla* changed, in any way, those standards adopted in *Strickland.* The *Wiggins* Court expressly relied on and applied the *Strickland* standards and simply concluded, based on its view of the factual record in that case, that, given the information they had regarding Wiggins's childhood, counsel's failure to broaden the scope of their investigation into possible mitigating factors in a death penalty case was both deficient and prejudicial under the *Strickland* standards. Indeed, the Court began its discussion of the ineffective assistance claim by expressly noting that "[w]e established the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington* . . . ." *Wiggins v. Smith, supra,* 539 U.S. at 521, 123 S.Ct. at 2535, 156 L.Ed.2d at 484.

We are aware of no reported decision, and none has been cited to us by Evans, holding that *Wiggins* established a new interpretation of a Constitutional principle. The decisions are to the contrary. *See Grossman v. Crosby,* 359 F.Supp.2d 1233, 1281 (M.D.Fla.2005) ("*Wiggins* merely applied *Strickland* to the facts of that case, it did not change the standard

by which a claim of ineffective assistance of counsel is to be judged."); *Hodges v. State,* 885 So.2d 338, 346 (Fla.2004) (*Wiggins* is a reiteration and application of *Strickland*); *Grant v. State,* 95 P.3d 178, 179 (Okla.Cr.App.2004), *cert. denied,* 543 U.S. 964, 125 S.Ct. 418, 160 L.Ed.2d 332 (2004) (*Wiggins* applied well-established standards of *Strickland*).

That analysis applies equally to *Rompilla v. Beard, supra,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 and *Miller–El v. Dretke, supra,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196. Like in *Wiggins,* the *Rompilla* Court expressly applied the standards enunciated in *Strickland* to find deficient and prejudicial performance by counsel. No new or different interpretation of *Strickland* was announced. Indeed, Justice O'Connor, the author of the Opinion in *Strickland,* noted in *Rompilla* that the decision "simply applies our longstanding case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland v. Washington.* ..." *Rompilla v. Beard, supra,* 545 U.S. at 393–94, 125 S.Ct. at 2469, 162 L.Ed.2d at 379. (O'Connor, J., Concurring).

Similarly, *Miller–El* was merely an application of *Batson v. Kentucky.* Throughout its Opinion, the Court characterized Miller–El's complaint as a *Batson* challenge, and it examined the record in light of the three-step analysis set forth in *Batson.* It did not, in any way, modify that analysis.

It is clear that the complaints made by Evans in No. 107 are not cognizable in a motion under Rule 4–345(a) to correct an illegal sentence. The judgment of the Circuit Court for Baltimore County entered in that case will be affirmed.

## II. NO. 124

The two issues raised in No. 107—the *Wiggins* and *Batson* claims—are also presented in No. 124, which is an appeal from the denial of Evans's fourth motion to reopen the 1995 post conviction case.

Maryland Code, § 7–102 of the Criminal Procedure Article (CP)—the heart of the State Post Conviction Procedure Act—

permits a convicted person to seek relief in the Circuit Court in which the conviction occurred upon an allegation that (1) the sentence or judgment was imposed in violation of the U.S. or Maryland Constitution or laws of this State, (2) the court lacked jurisdiction to impose the sentence, (3) the sentence exceeds the maximum allowed by law, or (4) the sentence is subject to collateral attack on a ground that would otherwise be available under a writ of habeas corpus, coram nobis, or other common law or statutory remedy.

There are two important conditions to that right, however, that are relevant here. The first, expressed in CP § 7–102(b)(2) and circumscribed to some extent in § 7–106, is that the alleged error "has not been previously and finally litigated or waived in the proceeding resulting in the conviction or in any other proceeding that the person has taken to secure relief from the person's conviction." The second appears in CP §§ 7–103(a) and 7–104. Section 7–103(a) provides that, for each trial or sentence, "a person may file only one petition for relief under this title." Section 7–104, however, permits a court to "reopen a post conviction proceeding that was previously concluded if the court determines that the action is in the interests of justice."

In *Gray v. State*, 388 Md. 366, 879 A.2d 1064 (2005), we made clear that a petition to reopen a concluded post conviction proceeding was not the functional equivalent of the former right to file a second (or before 1986, subsequent) petition, that the decision to reopen is a discretionary one with the court in which the petition to reopen is filed, and that "[w]e will only reverse a trial court's discretionary act if we find that the court has abused its discretion." *Id.* at 383, 879 A.2d at 1073. In that regard, we pointed out that " 'a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' " *Id.,* quoting from *Dehn v. Edgecombe,* 384 Md. 606, 628, 865 A.2d 603, 616 (2005), and ultimately from

*North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025, 1031–32 (1994).

That is the standard to be applied in reviewing the Circuit Court's denial of Evans's fourth motion to reopen the 1995 post conviction proceeding—a proceeding in which he had raised 41 other issues, that had been concluded nine years earlier, and that he had sought to reopen on three prior occasions. That was *not* the standard applied in *Wiggins, Rompilla,* or *Miller–El.* All three of those cases reached the Supreme Court in the context of an initial Federal habeas corpus action, an action of right. In *Wiggins* and *Rompilla,* the District Court granted relief, the U.S. Court of Appeals reversed, and the Supreme Court granted *certiorari* to review the legal correctness—the merits—of the lower courts' decisions. *Miller–El* also was an initial Federal habeas corpus action. In that case, the District Court denied relief, and the U.S. Court of Appeals for the Fifth Circuit affirmed. The rulings reviewed by the Supreme Court in those cases were not discretionary ones; those cases were brought as of right, they were tried, and judgments were entered on the merits of the petitions.

## A. The *Batson/Miller–El* Claim

█ Evans was tried in 1984, before *Batson* was decided by the Supreme Court. During jury selection, the State's use of its peremptory strikes to exclude African Americans was commented upon three times. The court (Judge Cathell) first raised the issue on its own initiative. After twelve jurors were tentatively seated, the parties proceeded to select two alternates. During that process, when the State excused a black prospective juror, Judge Cathell called counsel to the bench and directed them to make their strikes in alternating order. He wanted a clear record of who was striking whom, he said, "so that later on I can make an indication whether they were excused as to race." Noting that the lead prosecutor was "on loan from the United States Attorney's Office," Judge Cathell warned that there was a line of Maryland cases disapproving racial strikes and wanted to make sure that the Federal

prosecutor was aware of those cases: "[t]here has been some extremely strong language in dicta about using peremptory challenges for racial purposes. And I think you ought to think about that." The prosecutor responded that he was aware of those cases and stated "I am not striking anybody based on race."

The process continued until twelve jurors and two alternates had been selected, at which point the court asked if counsel were satisfied with the jury. Defense counsel informed the court that the panel was not acceptable because the State had used its peremptory challenges "to purposely limit blacks from representation on the panel." Counsel noted that the State had used eight of its ten peremptory challenges to strike black jurors and two to strike white jurors, leaving two African Americans on the jury and one as an alternate. The court invited a response from the State, whereupon the prosecutor advised that he did not keep track of whether he had struck black or white jurors and that "[w]e struck on background, age, occupation, what was learned during the voir dire at the bench and in open court. We did not strike on racial grounds." There was no challenge to that explanation and no request for further elucidation, and the court accepted it.

The next day, while the court was considering Evans's complaint that the venire itself did not reflect a fair cross-section of the community, the prosecutor noted that 22% of the county population was African American and three of the jurors—two regular jurors and one alternate—were black, which constituted 21.4% of the panel. His point was that there was no significant racial disparity in the actual make-up of the jury. Defense counsel responded that his objection the day before was not to a cross-section but rather that the State's peremptory challenges were racially motivated, to which the court noted that the prosecutor had given his reasons for the strikes and that the objection had been ruled upon.

In Evans's appeal from the conviction and sentence, he raised the issue of whether the State's peremptory strikes had been improperly used to exclude African Americans. *Batson* had still not been decided. After reviewing the existing state of the law, which was already trending beyond *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), we assumed that the use of eight peremptory strikes to exclude African Americans "was sufficient to establish a prima facie violation of the defendant's rights," but concluded that "the explanation offered by the prosecutor, and apparently accepted by the court, was sufficient under the circumstances to support the decision of the trial judge in overruling the defendant's objection." *Evans v. State*, 304 Md. 487, 528, 499 A.2d 1261, 1282 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986). We observed:

> "It is also significant that neither the judge nor defense counsel questioned the explanation of the prosecutor or requested further particulars. This may well have represented a tactical decision by the defendant's counsel, to require the court's decision to be made upon the weighing of the defendant's prima facie showing against the rather general response of the prosecutor, as opposed to seeking specific information from the prosecutor as to each excused venireman and running the risk of further strengthening the prosecutor's explanation. For whatever reason, the explanation of the prosecutor stood uncontroverted and unimpeached."

*Id.*

*Batson* was decided by the Supreme Court on April 30, 1986. At the time, Evans's petition for *certiorari* seeking review of this Court's decision was also pending in that Court. That petition was denied without comment on June 30, 1986; this Court was not directed to reconsider its decision in light of *Batson*.

In his first petition for post conviction relief, filed in 1990, Evans argued that the State's use of peremptory strikes to exclude African Americans constituted a violation of *Batson*.

The court had before it the transcript of the jury selection phase of the trial and noted that, even though *Batson* had not then been decided, Judge Cathell had required the prosecutor to explain his peremptory strikes. The reasons given, the court concluded, were race-neutral and did not appear to be pretextual. Moreover, the matter had been raised and decided in Evans's direct appeal and was therefore finally litigated. Evans complained about that aspect of the post conviction court's ruling in an application for leave to appeal, which we denied. *State v. Evans,* Misc. No. 8, Sept. Term 1991 (Order filed June 4, 1991).

As a result of the first post conviction proceeding, Evans received a new sentencing hearing, at which a jury in Baltimore County again sentenced him to death. He raised a *Batson* issue at that proceeding as well. It appears that the only African American jurors who were excused by the State were alternate jurors, however, and no alternate jurors were called upon to deliberate. The trial judge (Judge Kahl) found no merit to the complaint.

In August, 1995, Evans filed his second petition for post conviction relief. Among the 41 issues presented in that petition were seven relating to the State's peremptory challenges—three complaints dealing with the re-sentencing and four emanating from the initial trial. As no complaint is made in this appeal about jury selection at the re-sentencing proceeding, we need to consider only the four dealing with the initial trial.

Evans's only direct challenge did not invoke *Batson,* but was instead grounded on *Swain v. Alabama, supra,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. He complained that "he was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution because the Baltimore County State's Attorney's Office engaged in a pattern of using peremptory challenges to strike jurors on the basis of race in violation of *Swain v. Alabama.*" The post conviction court (Judge Smith), noting that that issue had been raised and decided in the appeal from the initial conviction and

sentence, *Evans v. State, supra,* 304 Md. 487, 522–28, 499 A.2d 1261, 1280–82, concluded that it had been finally litigated and that there was no merit to it in any event. A second, related argument was that trial counsel was deficient by failing to investigate and present evidence of the State's pattern of exercising peremptory challenges in a racially discriminatory manner. That, too, invoking *Swain* rather than *Batson,* was found to be without merit.

Two challenges grounded specifically on *Batson* were presented, but only in the context of deficient performance by counsel in the first post conviction proceeding. Evans complained that post conviction counsel was deficient in (1) failing to pursue grounds for establishing a *Batson* violation based on the State's racially discriminatory use of peremptory challenges, (2) not pursuing claims that the prosecutors in this case demonstrated a pattern of using peremptory strikes in a racially discriminatory manner in violation of *Batson,* (3) making only "a perfunctory presentation" to this Court relating to the State's discriminatory use of peremptory challenges, and (4) failing to raise and preserve on appeal meritorious claims that the prosecutors in this case had demonstrated a pattern of using peremptory strikes on the basis of race. Judge Smith found that the validity of the State's use of peremptory challenges at the initial trial had been fully and finally litigated. He observed that trial counsel had challenged the State's use of peremptory challenges at the trial, that the issue was raised and decided in the appeal from the initial judgment, and that it had been raised and decided in the first post conviction proceeding.

The second argument, as viewed by the post conviction court, was almost a repetition of the one just noted. Evans complained that post conviction counsel was deficient "in that he made only a perfunctory presentation to the Court of Appeals relating to the State's discriminatory use of peremptory challenges." He added:

"Petitioner alleges that (1) he was denied equal protection of the law by the prosecution's purposefully striking African Americans from the jury in violation of *Batson v. Kentucky*

and (2) he was denied equal protection of the law because he was prosecuted by attorneys who had demonstrated a pattern of using peremptory strikes in a racially discriminatory manner in violation of *Batson v. Kentucky.*"

The court rejected that claim, noting that the peremptory challenge issue had been finally litigated in the direct appeal, before post conviction counsel was involved in the case.

Those claims were presented to this Court in Evans's amended application for leave to appeal from the denial of relief by the post conviction court. We considered the application and obviously found no merit to it, for on May 7, 1997, we denied it. *Evans v. State,* 345 Md. 524, 693 A.2d 780 (1997). The Supreme Court denied *certiorari. Evans v. Maryland,* 522 U.S. 966, 118 S.Ct. 411, 139 L.Ed.2d 314 (1997).

In November, 1997, Evans filed a petition for habeas corpus in the U.S. District Court. Among the 24 issues raised in that petition was a four-part complaint about the State's peremptory strikes at the initial trial: "i) because his trial and direct appeal concluded before the Supreme Court announced *Batson,* the federal courts should give no deference to the state proceedings described above; ii) *Batson* requires, '[the] prosecution to articulate a race-neutral reason for *each* strike' once a prima facie case has been established ... iii) the race-neutral reasons given by prosecutor ... were clearly pretextual; and iv) his appellate counsel rendered ineffective assistance by failing to demonstrate this pretext by comparing the ages, occupations, etc. of the potential jurors Irwin struck against those he did not strike." *Evans v. Smith,* 54 F.Supp.2d 503, 514 (D.Md.1999).

The District Court (Judge Legg) reviewed the trial transcript and this Court's ruling on appeal and concluded that none of those complaints had merit. It found, first, that "anticipating the shifting burdens eventually adopted by the Supreme Court in *Batson,*" this Court, in Evans's appeal, "applied a reasonable and correct legal standard," and that, in the first post conviction proceeding, Judge Eschenburg "measured Evans's claim against *Batson,* which had by then been

published." *Id.* Accordingly, the court held that both decisions were entitled to deference under 28 U.S.C. § 2254(d) and (e). Second, the court held that *Batson* did not require an individual explanation for each strike but only a clear and reasonably specific justification for the prosecutor's use of strikes relating to the particular case to be tried. Third, the court held that Evans's analysis of the ages, occupations, etc. of the jurors stricken and accepted "does not clearly demonstrate the pretextuality of [the prosecutor's] explanation." *Id.* at 515. In that regard, the court found Evans's analysis of the juror data "unpersuasive" in that it "fails to take into consideration the many impressions that a potential juror makes on voir dire." *Id.* at 515, n. 20. Finally, the court concluded that Evans's appellate counsel were "not constitutionally remiss in failing to develop this." *Id.* at 515. Rather, it found "the proposed evidence unpersuasive as it does not clearly demonstrate that the factual determinations of Judge Cathell and the Court of Appeals were incorrect." *Id.*

The District Court denied the petition and a motion for rehearing. The U.S. Court of Appeals for the Fourth Circuit affirmed, *Evans v. Smith,* 220 F.3d 306 (4th Cir.2000), and the U.S. Supreme Court denied *certiorari, Evans v. Smith,* 532 U.S. 925, 121 S.Ct. 1367, 149 L.Ed.2d 294 (2001).

It is abundantly clear from this history that Evans's *Batson* claim has been fully and finally litigated, in both the State and Federal courts. It has been presented to and rejected by this Court on at least two occasions, it was presented to and rejected by the U.S. District Court and the U.S. Court of Appeals for the Fourth Circuit, and the Supreme Court has denied review of it at least three times. The Circuit Court did not abuse its discretion in refusing to reopen the 1995 post conviction proceeding to examine it again.

## B. *Wiggins/Rompilla* Claim

The *Wiggins/Rompilla* claim made by Evans is that his attorneys in the 1992 re-sentencing proceeding failed to investigate his social and psychological history and that there is a reasonable probability that, but for that omission, the

result of that re-sentencing proceeding would have been different. In support of his fourth motion to reopen the 1995 post conviction proceeding, counsel produced a 51–page *Psychosocial Evaluation of Mitigating Circumstances In Life Of Vernon Lee Evans, Jr.,* prepared by a licensed social worker, Pamela Taylor, and an 18–page *Investigation Of Psychological Mitigating Factors in Life Of Vernon Lee Evans* prepared by a psychologist, Janice Stevenson. Both reports were based predominantly on interviews with Evans and members of his family plus various documents. In her report, Ms. Taylor concluded, in pertinent part:

(1) There was a "Multi–Generational Family Legacy of Emotional Dysfunction." Evans's parents, she said, came from emotionally troubled backgrounds, and various members of his extended family—uncles, aunts, cousins—suffered from major mental disorders, gambling addiction, or may have been alcoholics. His father's uncle and cousin committed suicide. His grandmother "was known to faint when she got upset." One of his father's cousins "is reported to have had a chronic addiction to gambling." Although Evans's sisters "are accomplished in their various careers and present a positive public image," the oldest ones had experienced "significant instability" and "personal difficulties and inner turmoil" in their lives. One, who holds a doctorate in divinity, teaches bible studies, and is gainfully employed, was sexually promiscuous as a teenager, is separated from her second husband, and has a "strained relationship" with her 37–year–old daughter. Another, who holds a college degree and was pursuing a masters in business administration while employed as a financial aid counselor at Morgan State University, felt unloved as a child, once attempted suicide, and thirty years earlier had a "psychotic breakdown."

(2) Evans's parents did not know how to express loving feelings toward their children, to have empathy for their individual needs, to address conflict appropriately, or demonstrate constructive problem-solving skills. They unwittingly set up an environment of "chronic fearfulness, suppression of normal emotional reactions, and boundary violations" which

forced the children "to live in an environment which was toxic and traumatizing." Ms. Taylor asserted that Evans's father was physically abusive toward Evans and his sisters. All of this, she said, afforded Evans "neither the safety, security, nor nurturing for a healthy self to develop."

(3) There was an "anxious and insecure home environment" during Evans's formative years. The household was characterized as "fearful and full of tension between family members," and it was difficult for Evans "to navigate these emotional rapids within the family." Much of this seemed to emanate from marital discord between the parents.

(4) There were episodes of abandonment and extreme neglect by the parents. On one occasion, the mother left home for ten days. The children were not actually abandoned, however, as the father remained in the home to care for them. On another occasion, when Evans and his father went to the beach together, the father left him for a time and Evans became frightened. Evans "has nearly no memories of his father spending quality time with him."

(5) Evans experienced persistent taunting from his peers, apparently because he was small. This, according to Ms. Taylor, "exacerbated his feelings of inferiority, personal shame, alienation, fearfulness, humiliation, and powerlessness."

(6) On one occasion, when Evans was eleven, a man on a delivery truck exposed himself and asked Evans to kiss his penis. Evans escaped without having to perform.

(7) Although Evans's mother described him as a normal and happy child, a childhood friend interviewed by Ms. Taylor described him as sad. When Evans was 10, he took a bottle of Darvon from his mother's medicine cabinet and overdosed on the pills. He was taken to the hospital and recovered from the incident. An aunt recalled Evans looking "depressed." By the time he was in high school, he was on drugs.

(8) Evans sustained several head injuries that, according to Ms. Taylor, created "Risk for Organic Compromise." The

first of these events occurred when, at the time of his birth, a doctor accidentally dropped a scalpel on his head, giving the infant a gash. When he was nine, he fell down the steps and got "a big bump." He also was struck by a car and spent one night in the hospital. Ms. Taylor did not indicate how any of those events created a "Risk for Organic Compromise."

(9) On a number of occasions, Evans witnessed his father "with other women," which Ms. Taylor characterized as "Traumatic Witnessing of Painful Betrayal by Father." There is no indication that Evans ever saw his father engaged in any sexual activity; the only incidents of this kind that he witnessed were seeing his father on one occasion "in the arms of another woman" and on another occasion going into a house with another woman. Ms. Taylor reported several episodes when Evans's mother followed or chased his father in a car and complained about his relationships with other women.

(10) In part because of his father's philandering, Evans had "Unresolved Anger towards Father."

(11) Evans grew up in an impoverished, tough neighborhood. Ms. Taylor refers to that as "Coping through Displaced Rage, Fear and Sadness into a Tough Street Demeanor."

(12) According to Ms. Taylor, Evans was "predisposed both biologically and socially, for developing problems with substance abuse," and by 13 or 14 was using drugs.

(13) Symptoms that Ms. Taylor regarded as "resounding cries for help" by Evans went unnoticed and unattended because his parents were self-absorbed with their own problems.

On the positive side, Ms. Taylor listed as strengths Evans's "Capacity for Compassion and Empathy for Loved Ones"—an "underlying concern and sensitivity to his family's needs and welfare," "Repaired Close Family Relationships with Strong Advocacy for his Children and Grandchildren," and a "Newfound Spiritual Grounding and Therapeutic Strides towards More Healthy Self–Awareness." The greatest part of Ms. Taylor's findings regarding Evans's childhood came from her

conversations with Evans, his parents, and his siblings, who testified at his re-sentencing hearing and simply gave a different account of Evans's childhood. Much of the information regarding Evans's parents, grandparents, uncles, aunts, and cousins came from interviews with various uncles, aunts, and first and second degree cousins.

From some of the same history developed by Ms. Taylor, Dr. Stevenson concluded that "[s]ince he was nine years old, Vernon has continuously met the criteria for Post Traumatic Stress Disorder, Chronic and Severe, Depressive Disorder, and Generalized Anxiety Disorder. He currently meets the criteria for Paranoid Personality Disorder."

Evans claims that the dysfunctional childhood he suffered, as documented in these reports, was far worse than that suffered by Wiggins or Rompilla and that, had this information been developed and presented to the jury at the 1992 re-sentencing hearing, the outcome probably would have been different. The post conviction court was, of course, aware of what had transpired at the re-sentencing hearing. The transcript of that hearing was before the court and various witnesses testified as to what occurred. In considering whether the court abused its discretion in refusing to reopen the 1995 proceeding to allow this attack to proceed, it is important to examine at least the facial validity of Evans's argument.

In *Wiggins,* counsel was aware, from evidence they had, that Wiggins's mother was a chronic alcoholic, that she had left him home alone on occasion, and that, as a child, he had been shuttled among various foster homes. When they lost a motion to bifurcate the sentencing proceeding, to deal first with whether Wiggins was a principal in the first degree and then with mitigation, counsel chose to concentrate on principalship and not present a significant mitigation defense. That was a strategic decision. As a result, they made no further investigation beyond the rather meager evidence they had of Wiggins's childhood. They thus never learned that the mother frequently left him and his siblings home alone, forcing him to beg for food and eat paint chips and garbage, that she was

physically abusive, that she had sex with men while the children slept in the same bed, that she once forced Wiggins's hand against a hot stove burner that led to his hospitalization, that from the age of six he had been shuttled from one foster home to another, that the father in the second foster home repeatedly molested and raped him, that at age 16, he began living on the streets, that, on one occasion, he was gang-raped by a foster mother's sons, and that he was sexually abused as well by a supervisor in a Job Corps program.

The Supreme Court found to be deficient counsel's failure to follow up on the information they had and to make any further investigation into Wiggins's social and emotional history. The Court made clear that *Strickland* does not "require counsel to investigate every conceivable line of mitigating evidence" or "to present mitigating evidence at sentencing in every case," *Wiggins v. Smith, supra,* 539 U.S. at 533, 123 S.Ct. at 2541, 156 L.Ed.2d at 492, but concluded that the supposedly strategic decision by counsel to forego that kind of defense was made without a proper investigation of facts necessary to support that decision and was, for that reason, unreasonable. In that regard, the Court noted that counsel did, in fact, mention to the jury that Wiggins had an unfortunate childhood; the problem was that, because they had failed to make a proper investigation, the defense was a lame one.

With respect to the prejudice prong, the Court found that the mitigating evidence that counsel failed to discover was "powerful." It noted that the "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother" coupled with the "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care" showed "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Id.* at 535, 123 S.Ct. at 2542, 156 L.Ed.2d at 493. The Court found a reasonable probability that a competent attorney, aware of the nature and extent of that abuse, would have not only have offered evidence of it but would have made the mitigation defense a priority.

In *Rompilla*, it was clear that the State intended to offer at sentencing Rompilla's extensive history of felony convictions, as evidence of a propensity to use violence, which was an aggravating factor. Defense counsel, though she had ample opportunity to do so, never looked at the files in those cases, especially the transcript of a prior rape case, and was therefore wholly unprepared to counter or attempt to ameliorate that evidence. The file in the rape case would have revealed evidence of Rompilla's dysfunctional childhood, filled with pervasive domestic violence. Had school and mental health records been obtained, they would have revealed evidence of possible schizophrenia and mental retardation, all of which could have been used in support of a mitigation defense that "bears no relation to the few naked pleas for mercy actually put before the jury." *Rompilla v. Beard, supra,* 545 U.S. at 393, 125 S.Ct. at 2469, 162 L.Ed.2d at 379. None of that evidence was presented to the jury.

In this case, evidence presented during the 1995 post conviction proceeding indicated that Evans wanted counsel at the re-sentencing proceeding to concentrate on showing that he was not the shooter. If that defense proved successful, there could be no death penalty and therefore no need for mitigation evidence. The problem was that Evans had already been convicted twice of the two homicides—first in Federal court, then in Worcester County—and, given the evidence, counsel had little hope of succeeding on that issue. Ms. Chester, lead counsel at the re-sentencing hearing, stated that, as a result, they intended to present a strong mitigation case and, unless the State's case on principalship fell apart, not contest that issue too strongly. In a way, it was an opposite approach to that taken in *Wiggins*.

That, indeed, was their focus; they *did* present a mitigation defense. In opening statement, counsel described mitigation not as a justification for the killings, but as a reason not to impose the death penalty. The mitigation, she indicated, would center on two things: first, that, if given life imprisonment, it was unlikely that Evans, even though rehabilitated and then free of drug addiction, would ever be released and

therefore would never be a further danger to society; and second, that he grew up in a caring, loving family, but that, in his early teens, he drifted into and became consumed by drugs, turned away from his family, and got into the clutches of Grandison. It was *that,* from which he had since recovered, that led to the tragic murders. That argument was based on what Evans himself said and was corroborated by the testimony of his parents and his siblings, both at the initial sentencing in 1984 and at the re-sentencing in 1992.

At the 1984 proceeding, Evans's father said that the relationship in the home "was normally as any boy would be, up until [Evans] reached maybe seventeen," when the father discovered that Evans had a drug problem. The father said that he tried to talk with and counsel his son, and when that did not work, he spoke to a judge, who recommended a treatment program. The father got Evans into the program and felt that it had "done him some good." The father said that "we were always able to talk, talk over problems. He would always tell me about his problems." At some point, he discovered that Evans was seeking support from a friend of the father who worked in a drug program. The father acknowledged *current* tension in the family but attributed it to what Evans had done:

> "My family. Well, my youngest child, *up until this happened,* she was doing fine. She is married and is living with her husband, but *now she has a problem because of this.* All times of the night she calls me and I have to go and counsel with her, try to solve some problems for her. My ex-wife is the same. We seek help through her minister. My other daughters, I have to counsel with them, trying to explain the best I can. We still don't know why."

(Emphasis added).

The father added that the family is a close one—that Evans had a very good relationship with his own children. He said that he loved his son but felt that "somewhere along the line he's let [us] down."

Evans's mother gave very similar testimony. She said that Evans had a very close relationship with his sisters and with her and that imposition of the death sentence would have a devastating effect on her, on Evans's father, and on his sisters.

Gwendolyn Spence, Evans's sister, a high school graduate with one year of college at the time, was employed as an administrative assistant at a health center. When asked about her relationship with Evans while growing up, she responded that "he was just like any typical brother"—that "a lot of times we just looked up to him for the right thing to do" and that "[h]e was always there for us to ask." She said that they had a very close relationship, that Evans was "a lot of comfort to me, and he still is." Spence said that she learned of her brother's drug problem around 1978–79 and tried to help him get into a program. Crystal Wilson and Linda Trusty, also younger sisters who were successful in life, corroborated Ms. Spence's testimony. They too said that they had a very good relationship with Evans, both growing up and currently.

Gwendolyn Geter, a childhood friend who mothered three of Evans's seven children, testified that Evans "was the type of person that he always wanted to be a father, and he always wanted to have fatherly love and understanding with kids" and that he had a wonderful relationship with his children. Felicia Bell, who mothered another child of Evans, gave similar testimony, about the close relationship he had with that child.

None of these witnesses—parents, siblings, girlfriends—alluded to any serious discord in the family; none of them spoke of any physical or psychological abuse by the father or the mother, none of them said anything about the father's supposed philandering. Evans did not testify, but he did allocute. He made no claim of family turmoil. Indeed, he said that he had been protecting his family all his life, and "I love my mother, my father, my children very much." He acknowledged that, by age 14 or 15 he began abusing drugs, although his parents did not find out until a few years later.

Evans's parents and sisters gave much the same testimony at the 1992 re-sentencing. There, too, the emphasis was on

mitigation, in the form that Evans's problems stemmed from his significant drug abuse, commencing when he was thirteen or fourteen, and that, since the murders, he had conquered that devil and was a different person. When the father testified, the rest of the family was in court listening. He said that "[f]rom day one until I would say about age thirteen, fourteen, he was my dreams of a son and he fell in line with all of the other of my kids. . . . We were very close." Things began to change when Evans was about thirteen, when Evans began using drugs and detached himself from the family. Evans's mother described an almost idyllic early family life, showing photographs of the family together. She described trips they took, how proud they were at Evans's early academic achievements, the college plans they had for him, how things began to change and how her husband was "trying to really get him on the right track." She stated that, by the time they became aware that Evans was missing school "it was too late for us to do anything about it." Evans's three sisters also testified, much as they did in 1984, only in some more detail. Again, none of them alluded to any family turmoil, any abuse, any philandering by the father.

As in 1984, Evans chose to allocute. He began by acknowledging:

"It has been nine years since I have been involved in this hideous crime. *My family was not to blame, for Lord knows, I have shamed them. I know this because of the tears I have seen them shed.*"

(Emphasis added).

In his allocution, Evans blamed everything on his descent into drug abuse, and he averred that he was now rid of that curse: "I didn't just continue the lifestyle of drugs and associate myself with individuals that didn't want to excel. I rid myself of the one thing that allowed others to use me. I became drug-free. I began to profit as a human being."

Ms. Taylor's and Dr. Stevenson's recitation of all of the supposed discord and dysfunction in Evans's nuclear family came primarily from the very people who, on two occasions,

testified under oath (or allocuted) to precisely the opposite—Evans himself and his parents and sisters. Twenty-one years after testifying in the first proceeding and thirteen years after testifying in the second, they have now presented to a social worker employed by new counsel an entirely different, and contradictory, version of their family life. The notion that, if asked, they would have explained all of this to defense counsel in 1984 or 1992, is belied by the testimony and allocution they actually gave at those times.

This is not pre-existing, reliable, undiscovered evidence that would have supported a credible mitigation defense, as was the case in *Wiggins* and *Rompilla.* It is a dramatically different story told, for the most part, by the very witnesses presented by counsel at the two sentencing proceedings, including Evans himself. If this new story were to be repeated by the parents and sisters to a new jury, the cross-examination would be nothing short of devastating. We find no abuse of discretion in the court's refusal to reopen the 1995 post conviction proceeding.

## III. NO. 123

■ The question presented by Evans in No. 123 is whether the Circuit Court erred—*i.e.,* abused its discretion—in denying his third motion to reopen the 1995 post conviction proceeding, to consider his claim "that racial and geographic bias in the Maryland death penalty system, including race-based selective prosecution in Baltimore County, coupled with specific evidence of race discrimination in Evans's own case, makes his sentence unconstitutional." Evans makes two arguments: (1) that studies conducted by Raymond Paternoster, a professor in the Department of Criminology and Criminal Justice at the University of Maryland, demonstrate an unconstitutional scheme of selective prosecution on the part of the State's Attorney for Baltimore County; and (2) that it shows as well that the death penalty is implemented throughout the State in a racially and geographically biased and arbitrary manner, in violation of Federal and State Constitutional guar-

antees of equal protection of the law and against arbitrary enforcement.

In addressing the issue, we first must detach from it the wholly unfounded averment that there is any "specific evidence of race discrimination in Evans's own case," for there is no such evidence. In Evans's last appeal, *Evans v. State, supra*, 389 Md. 456, 464–65, 886 A.2d 562, 566, he presented essentially the same argument he presents here, based on the first (2003) version of a statistical study conducted by Dr. Paternoster. That study, Statewide in scope, established, according to Evans, a pattern of racial and geographic discrimination in the implementation of the death penalty in Maryland. After noting that Dr. Paternoster, at a public legislative hearing, had disavowed any suggestion that his Study established racial discrimination in any particular case, we observed:

"Apart from what Evans chose to draw from the statistics compiled by Professor Paternoster, there is *nothing* in the record of this case to indicate that (1) the State's Attorney, in seeking and pursuing the death penalty against Evans, was in any way influenced by the fact that Evans is an African–American or that his victims were white, (2) any ruling by any judge presiding at any proceeding in the case was in any way influenced by those factors, or (3) any juror who sat in the case and voted to impose the death penalty was in any way influenced by those factors. Thus, not only has Dr. Paternoster disavowed any suggestion that his Study establishes racial discrimination on the part of anyone in any particular case, but, after 21 years of opportunity to investigate with respect to the first proceeding and 13 years of opportunity to investigate with respect to the second, Evans has been unable to show that any such discrimination was at work in *this* case."

(Emphasis in original).

In this appeal, Evans claims there *was* some evidence of discrimination. He points to four things—(1) his own affidavit dated December 1, 2005, (2) a similarly dated affidavit from a

co-inmate, (3) an affidavit dated November 30, 2005 from a minister who visited Evans in prison, and (4) Evans's conclusion that the prosecutor exercised peremptory challenges in a racially discriminatory manner—the *Batson* claim. As we have held, the *Batson* claim has been presented at least twice to this Court and once to the U.S. District Court and the U.S. Court of Appeals for the Fourth Circuit and properly found by all three courts to be without any merit. It does *not* establish any racial discrimination on the State's part in this case.

The three affidavits are not even relevant, much less persuasive. In his own affidavit, Evans claims, for the first time in 22 years, that, upon his arrest, he was taken to an F.B.I. office where an unknown officer, identified only by the fact that he was wearing a black training suit, said to him, "it's alright for you to kill each other but when you start killing whites in this country you are going to burn." Evans does not indicate whether this officer was an F.B.I. agent or a State or local police officer, and he fails even to suggest, much less establish, that any State prosecutor who made or participated in the decision to seek the death penalty against Evans, either in 1983 or in 1992, ever heard or became aware of the statement (prior to the filing of his affidavit) or was influenced in any way by what this unknown officer said in the confines of an F.B.I. office. His affidavit states that there were "four or five law enforcement officers in the room with me." He does not indicate that any prosecutor was present.

The other two affidavits are no better. Edward Withers stated that he knew Evans from serving time at the Maryland Penitentiary in 1984–85. During that time, Evans related to Withers the comment supposedly made by the unknown officer at the time of Evans's arrest. Withers adds that, while he and Evans were sitting on some bleachers, "a correctional officer made a racist comment to Mr. Evans." How that may have affected the prosecutor's decision to seek the death penalty against Evans is not explained. The affidavit of Rev. James McEachim asserts that, in 2002, while visiting Evans in prison, Evans recited to him the comment supposedly made by the unknown officer at the time of Evans's arrest. Evans told

him as well, McEachim adds, that the officer had used the word "nigger," something that Evans, in his own affidavit, fails to mention.

This assertedly new evidence, which, if it happened, Evans knew about in 1983, is grossly insufficient to show any racial discrimination affecting the prosecutor's decision to seek the death penalty. The record remains precisely as we characterized it last year: "Evans has been unable to show that any such discrimination was at work in *this* case."

██ The question then is whether the 2003 Paternoster Study, enhanced by a 2004 special Baltimore County supplement, suffices on its own to have required the Circuit Court, as a matter of law, to reopen the 1995 post conviction proceeding in order to permit discovery on this issue. The answer is "no."

Some historical perspective is helpful. The death penalty law that had long been in existence in Maryland was invalidated in 1972 by *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and *Bartholomey v. State,* 267 Md. 175, 297 A.2d 696 (1972). The law under which, with occasional amendments, we now operate was enacted in 1978. That law, in accordance with requirements mandated in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), applies a "guided discretion" approach.

██ As pertinent here, a person is not eligible at all for the death penalty unless he or she (1) committed a first degree murder, (2) was a principal in the first degree in that murder—the actual killer or the person who paid the actual killer to commit the murder, (3) was eighteen or over when the murder was committed, and (4) at the time of the murder was not mentally retarded, as defined in the statute. Even if those criteria apply, the defendant may not receive the death penalty unless the State (1) is able to prove, beyond a reasonable doubt, the existence of one or more of ten aggravating factors set forth in CL § 2–303(g), (2) has given timely written

notice to the defendant of (i) its intention to seek the death penalty and (ii) each aggravating factor upon which it intends to rely, and (3) is able to prove, by a preponderance of the evidence, that the aggravating factor(s) it proves beyond a reasonable doubt outweigh any mitigating factors that any juror (or the judge, if, at the defendant's option, sentencing is imposed by a judge) may find by a preponderance of the evidence to exist.

■■■ Subject to those legal conditions and, of course, to any Constitutional ones that may apply, the State's Attorneys retain the broad discretion they have historically enjoyed in determining which cases to prosecute, which offenses to charge, and how to prosecute the cases they bring. *See Brack v. Wells,* 184 Md. 86, 40 A.2d 319 (1944); *Murphy v. Yates,* 276 Md. 475, 348 A.2d 837 (1975); *Evans v. State, supra,* 304 Md. at 503, n. 4, 499 A.2d at 1269, n. 4. In any case that is legally eligible for the death penalty, they are generally free to seek, or not seek, that penalty, and to pursue or abandon their quest for the death penalty as the case proceeds.

The first formal study of the implementation of Maryland's death penalty involved the pre-*Furman* law and was conducted in 1962 by a committee of the Legislative Council. *See Report on Capital Punishment,* Legislative Council Committee on Capital Punishment (October 3, 1962). The committee examined the 122 death sentences that had been imposed between 1936 and 1961. At the time, the death penalty was available for both murder and rape.

During the 25–year study period, 122 persons had been sentenced to death, 71 for murder and 51 for rape. Twenty were still on death row when the study ended. Of the 102 others, 57 had been executed, 36 for murder and 21 for rape; the remaining 45 had either been given new trials, had their sentences commuted or, in two cases, committed suicide. The committee noted then both a racial and geographic disparity in the imposition of death sentences. Baltimore City, which during the 1930's and 1940's contained about half the State's population, was responsible for 59 of the 122 death sentences

and 24 of the 57 executions. Anne Arundel County was second with 12 death sentences and four executions, followed by Dorchester and Montgomery Counties, with eight death sentences each, and Baltimore County, with seven death sentences.

Three other pertinent findings were made by the Legislative Council Committee. First, in the great majority of the 122 death sentences, the defendant and victim were strangers (60% of the murder cases and all but three of the 51 rape cases), indicating that "strangerhood" was an important factor in the decision to seek the death penalty. Second, there was a disproportionate number of African Americans who received the death sentence and were executed. Eighty percent of the 122 defendants were black, and 50% of the black defendants sentenced to death were executed, whereas 40% of the white defendants sentenced to death were executed. Finally, the greatest proportion of persons sentenced to death and executed were laborers, farm hands, truck drivers, and cannery workers; none of the defendants occupied positions of wealth or influence in society.

The issue of geographic proportionality under the 1978 law came before this Court in *Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). At the time, the Court was required to determine, in any appeal involving a death sentence, whether the sentence was "excessive or disproportionate to the penalty imposed in similar cases...." *See* former Md.Code (1987 Repl.Vol.), Art. 27, § 414(e)(4). Calhoun, who was tried, convicted, and given the death sentence in Montgomery County, complained that the death penalty statute was unconstitutional because of the "unbridled exercise of discretion" by prosecutors. The record in that case, summarized in a dissent filed by Judge Davidson in *Tichnell v. State*, 297 Md. 432, 496–97, 468 A.2d 1, 33–34 (1983), showed both a "substantial variation, ranging from 1.8% to 100%, in the percentage of cases in which the death penalty is sought, depending upon the identity of the prosecutor making the determination" and "in the standards employed by prosecutors in deciding in which cases

to seek the death penalty." *Id.* As examples, in six counties, prosecutors sought the death penalty "whenever a single aggravating circumstance is present and mitigating circumstances are not taken into account," whereas in Baltimore City and six other counties, prosecutors considered mitigating circumstances in making that decision. *Id.* In five counties, prosecutors took into account the relationship between the accused and the victim, whereas in three they did not.

In response to Calhoun's complaint about how prosecutorial discretion was exercised, we held that "[a]bsent any *specific evidence* of indiscretion by prosecutors resulting in irrational, inconsistent, or discriminatory application of the death penalty statute, Calhoun's claim cannot stand." *Calhoun v. State, supra,* 297 Md. at 605, 468 A.2d at 64. (Emphasis added). We have never abandoned that standard.

In 1987, the Public Defender's Office, which handled, and continues to handle, the great majority of death penalty cases under the 1978 law, examined the 1,461 homicide cases that, by then, had arisen since 1978. Applying the statutory criteria, the Public Defender found 415 of those cases to qualify for the death penalty. Formal notices of intent to seek the death penalty had been filed in 190, of which 90 had actually proceeded to the penalty phase (14 of the 90 were re-sentencing proceedings following a reversal by this Court). A total of 40 death sentences were actually imposed. Because of re-sentencings ordered on appeal, seven defendants accounted for 17 of those sentences; seven others who had been sentenced to death had their sentences either commuted or stricken on appeal.

The first and most critical finding by the Public Defender was the predominant influence of plea bargaining. Sixty-one defendants entered guilty pleas in return for withdrawal of the notice, and another 42 pled guilty in return for a commitment not to file the notice in the first instance. Of the 17 persons then on death row, twelve were African American and five were white. Eleven of the seventeen committed their crimes in Baltimore County. Neither Baltimore City nor any other

county had more than one inmate on death row. *See Capital Punishment in Maryland 1978–87: A Report by the Maryland Public Defender on the Administration of Capital Punishment,* 21–23 (1987).

The geographic disparity trumpeted in the Paternoster study was reported as well by the Public Defender, at a time more relevant to Evans's case. It was noted that Baltimore City filed death penalty notices in 10% of qualified cases, whereas Baltimore County filed such notices in 56.5% of qualified cases, and that, notwithstanding that the City accounted for nearly four times as many death penalty-eligible murders as the county, in absolute terms, the county conducted more than twice as many penalty phases as the City. Even then, Baltimore County "where fewer than one in nine death eligible murders are committed, has sentenced more people to death than all other jurisdictions combined." *Id.* at 26. Prince George's County, in which 18% of death penalty-eligible murders occurred, filed far more death penalty notices than Baltimore County (49 vs. 26), but it withdrew 34 of them and was apparently unsuccessful in obtaining or defending death sentences in the other 15 cases.

The Public Defender also commented on racial proportionality. He acknowledged that the concern about racial discrimination had "focused less upon the race of the offender than upon the race of the victim" and that statistical studies conducted in some of the southern States that allegedly confirmed such discrimination had been found by the Supreme Court in *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) to be insufficient to establish unconstitutional discrimination.

Like Dr. Paternoster, the Public Defender identified the various steps at which decisions can be made regarding the death penalty—the decision to seek it by sending a formal notice, the decision not to withdraw it (either unilaterally or in connection with a plea agreement), and the sentencing.[2] He

---

2. Dr. Paternoster split the third decision-making point into two—the decision by the prosecutor to proceed with the penalty phase and the

reported that, although murders involving white victims represented 42.6% of all cases eligible for the death penalty State-wide, those cases accounted for 65.2% of the death penalty notices, and that, as a result, "it is 2.18 times more likely that a death penalty notice will be filed in a case involving the murder of a white person than in a case involving the murder of a black person." *Capital Punishment in Maryland 1978–87, supra,* at 30. A similar disparity was observed at the second stage: 40.2% of the notices were withdrawn in cases involving a white victim, but in cases involving a black victim, 72.2% of the notices were withdrawn. Thus, "it [was] 2.15 times more likely that a filed death penalty notice will be withdrawn where the murder victim was black than where the murder victim was white." *Id.* at 30.

From these statistics, the Public Defender concluded:

"In all, prosecutors seek the death penalty . . . in 31.7% (64 of 202) of all cases involving white victims and in 6.8% (15 of 221) of all cases involving black victims. There is, therefore, a 4.7 times greater numerical probability that the prosecutor will seek the death penalty in a case involving a white victim than in a case involving a black victim."

*Id.* at 31.

A similar disparity was evident as well with respect to the actual sentencing. The death penalty was imposed in 35.9% of all cases involving a white victim and in 20.0% of cases involving a black victim. Thus, "[t]here is a 1.80 times greater numerical probability that a capital sentencer will impose the death penalty in a case involving a white victim than in a case involving a black victim." Although the Public Defender acknowledged that he had not subjected the data to the "sophisticated statistical analysis" that was the subject of the *McCleskey* case, he asserted that, from the raw data alone, "no factor or group of factors remotely bears so strong a

---

decision by the jury or judge whether to impose the death sentence. If the issue is selective prosecution, the prosecutor's decision to proceed would seem to be the more relevant.

numerical correlation with capital sentencing results as does the race of the victim." *Id.* at 32.

In December, 1992, Governor Schaefer created a special Commission to conduct a comprehensive review of the administration of the death penalty in Maryland. The focus of the Commission was not just on racial or geographical disparity, but it did comment on those matters. Finding No. 9 was that "[c]apital prosecutions under Maryland's 1978 death penalty statute are distributed among the State's twenty-four charging jurisdictions in a numerically uneven fashion." *The Report of the Governor's Commission on the Death Penalty*, at xix and 198 (November, 1993). From 1978 to 1993, fifty-seven death sentences had been imposed (41 initial impositions and 16 at re-sentencing), of which 22 came from Baltimore County, five each from Baltimore City and Prince George's County, and two from Harford County. No other county had more than one. *Id.* at 91. As the record revealed in *Calhoun v. State, supra*, the standards for determining when to pursue the death penalty in a case eligible for that penalty varied significantly from county to county. Some prosecutors considered possible mitigating circumstances, others did not; some looked at the likelihood of success, others did not; some weighed the frustration emanating from the process, most did not.

Finding No. 10 was that "[t]here is no evidence of intentional discrimination in the implementation of the death penalty in Maryland, but racial disparities in its implementation remain a matter of legitimate concern." *Id.* at xix-xx and 201. In its Commentary to that finding, the Commission, though noting that the data had not been subjected to the type of statistical analysis necessary to determine whether numerical discrepancies were statistically significant, concluded that the data it had neither established nor disproved discrimination against African American defendants or in favor of white victims.

In light of the concern expressed over racial disparity, Governor Glendening created another Task Force in 1996 to "determine the causes of racial disparity in the administration of the death penalty in Maryland." *Report of Task Force on*

*the Fair Imposition of Capital Punishment* (Executive Summary) (December, 1996). The Task Force gathered statistics on the racial breakdown of persons on death row and surveyed national literature dealing with racial disparity in capital sentencing. It concluded that "the high percentage of African–American prisoners under sentence of death and [ ] the low percentage of prisoners under sentence of death whose victims were African–American remains a cause for concern." *Id.* at 39. The potential for prejudice existed, the Task Force opined, because minorities were often under-represented in those positions whose incumbents make decisions regarding the capital punishment process. *Id.* at 41.

There was no finding by the Task Force that any death penalty-eligible defendant in particular had been the subject of racial discrimination, either directly or by reason of the race of his victim.

In 2001, yet another study was made, this one by Professors David Baldus and George Woodworth, of the University of Iowa. Dr. Baldus had made similar studies in several southern States, and, indeed, it was his study of the Georgia death penalty that was at issue in *McCleskey v. Kemp, supra.* Baldus and Woodworth examined 346 Maryland first degree murder cases in which the State had served notice of intention to seek the death penalty and found that, even when considering the number of statutory aggravating factors charged, defendants who killed white persons were more likely to advance to the penalty phase and receive the death sentence than those whose victim was African American. David Baldus and George Woodworth, *Race of Victim and Race of Defendant Disparities in the Administration of Maryland's Capital Charging and Sentencing System (1979–1996): Preliminary Finding* (2001).

Even before the Baldus study was completed, Governor Glendening placed in the FY 2000 budget $225,000 for a further study—the fifth in 13 years—of racial disparity in the administration of the death penalty. 2000 Md. Laws, ch. 204, at 1166. Professor Raymond Paternoster, who had participat-

ed in the 1996 Task Force evaluation, was appointed by the Governor to conduct the new study. The report of that study, *An Empirical Analysis of Maryland's Death Sentencing System with Respect to the Influence of Race and Legal Jurisdiction,* is itself undated but, according to a press release issued by the University of Maryland, was completed in January, 2003.

Following the approach of the other studies, Dr. Paternoster identified four key decision points in the death penalty sentencing system: the decision to issue a notice of intention; the decision not to retract that notice as the case proceeded; whether the case actually reached the penalty phase; and whether the death sentence was imposed. His statistical analysis began with approximately 6,000 first and second degree murders committed in Maryland from August, 1978 to September, 1999, of which he concluded 1,311 were death-penalty eligible, either because the State's Attorney, by filing a formal notice of intent to seek the death penalty, determined that they were death eligible, or because, in the view of the researchers or, in close cases, the view of a panel of prosecutors and defense attorneys, the case met the legal criteria for seeking the death penalty.[3] Prosecutors filed notices in 353(27%) of those cases, but in 140 of them subsequently withdrew the notice, usually in connection with a plea agreement. Of the 213 remaining cases, 180 actually proceeded to a penalty phase, but only 76 resulted in a death sentence. Paternoster gives a number of reasons for a case not proceed-

---

**3.** The actual composition of these panels, which reviewed about 300 cases, is not entirely clear. The Report speaks of "a panel of attorneys who had some experience in death penalty cases" that was put together by "the senior researcher" after consultation with one prosecutor and one public defender, and states that it consisted of a roughly equal number of State's Attorneys, public defenders, and private lawyers who had previously handled death penalty cases. *Id.* at 16. It appears that the actual cases to be reviewed were submitted to sub-panels of from five to ten attorneys, but the composition of those sub-panels is not indicated. A case for which no notice had been filed was included as death penalty eligible if a majority of the sub-panel (possibly three out of five) rated the case as such and were "at least moderately confident in making that assessment." *Id.* at 17.

ing to the penalty phase—the prosecutor concludes that a death sentence is unlikely or, during the guilt phase, no aggravators were found or the defendant was found not to be a principal in the first degree. *Id.* at 17. The conditional probability of a death sentence in a death eligible case was only 5.8% for all defendants.

The data showed that white offenders comprised 24% of the pool of death eligible cases; black offenders comprised 74% of that pool and offenders of other races 2%. Of the notices of intention filed by prosecutors, 34% were filed against white offenders, 65% against black offenders. Thus, the report concludes, "[t]he probability that a death notification will be filed given a death eligible case is .24 for black offenders, and .37 for non-black offenders (over 90% of whom are white)." *Id.* at 21. It adds that, "[a]t each subsequent stage of the process there are no significant differences in the handling of black offenders and non-black offender cases." *Id.*[4] Even after the data was adjusted to take account of 123 factors that he concluded might be relevant in a prosecutor's decision to seek and pursue the death penalty, Dr. Paternoster made the definitive finding that "[l]ooking across the different decision points, *there is no evidence that the race of the defendant matters at any stage once case characteristics are controlled for.*" *Id.* at 31. (Emphasis in original).

With this finding, which supports the conclusion that the decision to seek and pursue the death penalty against Evans was *not* based on *his* race, the only possible relevance of the Study lies in its examination of whether the race of the *victim(s)* influenced those decisions. In that regard, Dr. Paternoster concluded that white victims comprised 45% of all death eligible cases,[5] 65% of death eligible cases in which an

---

**4.** Curiously, in the preceding sentence, Paternoster states, inconsistently, that "[a]t this first decision point, then, *non-white* offenders are significantly more likely to have a death notice filed against them than *black* offenders." (Emphasis added). We assume that this sentence is a mistake, one of several apparent on the face of the Report.

**5.** There is another obvious error in the articulation of that statistic. The Report actually states that "[w]hite *offenders* comprise approxi-

intention to seek the death penalty was filed, 74% of the cases in which that notice was not withdrawn, 77% of the cases that advanced to the penalty phase, and 80% of the death sentences actually imposed. Based on the raw, unadjusted data, he concluded that the probability that a prosecutor will file a notice in a death eligible case was 43% when there is at least one white victim but only 19% when there are no white victims, that there was a 70% probability that the notice will not be withdrawn in white victim cases but only 46% in non-white victim cases, and there was an 88% probability of a white victim case advancing to the penalty phase and a 75% probability in a non-white victim case. Those disparities he found to be statistically significant.[6] Dr. Paternoster posits that this data "suggest[s] that the race of the victim appears to matter at least in the early stages of the capital punishment system." *Id.* at 22. His conclusions, from the unadjusted analysis are:

(1) White offenders are more likely to be death notified than non-white offenders;

(2) Offenders who kill at least one white victim are more likely to be death-notified, more likely to have that notice "stick," and more likely to proceed to a penalty phase than cases without a white victim;

(3) White offenders who kill whites are more likely to be death-notified than others;

(4) Black offenders who kill blacks are less likely to be death-notified and have that notice "stick" than others;

---

mately 45% of all death eligible cases." *Id.* at 22. (Emphasis added). The source for that statement—Figure 3—deals with *victims*, not offenders, and that is the focus of the discussion in the paragraph.

6. In categorizing cases based on race of victim, Paternoster includes in the "white" column every case in which there was a white victim, even if there were also in that case one or more black victims. *Id.* at Table 3A. He gives no reason why a case in which there were both white and black victims should be regarded exclusively as a white victim case, does not indicate how many such cases there were, if any, and does not indicate whether or how any conclusions drawn from the data might be affected if a different categorization had been used.

(5) Black offenders who kill whites are more likely to be death-notified and have that notice "stick"; and

(6) There is substantial and significant variation in the way State's Attorneys in Maryland make the decision to file a notice of intent to seek the death penalty and whether that notice is withdrawn.

Following the lead of Dr. Baldus, Dr. Paternoster recognized that there were many factors other than race that influenced the decision to seek, pursue, and obtain the death penalty. Baldus had identified over 200 such "covariates." Paternoster whittled them down to 123, including the ten statutory aggravators. *Id.* at Table 9. Some of those covariates seem, at least facially, to be duplicative.[7] It is also of interest that there is no covariate for the circumstance in which a defendant had been sentenced to death and, like Evans and many others, had been awarded a new sentencing hearing on appeal or by reason of a successful collateral attack. Those cases seem to be part of the general mix, with no consideration given to whether the prosecutor seeks reimposition of the death penalty principally because the State was successful in getting it the first time and the case has been remanded specifically to give the State another opportunity— whether, in other words, race of the victim or the offender plays any role at all in those decisions. There may be an explanation for the omission of that circumstance, which has affected many, if not most, of the defendants given the death sentence since 1978, including Evans, but the Report does not contain one.

---

7. Factor No. 5 is that defendant has a history of alcohol abuse. Factor No. 6 is that defendant has a history of drug abuse. Factor No. 26 is that defendant has history of drug or alcohol use/abuse. Factor No. 7 is that defendant has history of mental illness/emotional problems. Factor No. 25 is that defendant has history of mental illness/emotional problems. Factor 15 is that defendant was physically abused as a child. Factor 20 is that defendant has history of physical abuse as a child. Factor 16 is that defendant was sexually abused as a child. Factor 21 is that defendant has history of sexual abuse as a child. Different "Mean/Proportion" numbers are given for each of these seemingly duplicative factors.

Because of a lack of information on some of the covariates in some cases, Dr. Paternoster excluded those cases, which reduced the pool from 1,311 to 1,202. He did not regard that 8% exclusion as statistically significant. He reduced the pool further to 1,061, however, to eliminate cases in which information was missing either as to the race of the defendant or the victim, and he *did* regard *that* reduction as "an important but unavoidable weakness of this study," adding that "[r]eaders of this report must bear in mind that analyses involving victim race and the intersection of victim and offender race have disproportionately eliminated death eligible cases that were not death noticed." *Id.* at 28.

After applying in some fashion the 123 "covariates" to the 1,061 cases, Dr. Paternoster concluded that there were both geographic and racial disparities in the decision to seek and pursue the death penalty which, in his view, could not be explained by the various covariates. In terms of geography, the probability of the death penalty being sought and pursued was much greater in Baltimore County than in any of the other 23 jurisdictions. *Id.* at 29–31. As to race of victim, Dr. Paternoster concluded that the adjusted data confirmed the unadjusted data, that "killers of white victims were significantly more likely to be death noticed, [and] to have that death notification 'stick,'" but, for some reason, "does not hold up . . . at the decision of the state's attorney to advance a case to a penalty trial." *Id.* at 32–33. That conclusion, Paternoster opined, remained constant when the race of the offender was considered. Thus, he found that black offenders who kill white victims were at greater risk even after case characteristics and the jurisdiction were considered. *Id.* at 36.

In the concluding part of his Report, Dr. Paternoster made clear that the geographic and racial disparities he found exerted their greatest influence at the death notice and notice retraction points and were not exacerbated when the case actually proceeded to the penalty phase. He acknowledged three limitations or weaknesses in the Report. The first, already noted, arose from the fact that "there were significant quantities of missing data on the race of some victims," that

those cases "were disproportionately lost at the notice decision," and that "some of the most important effects estimated in the study revolved around the death notice decision." *Id.* at 40. A second weakness, he said, was "the inability to hold statutory aggravating factors constant at the notice decision," as prosecutors were not required to identify aggravating factors unless they issued a notice of intention to seek the death penalty. *Id.* Finally, he emphasized that he had not addressed whether "the statewide results estimated here hold equally for all counties." *Id.*

Within a week after this Report was issued, Dr. Paternoster appeared before the Senate Judicial Proceedings Committee, where he was questioned about some of his methodology and conclusions. He summarized his conclusions thusly: "[S]o, the lesson that we took away from this was that the race of the offender did not matter; the race of the victim mattered pretty substantially; and the county or jurisdiction where the crime occurred probably mattered most of all."

When asked whether he had an opinion as to why there was a greater risk of a death penalty in cases with white victims, he acknowledged that the results of the study did not mean that prosecutors were acting in a prejudicial fashion but suggested that the phenomenon could result from the fact that, nationally and presumably in Maryland, white people support the death penalty more than non-whites, that the families of white victims might push prosecutors to seek the death penalty more frequently than the families of non-white victims, and that, if prosecutors were responding to pressure from the families, "that could produce the effects we're observing right now without any reference to racial prejudice or racial animus." He added "*I would like to make it especially clear that these results do not mean that anyone is behaving in a racially discriminatory manner because I think there are other explanations for that.*" (Emphasis added).

In February, 2004, Dr. Paternoster released a supplement to his 2003 Report dealing specifically with Baltimore County. *See The Administration of the Death Penalty in Baltimore*

*County, Maryland 1978–1999.* Unlike the 2003 Report, which was written in a fairly understandable narrative, the description of the logistic regression analysis from which the ultimate conclusions are derived in the 2004 Report is highly technical. Dr. Paternoster identified 152 death-eligible cases in Baltimore County during the study period. The county prosecutor sought the death penalty in 99 of those cases (65%), which was the highest rate in the State. Of the 99 cases, 75 (49% of death eligible cases) proceeded to a penalty phase, and a death penalty was imposed in 34 (23%).

The raw data showed that non-white offenders comprised 55% of the 152 death-eligible killings (83 non-white/69 white), 59% of the 99 cases in which the prosecutor sought the death penalty (58 non-white/41 white), 60% of the 75 cases that proceeded to a penalty phase (45 non-white/30 white), and 71% of the 34 cases in which a death penalty was imposed (24 non-white/10 white).[8] Based on those numbers, Dr. Paternoster indicated that black offenders were "slightly over represented in the Baltimore County capital punishment system when compared with their representation in the universe of death eligible cases." *Id.* at 4. The data regarding race of the victim showed that there was at least one white victim in 79% of the 152 death eligible cases (120 white/32 non-white), 81% of the 99 cases in which an intention to seek the death penalty was filed (80 white/19 non-white), 83% of the 75 cases that proceeded to a penalty phase (62 white/13 non-white), and 88% of the 34 death sentences imposed (30 white/4 non-white). Notwithstanding that 55% of the death eligible cases involved non-white offenders and 79% involved a white victim, the Study reports that blacks who killed whites accounted for only 37% of all death eligible cases, 42% of death notices, 44% of cases advancing to the penalty stage, and 41% of actual death sentences. *Id.* at 5, 6. Similar to the conclusions drawn as to race of offender alone, Dr. Paternoster estimated from this

---

8. The Report does not give actual numbers, only percentages. The numbers are estimated from the percentages.

data that cases involving blacks killing whites "are *slightly over represented* at each decision making point in the capital punishment process." *Id.* at 5. (Emphasis added).

Noting that the county prosecutor did frequently exercise her discretion in deciding whether to issue a death penalty notice, Dr. Paternoster reported that there was "preliminary evidence" that her discretion "might be influenced by the race of the offender and victim in the case," although he does not indicate what that evidence might be. *Id.* at 6. He added that "[i]t is possible that any observed racial effect is not due to race at all but to legitimate case characteristics that are merely correlated with race." *Id.* at 6, 7. The report then launches into a highly technical "bivariate logistic regression analysis" involving a "logistic regression coefficient" and an "odds multiplier." [9] The results of this analysis appear in 21 tables, each containing a logistic regression coefficient, an odds multiplier, a constant, and a "–2 Log Likelihood," the derivation of which are unexplained. Presumably, the relevant factor is the –2 Log Likelihood, which is reported for

---

**9.** Dr. Paternoster explains the analysis, as it relates to the decision to file a death penalty notice, this way:

"The sign of the logistic regression coefficient for the race of the offender is negative. Since the race of the offender is coded '0' for black offenders and '1' for white offenders, this negative sign of the logistic regression coefficient (b) indicates that white offenders are less likely to have the Baltimore County state's attorney file a notification to seek a death sentence than are black offenders. The magnitude of the logistic regression coefficient tells us that the log of the odds that a white offender will have a death notification filed against them is –.449 less than for black offenders. A coefficient of 0 would tell us that there is no relationship between the race of the offender and the decision of the Baltimore County state's attorney to file a notification to seek death. Our observed coefficient of –.449 is zero, indicating that there is some relationship between the race of the offender and the decision to seek a death sentence. The odds multiplier tells us that the odds of a death notification is reduced by a factor of .639 if a white rather than a black offender is involved. Since no relationship between race of offender and death notification is indicated by a factor of 1.0, the odds multiplier of .639 further suggests that the decision of the Baltimore County state's attorney to file a death notification is modestly affected by the race of the offender."

race of offender, race of victim, and race of offender and victim models. Table 1 is illustrative:

Table 1: Logistic Regression Results for Bivariate Race of Offender Model on the <u>Decision to File a Notification to Seek a Death Sentence</u>

| Variable | b | Odds Multiplier |
|---|---|---|
| Race of Offender | -.449 | .639 |
| Constant | .842 | |

-2 Log Likelihood 191.916.

Converting this data through what he described as a "very simple formula," Dr. Paternoster determined that "the probability that the Baltimore County state's attorney will file a notification to seek death in a white offender case is .70 while the probability for a black offender case is .60," and that "[t]his shows quite clearly that there is a greater tendency for the Baltimore County state's attorney to file a notification to seek a death sentence in a black offender case rather than one involving a white offender." *Id.* at 9. The "simple formula" is as follows:

$$\hat{p} = \frac{e^{\beta_0 + \beta_1 x_1}}{1 + e^{\beta_0 + \beta_1 x_1}}$$

Dr. Paternoster defines the terms as follows: "$\beta_0$ is the estimated value of the constant, $\beta_1$ is the estimated logistic regression coefficient for the explanatory variable, and $x_1$ is a given value of the independent variable."

Evans argues that this supplemental analysis shows that "even after controlling for case characteristics, the Baltimore County State's Attorney's Office has, over the past 21 years, engaged in racial discrimination in selecting cases for capital prosecution." It does no such thing and has never been asserted by Dr. Paternoster to present or document such an accusation. The only conclusion drawn by Dr. Paternoster is that, based solely on his statistical analysis, black offenders who slay white victims in Baltimore County are:

"1. more likely to have the state's attorney file a notification to seek a death sentence

2. less likely to have an initial death notification withdrawn
3. more likely to have their case advance to a penalty trial
4. more likely to be sentenced to death than death eligible crimes involving all other racial combinations."

*Id.* at 30.

There have been numerous studies of post-*Furman* death penalty cases that purport to examine and demonstrate the effect of race on the imposition of the death penalty, beginning as early as 1976. In 1990, the U.S. General Accounting Office (GAO) examined many of those studies. *See* UNITED STATES GENERAL ACCOUNTING OFFICE, DEATH PENALTY SENTENCING, Report to Senate and House Committees on the Judiciary (1990). After excluding studies based on pre-*Furman* data and those that were either duplicative or that did not contain empirical data, GAO looked at 28 studies and rated about half as low quality and half as of either medium or high quality. *Id.* at 2, 3. After noting three methodological limitations affecting some of the studies—the threat of sample selection bias, omitted variables, and small sample sizes—GAO reported that 82% of the studies indicated that defendants who murdered whites were more likely to be sentenced to death than those who murdered blacks. That conclusion, drawn from several varieties of statistical analysis, was confirmed in 15 studies conducted in the 1990's and at least 15 more published since 2000. *See* Jon Sorensen, *et al., Empirical Studies on Race and Death Penalty Sentencing: A Decade After the GAO Report,* 37 CRIM. L. BULL. 395 (2001); David Baldus and George Woodworth, *Race Discrimination in the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post–1990 Research,* 41 CRIM. L. BULL. 6 (April 2005).

These studies have used a number of statistical methods, ranging from simplistic ones that made no attempt to evaluate the severity of the crime, to those that attempted to classify severity of the crime by considering whether the defendant was a deliberate killer, the status of the victim, and the heinousness of the killing, to the logistical regression tech-

niques developed by Baldus and used by Paternoster. *See Bryan Edelman*, RACIAL PREJUDICE, JUROR EMPATHY, AND SENTENCING IN DEATH PENALTY CASES, 22–25 (LBF Scholarly Publishing LLC, 2006); Baldus, *et al., Monitoring and Evaluating Contemporary Death Sentencing Systems: Lessons from Georgia*, 18 U.C. DAVIS L.REV. 1375, 1381–82 (1985).

In 1987, the relevance and impact of this kind of statistical analysis came before the Supreme Court in *McCleskey v. Kemp, supra*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262. McCleskey, a black man, was convicted in a Georgia court of murdering a white police officer during the commission of a robbery and was sentenced to death. In a Federal habeas corpus action, he claimed, based solely on a logistical regression analysis by Dr. Baldus of the implementation of the death penalty in Georgia and not on any specific evidence in his own case, that he was discriminated against by reason of his race and that of the victim.

The District Court conducted an evidentiary hearing, exhaustively examined the Baldus study, and rejected it as unpersuasive because of numerous faults, including the subjective nature of the coding for the presence of variables, the treatment of certain unknown variables, the potentially faulty assumption that all of the information available to the coders was available to the prosecutors or sentencing bodies at the time their respective decisions were made, and the potential that unaccounted for variables could explain the outcome. The court found that the data base used by Baldus had substantial flaws and had not been shown to be trustworthy, that none of the models used by him were sufficiently predictive to support an inference of discrimination, and that the presence of multi-colinearity—positive coefficients for race of victim and race of defendant—substantially diminished the weight to be accorded to the circumstantial statistical evidence of racial disparity. *See McCleskey v. Zant*, 580 F.Supp. 338, 356–64 (N.D.Ga.1984). On appeal, the U.S. Court of Appeals for the Eleventh Circuit, sitting *en banc*, affirmed the District Court's ruling, on the ground that, even assuming the validity of the research (which the District Court found wanting), it

still did not support a decision that Georgia law was being unconstitutionally applied. *McCleskey v. Kemp*, 753 F.2d 877, 886–87 (11th Cir.1985).

In affirming, the Supreme Court used essentially the same approach as that used by the Court of Appeals—that the Baldus study, even if statistically valid, was insufficient to establish unlawful racial discrimination. Dealing first with McCleskey's equal protection argument, the Court noted that, although it had accepted statistics as proof of intent to discriminate in "certain limited contexts," the nature of the capital sentencing decision and the relationship of statistics to that decision are different from those contexts. *McCleskey v. Kemp, supra,* 481 U.S. at 294, 107 S.Ct. at 1768, 95 L.Ed.2d at 279. As to the sentencing decision itself, it is made by a jury selected from a properly constituted venire, each jury is unique, and the jury's decision rests on innumerable factors that vary. Another distinction noted by the Court is that, unlike venire selection and Title VII cases, the State has no practical opportunity to explain the statistical disparity and should not be required to do so:

> "Similarly, the policy considerations behind a prosecutor's traditionally 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, 'often years after they were made.' [citation omitted]. Moreover, absent far stronger proof, it is unnecessary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty."

*Id.* at 296–97, 107 S.Ct. at 1769, 95 L.Ed.2d at 281.

The Court also observed that McCleskey's statistical proffer had to be viewed in the context of the challenge—an attack on decisions at the heart of the criminal justice system, the implementation of which "necessarily requires discretionary judgments." *Id.* at 297, 107 S.Ct. at 1770, 95 L.Ed.2d at 281. The Court continued:

"Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused. The unique nature of the decisions at issue in this case also counsels against adopting such an inference from the disparities indicated by the Baldus study. Accordingly, we hold that the Baldus study is clearly insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with discriminatory purpose."

*Id.*[10]

Essentially the same reasoning was used to reject McCleskey's argument that the racial disparities revealed by the Baldus Study caused the death penalty to be arbitrary in its application and to violate the Eighth Amendment for that reason. The Court observed, as we have with respect to Dr. Paternoster, that even Dr. Baldus did not contend that his statistics proved that race was a factor in McCleskey's, or any other particular, case. Apparent discrepancies in sentencing, the Court noted, "are an inevitable part of our criminal justice system," and that the discrepancy indicated by the Baldus study was "a far cry" from the systemic defects identified in *Furman. McCleskey v. Kemp, supra,* 481 U.S. at 312–13, 107 S.Ct. at 1778, 95 L.Ed.2d at 291–92. It continued:

"Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is

---

**10.** The *McCleskey* Court noted that the Baldus study divided cases into eight different ranges according to the estimated aggravation level of the offense and that, in his testimony in the District Court, Dr. Baldus observed that the effects of racial bias were most striking in the midrange cases. His actual testimony, quoted by the Supreme Court, was: "[W]hen the cases become tremendously aggravated so that everybody would agree that if we're going to have a death sentence, these are the cases that should get it, *the race effects go away.* It's only in the mid-range of cases where the decision-makers have a real choice as to what to do." *Id.* at 287, n. 5, 107 S.Ct. at 1764, n. 5, 95 L.Ed.2d 275, n. 5 (Emphasis added). Dr. Baldus has continued to acknowledge that fact. *See* David Baldus and George Woodworth, *Race Discrimination in the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post–1990 Research, supra,* 41 CRIM L. BULL. 6.

unexplained is invidious. In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process."

*Id.* at 313, 107 S.Ct. at 1778, 95 L.Ed.2d at 292.[11]

Apparently realizing that *McCleskey* is of little help with respect to the main Paternoster Study, Evans, seizing on a comment included in a footnote in *McCleskey,* urges that the Baltimore County supplement would pass muster under that case. In distinguishing venire selection and Title VII cases from selective prosecution claims, the *McCleskey* Court observed that in the former cases, the statistics referred to fewer entities and that fewer variables were relevant. In a footnote, the Court acknowledged that an unexplained statistical discrepancy can be said to indicate a consistent policy of one decision-maker, but that it was much more difficult to deduce a consistent policy by studying the decisions of many unique entities. *Id.* at 295, n. 15, 107 S.Ct. at 1768, n. 15, 95 L.Ed.2d at 280, n. 15. As decisions whether to prosecute and what to charge "necessarily are individualized and involve

---

**11.** Although that is the critical holding, the *McCleskey* Court pointed out two other considerations that "inform[ed]" its decision. The first was the slippery slope of McCleskey's argument—that if the Court accepted the claim that racial bias had impermissibly tainted the capital sentencing decision, it would not only be faced with similar claims as to other types of penalty but with respect to unexplained disparities relating to other minority groups, other actors in the criminal justice process, or other arbitrary variables, such as attractiveness of the defendant or victim. The Court concluded: "there is no limiting principle to the type of challenge brought by McCleskey. The Constitution does not require that a State eliminate any demonstrable disparity that correlates with a potentially irrelevant factor in order to operate a criminal justice system that includes capital punishment." *Id.* at 318–19, 107 S.Ct. at 1781, 95 L.Ed.2d at 295. Second, the Court noted that McCleskey's arguments "are best presented to the legislative bodies" as "[i]t is not the responsibility—or indeed even the right—of this Court to determine the appropriate punishment for particular crimes." *Id.* at 319, 107 S.Ct. at 1781, 95 L.Ed.2d at 296.

infinite factual variations," coordination among prosecutors across a State would be meaningless, thereby making inferences from Statewide statistics "of doubtful relevance." *Id.*

The Baltimore County supplement, Evans urges, overcomes that concern and demonstrates consistent racial discrimination on the part of one prosecutor. At the very least, he claims, *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) mandates his entitlement to discovery on his selective prosecution claim. *Armstrong* provides no such mandate.

In *Armstrong*, the defendants, all African American, were indicted in Federal court for conspiracy to possess with intent to distribute more than 50 grams of crack cocaine and conspiracy to distribute that substance. They moved for discovery or to dismiss the indictment on the ground that they were selectively chosen for Federal prosecution because they were black. In support of their motion, they offered an affidavit from a "Paralegal Specialist" employed by the Public Defender, who asserted, with documentation, that, in every one of the 24 cases involving those charges closed by the Public Defender's Office in 1991, the defendant(s) were black. Over the Government's objection, the District Court granted the discovery motion and ordered the Government to produce certain information regarding all cases in the past three years in which it had charged both cocaine and firearm offenses, including its criteria for deciding to prosecute those cases.

When the Government refused to comply with that order, the court dismissed the indictment and the Ninth Circuit Court of Appeals affirmed. The Supreme Court reversed. The Supreme Court dealt first with whether the defendants were entitled to the discovery under Fed. Rule Crim. Proc. 16(a)(1)(C). It concluded that they were not, and that ruling does not concern us here. With respect to the broader attack, based on equal protection under the Fifth Amendment, the Court observed that its cases delineating the necessary elements to prove a claim of selective prosecution "have taken great pains to explain that the standard is a demanding one"

and that "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463–64, 116 S.Ct. at 1486, 134 L.Ed.2d at 698. The Court emphasized the broad discretion that prosecutors have in deciding which cases to prosecute and what charges to bring, that there is a presumption of "regularity" in how they exercise that discretion, and that, "[i]n order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.' " *Id.* at 465, 116 S.Ct. at 1486, 134 L.Ed.2d at 698, quoting in part from *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131, 143 (1926).

To establish a selective prosecution claim, the Court held, the claimant must demonstrate that the prosecutorial policy " 'had a discriminatory effect and that it was motivated by a discriminatory purpose,' " *id.* at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699, quoting from *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556 (1985), and to establish a discriminatory effect in a race case, *"the claimant must show that similarly situated individuals of a different race were not prosecuted." United States v. Armstrong, supra,* 517 U.S. at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699. (Emphasis added). In that regard, the Court emphasized a contrast in two of its earlier cases—*Ah Sin v. Wittman,* 198 U.S. 500, 25 S.Ct. 756, 49 L.Ed. 1142 (1905), and *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In *Ah Sin,* the Court had rejected the claim by a Chinese defendant that the law under which he was prosecuted was enforced solely against Chinese people because it did not allege that there were non-Chinese people against whom it could have been but was not enforced. In *Yick Wo,* the Court granted relief on a claim that an ordinance prohibiting the operation of a laundry in a wooden building had been enforced against 200 Chinese individuals whose applications for permits had been denied but that 80 non-Chinese applicants had been granted permits.

The Court expressly rejected Armstrong's argument that cases such as *Batson, supra,* and *Hunter v. Underwood,* 471

U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) cut against "any absolute requirement that there be a showing of failure to prosecute similarly situated individuals." *United States v. Armstrong, supra,* 517 U.S. at 467, 116 S.Ct. at 1487, 134 L.Ed.2d at 700. The Court noted that, in *Hunter,* where it had invalidated a law disenfranchising persons who had been convicted of crimes involving moral turpitude, there was direct evidence that the law had been enacted for the purpose of disenfranchising blacks and "indisputable evidence" that it had the desired effect.

Because of the significant costs to the Government to provide the kind of discovery likely to be required—assembling documents from its files that might support or rebut the defendant's claim, diverting resources, disclosing prosecutorial strategy—the Court held that the justifications for a rigorous standard for the elements of a selective prosecution claim "require a correspondingly rigorous standard for discovery in aid of such a claim." *United States v. Armstrong, supra,* 517 U.S. at 468, 116 S.Ct. at 1488, 134 L.Ed.2d at 701. That requires "some evidence of differential treatment of similarly situated members of other races or protected classes." *Id.* at 470, 116 S.Ct. at 1489, 134 L.Ed.2d at 702. The study offered by Armstrong did not constitute evidence sufficient to show the essential elements of a selective prosecution claim, in that it "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not prosecuted." *Id.*

*Armstrong* was not a death penalty case, did not involve a statistical analysis approaching that done by Dr. Paternoster, and did not permit discovery on the issue. We fail to see how it mandates the relief Evans seeks. A case more on point, and more pointedly dooming Evans's claim, is *Belmontes v. Brown,* 414 F.3d 1094 (9th Cir.2005), *rev'd on other grounds sub nom. Ayers v. Belmontes,* —— U.S. ——, 127 S.Ct. 469, 166 L.Ed.2d 334 (2006), which Evans has failed even to mention, much less attempt to distinguish.

*Belmontes* was a Federal habeas corpus action arising from a conviction and death sentence imposed in State court. Among other complaints, Belmontes contended, as does Evans, that the decision to pursue the death penalty was infected by racial discrimination against defendants who killed white victims, and in support of that charge, he produced a statistical study of death eligible homicides in the county where he was prosecuted. The study was similar in methodology and conclusions to the Baltimore County supplement prepared by Dr. Paternoster. Citing *Armstrong,* the Ninth Circuit Court held that, to succeed in a selective prosecution claim, Belmontes needed to show both a discriminatory effect and that the decision-makers in his case acted with a discriminatory purpose—that the prosecutor in his case pursued a death sentence because of the race of his victim.

Belmontes offered no direct evidence on that issue but relied entirely on the statistical study. The court found it unnecessary to determine whether a statistical analysis alone could suffice because, in response to the motion, the prosecutor stated that, when he decided to pursue a death sentence against Belmontes, he had reason to believe that Belmontes had committed another murder as well and that there was evidence in the record to provide a good faith basis for that belief. Thus, the court held, "there appears to be a legitimate race-neutral reason for a prosecutor to seek a death sentence in this particular case, and therefore sufficient evidence to rebut the inference of discrimination raised by Belmontes' statistical study." *Id.* at 1129. The racial discrimination claim was denied.

In considering the force of *Armstrong* and, indeed, Evans's entire argument grounded on the Paternoster studies, we must recall from our discussion of the *Wiggins* issue the context in which the issue arises. *Armstrong* was a direct appeal from the dismissal of a criminal indictment, and at issue was the validity of that dismissal; *Belmontes* was a Federal habeas corpus action, an action of right. That is certainly not the case here. The issue is not whether a lower court erred as a matter of law in rejecting the statistical

evidence offered by Evans, but only whether it abused its discretion in denying his third motion to reopen the 1995 post conviction case to allow this new claim to be presented, in the hope that, if allowed to rummage through the prosecutor's files in more than 150 other cases, he might find some evidence of racial discrimination.

In resolving that issue, notwithstanding what appear to be some significant weaknesses and omissions in both the 2003 study and the 2004 Baltimore County supplement, some admitted by Dr. Paternoster, others that are seemingly apparent and unexplained, we shall accept, for purposes of this appeal, that they show a greater likelihood that, in a death penalty eligible case arising in Baltimore County, the death penalty is *statistically* more likely to be pursued against a black person who murders a white victim than against a defendant in any other racial combination. For the reasons already stated, we note that the statistical studies are the *only* evidence of racial discrimination on the part of the Baltimore County prosecutor offered by Evans—that there is *no* other evidence that the race of the offender or of the victim(s) played any role whatever in the prosecutor's decision to pursue the death penalty against Evans, either in 1983 or in 1992.

The disparities supposedly demonstrated by the Paternoster Study and the Baltimore County supplement have been in the public domain for nearly twenty years. They are not new. The statistical methodology has been refined over time, but the conclusions drawn from it have remained fairly constant, at least since the Public Defender's study in 1987. This issue could have been raised by Evans in his first post conviction case in 1990, at his re-sentencing in 1992, in his second post conviction case in 1995, in his first Federal habeas corpus action in 1997, in his second petition for Federal habeas corpus in 2000, in his first motion to reopen the 1995 post conviction case in 1999, and in his second motion to reopen that case in 2001. Instead, he has chosen to wait 22 years from his first sentencing and 14 years from his second until the eleventh hour, as the date and time for executing the sentence were imminent, to raise this issue and demand the right to search

through all of the 152 death eligible cases arising in Baltimore County since 1978 to see if he could find some clue as to why the State's Attorney chose to seek or not seek the death penalty in each of those cases and, if he found what he regarded as a suspicious fact, to examine or cross-examine the prosecutor with respect to her decision in any or all of those cases.

Apart from this deliberate withholding of a claim that could well have been presented on several earlier occasions, he has failed to show, from any of the statistical evidence, that there was any other person similarly situated to himself against whom the death penalty was not sought because the victim was black—who, in Baltimore County, had, for hire, murdered two people in order to prevent them from testifying in a pending criminal case. We have already taken judicial notice, on at least three occasions, that "[t]he murders giving rise to this prosecution were as heinous as those in any case to come before us under the present capital punishment statute. No killings could have been more premeditated and deliberate than those here." *Evans v. State, supra,* 304 Md. 487, 539, 499 A.2d 1261, 1288; *Evans v. State, supra,* 389 Md. 456, 461–62, 886 A.2d 562, 565; *Grandison v. State,* 305 Md. 685, 750, 506 A.2d 580, 613 (1986), *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). It would seem rather fruitless to require, as a matter of law, that a post conviction case that was concluded nine years ago be reopened so that the prosecutor could confirm the obvious, that if there was ever a case for the death penalty, it was Evans's—the cold commercial aspect, the brutality, firing nineteen bullets close range at two people, and the fact that it struck at the very heart of our criminal justice system, murdering witnesses to prevent them from testifying in a pending criminal case. *See Belmontes v. Brown, supra.* We recall the point made in the Baldus study and commented on in *McCleskey*—that, in the extreme case, where "everybody would agree that if we're going to have a death sentence, these are the cases that should get it, the race factors go away."

As noted, apart from his selective prosecution complaint, Evans argues that the 2003 Paternoster study shows that the imposition of the death penalty throughout Maryland operates in a racially and geographically biased manner. This type of attack is directly addressed by *McCleskey*, and Evans offers no support for a rejection of the reasoning employed there.

Since *McCleskey*, no court has allowed a claim of this kind. The courts accept the reasoning in *McCleskey* concerning the failure of general statistics to establish a statewide Equal Protection or Cruel and Unusual Punishment violation and instead require a defendant to assert some specific discriminatory intent in their case. *Lee v. State*, 327 Ark. 692, 942 S.W.2d 231, 237 (1997); *Cochran v. State*, 547 So.2d 928, 930 (Fla.1989); *Jones v. State*, 263 Ga. 904, 440 S.E.2d 161, 163 (1994), *cert. denied*, 513 U.S. 853, 115 S.Ct. 154, 130 L.Ed.2d 93 (1994); *People v. Britz*, 123 Ill.2d 446, 124 Ill.Dec. 15, 528 N.E.2d 703, 718–19 (1988), *cert. denied*, 489 U.S. 1044, 109 S.Ct. 1100, 103 L.Ed.2d 242 (1989); *Underwood v. State*, 708 So.2d 18, 37–38 (Miss.1998); *State v. Taylor*, 929 S.W.2d 209, 221 (Mo.1996) (en banc), *cert. denied*, 519 U.S. 1152, 117 S.Ct. 1088, 137 L.Ed.2d 222 (1997); *State v. Reeves*, 258 Neb. 511, 604 N.W.2d 151, 160–61 (2000); *Lane v. State*, 110 Nev. 1156, 881 P.2d 1358, 1363 (1994), *vacated on other grounds*, 114 Nev. 299, 956 P.2d 88 (1998); *People v. Hale*, 173 Misc.2d 140, 661 N.Y.S.2d 457, 467 (N.Y.Sup.Ct.1997); *State v. Byrd*, 32 Ohio St.3d 79, 512 N.E.2d 611, 619 (1987), *cert. denied*, 484 U.S. 1037, 108 S.Ct. 763, 98 L.Ed.2d 780 (1988); *Commonwealth v. Marshall*, 570 Pa. 545, 810 A.2d 1211, 1228 (2002) (rejecting argument based on statistics because "Appellant has failed to provide any link between the findings of this statistical abstract and his particular case"), *cert. denied*, 540 U.S. 833, 124 S.Ct. 81, 157 L.Ed.2d 61 (2003); *State v. Evans*, 838 S.W.2d 185, 196 (Tenn.1992), *cert. denied*, 510 U.S. 1064, 114 S.Ct. 740, 126 L.Ed.2d 702 (1994); *Bell v. State*, 938 S.W.2d 35, 51–52 (Tex.Cr.App.1996) (rejecting Equal Protection argument based on statistics "[b]ecause appellant fails to direct us to any proof of purposeful prosecutorial or jury discrimination in his particular case" and rejecting Cruel and Unusual Punishment

challenge), *cert. denied,* 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997); *Turner v. Commonwealth,* 234 Va. 543, 364 S.E.2d 483, 490 (1988), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988); *In re Davis,* 152 Wash.2d 647, 101 P.3d 1, 58 (2004) (general statistics insufficient to render death penalty unconstitutional). This reasoning holds true for asserted geographic disparities as well. *See State v. Hairston,* 133 Idaho 496, 988 P.2d 1170, 1192 (1999) (rejecting claim based solely on statistical study demonstrating that state's death penalty is applied significantly more often in urban counties), *cert. denied,* 529 U.S. 1134, 120 S.Ct. 2014, 146 L.Ed.2d 963 (2000).[12]

The result in Maryland should be no different than the consensus around the country. In *Calhoun v. State, supra,* 297 Md. 563, 468 A.2d 45, we rejected Calhoun's arguments that the Maryland Death Penalty Statute violated the Eighth and Fourteenth Amendments of the U.S. Constitution and Articles 16 and 25 of the Maryland Declaration of Rights by its lack of standards governing the prosecutor's exercise of discretion in whether to seek the death penalty. The Court held:

---

12. Only one state has even come close to allowing a general statistical study showing disparate racial impact in the administration of the death penalty to establish a general constitutional violation. In *State v. Marshall,* 130 N.J. 109, 613 A.2d 1059, 1110 (1992), *cert. denied,* 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993), the Court expressed a willingness to contradict *McCleskey* based on the New Jersey Constitution, saying that "were we to believe that the race of the victim and race of the defendant played a significant part in capital-sentencing decisions in New Jersey, we would seek corrective measures, and if that failed we could not, consistent with our State's policy, tolerate discrimination that threatened the foundation of our system of law." However, New Jersey has yet to encounter proof of such systematic discrimination. In *State v. Loftin,* 157 N.J. 253, 724 A.2d 129 (1999), the court reaffirmed its general statement from *Marshall* but rejected statistics similar to those involved in this case for various reasons pointed out by their Special Master, finding that the defendant "has not 'relentlessly document[ed] the risk' of racial disparity in the imposition of the death penalty" as would be required to invalidate the penalty under the state constitution. *Id.* at 160, quoting *State v. Marshall, supra,* 613 A.2d at 1111–12.

"Absent any specific evidence of indiscretion by prosecutors resulting in an irrational, inconsistent, or discriminatory application of the death penalty statute, Calhoun's claim cannot stand. To the extent that there is a difference in the practice of the various State's attorneys around the State, our proportionality review would be intended to assure that the death penalty is not imposed in a disproportionate manner."

*Id.* at 605, 468 A.2d at 64. *See also Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980) (upholding constitutionality of the Maryland Death Penalty Statute on its face).

 Finally, Evans contends in this regard that, even if his complaint does not pass muster under the Eighth and Fourteenth Amendments to the Federal Constitution, it does under Articles 16, 24, and 25 of the Maryland Declaration of Rights. We have consistently construed those provisions as being *in pari materia* with their Federal counterparts and are not convinced that they should be read more broadly (or narrowly) in this context. We hold that the Circuit Court did not abuse its discretion in denying Evans's third motion to reopen the 1995 post conviction case and the judgment in No. 123 will be affirmed.

## IV. NO. 122

 Unlike the claims previously addressed, No. 122 arises from an independent action in the Circuit Court for Baltimore City filed by Evans and three other plaintiffs, in which they sought to enjoin the Division of Correction (DOC) from carrying out lethal injections under its existing protocols. The appeal is from the denial of their request for a temporary restraining order. Because a temporary restraining order is in the nature of an injunction, such an appeal, though from an interlocutory order, is permitted under Maryland Code, § 12–303(3)(iii) of the Cts. & Jud. Proc. Article (CJP). Two complaints are made about the DOC protocols: first, that they are inconsistent with Maryland Code, § 3–905(a) of the Correctional Services Article (CS), which prescribes the method of

execution by lethal injection; and second, that they constitute a regulation that was not adopted in conformance with procedural requirements of the State Administrative Procedure Act (APA).[13]

## A. Standing

■ The State's first response to these complaints is that we should not address them because (1) the co-plaintiff organizations have no standing to raise them, and (2) Evans failed to exhaust available administrative remedies and, under both the Prisoner Litigation Act (Maryland Code, CJP §§ 5–1001 through 5–1007) and traditional administrative law, he is precluded from challenging the execution protocols through a direct judicial action for declaratory and injunctive relief. We agree with the State that the three organizations have no standing on their own to pursue the litigation, but we shall consider the challenge made by Evans.

We have long held to the view that, under Maryland common law principles, "for an organization to have standing to bring a judicial action, it must ordinarily have a 'property interest of its own—separate and distinct from that of its individual members' " and that "an individual or an organization 'has no standing in court unless he has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public.' " *Medical Waste v. Maryland Waste,* 327 Md. 596, 612–13, 612 A.2d 241, 249 (1992), quoting in part from *Citizens P. & H. Ass'n v. County Exec.,* 273 Md. 333, 345, 329 A.2d 681, 687 (1974) and *Rogers v. Md.-Nat'l Cap. P. & P. Comm'n,* 253 Md. 687, 691,

---

**13.** Although in his brief, Evans captions his argument as being that the execution protocol violates the APA and the statute "and creates a grave risk that an inmate will be inadequately sedated and suffer an excruciating death," his counsel conceded at oral argument that he was *not* making an argument that the execution protocol constituted a cruel and unusual punishment, under either the State or Federal Constitution. Counsel stated that such an argument had been made in a pending action in Federal court. We shall therefore regard any cruel and unusual punishment claim as having been knowingly and voluntarily waived with respect to this appeal.

253 A.2d 713, 715 (1969). *See,* more recently, *Duckworth v. Deane,* 393 Md. 524, 903 A.2d 883 (2006), and compare *Teachers Union v. State Board of Education,* 379 Md. 192, 199, 840 A.2d 728, 732 (2004), confirming that principle but finding that the organization in question *did* suffer that special damage necessary to provide standing.

In this case, the only asserted basis for standing on the part of the three organizations is that they all oppose capital punishment and desire to see that the death penalty is not carried out—at all, but especially in violation of law. In the complaint, the NAACP asserted that it works to eliminate racial prejudice and has long opposed the death penalty and, in particular, the disproportionate impact of the death penalty on African–American criminal defendants. The ACLU averred that it works to ensure that all people in the State of Maryland are free to think and speak as they choose and that it continues to oppose capital punishment on moral, practical, and constitutional grounds. The third organization, CASE, posited that it is a coalition of groups and individuals united to end the death penalty in Maryland. All three organizations claimed that they had an interest in seeing that State officials operate within the boundaries of the law and ensuring that executions are not carried out in violation of the Constitution and Maryland law.

The mere fact that an individual or group is opposed to a particular public policy does not confer standing to challenge that policy in court. If it were otherwise—if any person or group disenchanted with some public policy but not adversely affected by it in some special way were free to seek a judicial declaration that the policy is invalid—the courts, rather than the legislative branch, would end up setting public policy, and that is *not* the proper role of the Judiciary. The interest asserted by the organizations—ensuring that State officials operate legally and that executions are not carried out unlawfully—is no different than the interest of all Maryland citizens. The three organizations have not alleged, and presumably cannot legitimately allege, that they will suffer any

special damage or injury if the current execution protocols adopted by the DOC are implemented, and, consequently, they have no standing on their own to challenge those protocols.

█ The situation with Evans is different and requires some contextual explanation. We are dealing here with three agencies—the Department of Public Safety and Correctional Services (DPSCS), which is a principal department of the Executive Branch of the State Government, the DOC, which is a unit within DPSCS vested with responsibility over the State correctional facilities, and the Inmate Grievance Office (IGO), a unit that is also within DPSCS and that was created to address certain complaints and grievances on the part of individuals confined in a DOC facility.

█ In 1997, the General Assembly enacted the Prisoner Litigation Act (PLA) in order to complement the Federal Prison Litigation Reform Act (42 U.S.C. § 1997e), enacted by Congress a year earlier. CJP § 5–1003(a) provides that "[a] prisoner may not maintain a civil action until the prisoner has fully exhausted all administrative remedies for resolving the complaint or grievance." Section 5–1003(b) requires the prisoner to attach to the initial complaint "proof that administrative remedies have been exhausted," including proof that the prisoner filed a complaint or grievance with the appropriate agency, proof of the administrative disposition of the complaint or grievance, and proof that the prisoner appealed the administrative disposition to the appropriate authority, including proof of judicial review. Evans is undisputedly a "prisoner," as that term is defined in CJP § 5–1001(g)—"a person who is in the custody of the [DPSCS]. . . ." It is also undisputed that he failed to attach to his complaint in No. 122 any proof that he had exhausted any administrative remedy.

Maryland Code, CS §§ 10–201 through 10–210, create the IGO and permit an individual confined in a DOC correctional facility who has a grievance against an official or employee of the DOC to submit a complaint to the IGO within the time and in the manner required by regulations adopted by the IGO. Section 10–206(b) provides, however, that, if the DOC has a

grievance procedure applicable to the particular grievance and the IGO considers that procedure to be reasonable and fair, IGO, by regulation, may require that the DOC procedure be exhausted before submission of a complaint to the IGO. The IGO has, indeed, adopted regulations governing those matters. COMAR 12.07.01.03D provides that, to the extent that a DOC administrative remedy procedure applies to a particular grievance, the inmate must exhaust that procedure before submitting the grievance to the IGO. COMAR 12.07.01.06A. and B. require that a grievance be filed with the IGO "within 30 days from the date of the occurrence being grieved, or within 30 days after the grievant knew or should have known of the occurrence" and that an appeal from the DOC administrative remedy procedure be filed within 30 days from the grievant's receipt of a response from the Commissioner of Correction or within 30 days of the date the Commissioner's response was due.

DOC has adopted an administrative remedy procedure for the adjustment of certain inmate grievances. At the times relevant to this case, it was set forth in DOC Directives 185–101 through 185–700. The procedure was declared to be applicable to grievances related to "institutional policies and procedures." Directive 185–101 (effective February 1, 2001) required a prisoner to submit a Request for Administrative Remedy to the warden within 15 days from the date "the incident or complaint occurred" or from the date the inmate first gained knowledge "of the incident." Under the ensuing Directives in the 185 series, the warden was required to respond to the request within 30 days, and the prisoner was then required to appeal an unfavorable response from the warden to the Commissioner of Corrections within 10 days after receipt of the response. The Commissioner, whose decision was final for purposes of the DOC procedure, had 30 days to respond. The next step was a complaint to the IGO.

On November 21, 2005, this Court decided *Massey v. Secretary, Dept. of Public Safety and Correctional Services*, 389 Md. 496, 886 A.2d 585 (2005), where we reviewed various Directives adopted either by the Secretary of DPSCS pursu-

ant to CS § 2–109 or the Commissioner of Correction pursuant to CS § 3–205. The prisoner, Massey, had sought administrative review, pursuant to DOC Directive 185–100, of discipline meted out pursuant to DPSCS Directives 105–4 and 105–5 adopted by the Secretary of DPSCS, claiming that the Secretary's Directives were not valid because they constituted regulations under the APA that had not been adopted in conformance with the requirements of that Act. We agreed with Massey that the Secretary's Directives constituted regulations under the APA, that they had not been adopted in conformance with the statutory requirements, and that they were therefore ineffective. We delayed the issuance of our mandate in that case for 120 days in order to give the Secretary an opportunity to pursue the statutory requirements.

Although the DOC Directive 185 series was implicated in *Massey*, our ruling did not deal with those Directives, but only with the Secretary's Directives. On December 9, 2005, Evans filed a request for administrative remedy with the appropriate warden, contending that the DOC execution protocols were unlawful for a variety of reasons, including that they constituted regulations that had not been validly adopted. He thus made the same argument as to the DOC protocols that Massey had made with respect to the Secretary's Directives. The warden denied the request on January 3, 2006, and on January 9, Evans filed an appeal to the Commissioner. Without waiting for the Commissioner's response, he and the three organizations, on January 20, 2006, filed this action for declaratory and injunctive relief, raising the same issues presented in the administrative proceeding. On February 1, 2006, the court denied Evans's request for a temporary restraining order and preliminary injunction, from which this appeal was taken. No final judgment has been entered in the matter; the case remains pending in the Circuit Court.

On February 27, 2006—after the Circuit Court entered its order denying temporary injunctive relief—the Commissioner rejected Evans's administrative appeal, whereupon, on March 13, 2006, Evans appealed to the IGO. On June 2, 2006, an

Administrative Law Judge, acting for the IGO, concluded that the execution protocols were not inconsistent with CS § 3–905 but that portions of them were ineffective because they had not been adopted in conformance with the APA. On June 27, the Secretary of DPSCS rejected the latter determination and concluded that the Execution Operations Manual (EOM) that specifies the lethal mixture and the manner of its injection— the procedures challenged by Evans—"is not a regulation requiring adoption pursuant to the APA rule-making provisions." That determination, embodied in the Secretary's Order, constitutes the final administrative ruling in the matter. On July 26, 2006, Evans filed a petition for judicial review of the adverse rulings in the Circuit Court for Baltimore City.

As noted, the PLA was enacted in response to the Federal Prison Litigation Reform Act. That Act—42 U.S.C. § 1997e(a)—provides that no action may be brought "with respect to prison conditions" under 42 U.S.C. § 1983 or any other Federal law by a prisoner confined in any correctional facility "until such administrative remedies as are available are exhausted." Although § 1997e does not define the term "prison conditions," some Federal courts have looked to 18 U.S.C. § 3626, which deals with the kinds of remedies available in civil actions with respect to prison conditions. Section 3626(g)(2) defines "civil action with respect to prison conditions" as meaning "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions of government officials on the lives of persons confined in prison," other than habeas corpus proceedings challenging the fact or duration of confinement in prison. *See Freeman v. Francis*, 196 F.3d 641 (6th Cir.1999); *Treesh v. Taft*, 122 F.Supp.2d 887 (S.D.Ohio 2000).

In the limited time that the Federal Act has been in effect, the Federal courts have construed the term "with respect to prison conditions" very broadly, to include claims of excessive force, harassment, failure to provide qualified interpreters at disciplinary hearings, indifference to medical needs, failure to protect a prisoner from other prisoners, failure to

comply with the Americans With Disabilities Act, and denial of First Amendment rights. *See,* for example, *Larkin v. Galloway,* 266 F.3d 718 (7th Cir.2001), *cert. denied,* 535 U.S. 992, 122 S.Ct. 1551, 152 L.Ed.2d 475 (2002) (excessive force), *Johnson v. Litscher,* 260 F.3d 826 (7th Cir.2001) (harassment), *Castano v. Nebraska Dept. of Corrections,* 201 F.3d 1023 (8th Cir.2000), *cert. denied,* 531 U.S. 913, 121 S.Ct. 266, 148 L.Ed.2d 193 (2000) (failure to provide interpreter); *Witzke v. Femal,* 376 F.3d 744 (7th Cir.2004) (medical conditions); *Brady v. Attygala,* 196 F.Supp.2d 1016 (C.D.Cal.2002) (failure to protect), *Carrasquillo v. City of New York,* 324 F.Supp.2d 428 (S.D.N.Y.2004) (ADA violation), *Treesh v. Taft, supra,* 122 F.Supp.2d 887 (denial of condemned inmate's right to make last statement prior to execution). We are aware of no case, however, and none has been cited to us, in which the term has been held to include an attack on the manner of executing the death penalty.

Although § 1997e(a) declares that "no action" shall be brought by a prisoner confined in any correctional institution, the Act has been interpreted as precluding only actions in Federal court, and, indeed, it was that limitation that prompted the concern leading to the enactment of PLA—that it would lead prisoners to file actions under 42 U.S.C. § 1983 and other Federal statutes enforceable in State court in the State courts and thus overwhelm the State courts with often frivolous litigation. *See Adamson v. Correctional Medical,* 359 Md. 238, 261–65, 753 A.2d 501, 513–15 (2000).

The Maryland statute, though perhaps modeled on the Federal, is constructed somewhat differently. Unlike the Federal approach of stating that "no action ... with respect to prison conditions" may be brought absent exhaustion of available administrative remedies, the PLA, CJP § 5–1003(a)(1), tracks more the verbiage of 18 U.S.C. § 3626. It precludes a "civil action" and defines that term in § 5–1001(c) as a "legal action ... that relates to or involves a prisoner's *conditions of confinement.*" (Emphasis added). Unlike 42 U.S.C. § 1997e, which applies to actions respecting "prison conditions" but does not define that term, the PLA applies to actions involving

"conditions of confinement" and defines that term as meaning "any circumstance, situation or event that involves a prisoner's *custody, transportation, incarceration, or supervision.*" (Emphasis added).

There can be little doubt that the execution protocols challenged by Evans affect in a significant way aspects of his custody, incarceration, or supervision. *See Treesh v. Taft, supra,* 122 F.Supp.2d 887. Nor, in light of the legislative history of the PLA, can there be much doubt that the General Assembly intended for that statute to have a broad reach and to require prisoners to exhaust all available administrative remedies before filing judicial actions relating to prison conditions. The very fact that Evans filed an administrative complaint and ultimately pursued it to a conclusion demonstrates that an administrative procedure *did* exist.

The Federal Act imposes no pleading requirement on prisoners to allege exhaustion of administrative remedies. Failure to exhaust is an affirmative defense to the action that must be pled and shown by the defendant. *See Mitchell v. Horn,* 318 F.3d 523 (3rd Cir.2003); *Abney v. McGinnis,* 380 F.3d 663 (2nd Cir.2004). The Maryland statute is more onerous. As noted, CJP § 5–1003(b) requires the prisoner to attach to the initial complaint "proof that administrative remedies have been exhausted," including proof (1) that the prisoner filed a complaint or grievance with the appropriate agency, (2) of the administrative disposition, and (3) that the prisoner has "appealed" the administrative disposition to the appropriate authority, including proof of judicial review. If the prisoner has, in fact, exhausted his or her administrative remedies but has simply failed to attach proof of that fact, § 5–1003(b)(3) requires the court to "dismiss the case without prejudice and grant the prisoner leave to amend the complaint and to provide the proof necessary to demonstrate that the prisoner has fully exhausted the administrative remedies." If the prisoner has *not* actually exhausted available administrative remedies, § 5–1003(c) requires the court to dismiss the action without leave to amend ("A court shall dismiss a civil

action if the prisoner filing the action has not completely exhausted the administrative remedies.").

■ In light of these requirements (and the lack of standing on the part of the three co-plaintiffs), the Circuit Court should have dismissed the complaint under § 5–1003(c). Had that been done, Evans could have completed the administrative process and proceeded through the judicial review action to litigate his challenge.

If the administrative proceeding had never been completed, we would be required to vacate the Circuit Court order and remand the case for that court to dismiss the action. It is clear, however, that the administrative process has now been completed. The Secretary of DPSCS has made a final administrative determination that the execution protocols (1) do not violate CS § 3–905, and (2) do not constitute regulations. Those issues, which have been fully briefed and argued in this Court, are purely legal ones that require no further evidentiary development. For us to direct the dismissal of the complaint filed in January, 2006, so that the Circuit Court could consider anew essentially the same issue in the context of the pending judicial review action, from which a new appeal would necessarily arise, would be a useless waste of judicial resources. The purposes of the PLA, and, indeed, of the common law exhaustion requirement, have been met.[14]

## B. Consistency with the Statute

Title 3, subtitle 9 of the Correctional Services Article sets forth the procedures for executing a sentence of death. CS § 3–905(a) states:

"The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quanti-

---

**14.** We caution that this is an unusual case, and our decision to proceed with this aspect of the appeal should not be taken as a license for prisoners to file court proceedings subject to the PLA without having fully exhausted their administrative remedies. The law is clear. If the complaint does not contain proof that the administrative process has been exhausted, it must be dismissed.

ty of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent until a licensed physician pronounces death according to accepted standards of medical practice."

That provision is supplemented by CS § 3–906, which directs the Commissioner of Correction to provide a suitable and efficient place, enclosed from public view, in which to carry out an execution, to provide all of the materials necessary to perform the execution, and to select trained individuals to administer the lethal injection. Section 3–906(c) provides that an individual who "administers the paralytic agent and lethal injection" need not be a health care practitioner. Those provisions were enacted by the General Assembly in 1994. *See* 1994 Md. Laws, ch. 5.

After enactment of Ch. 5, DOC adopted an Execution Operations Manual (EOM) to govern virtually all aspects of implementing the death sentence by lethal injection. The EOM specifies the logistics, the responsibilities of various DOC officials and personnel, pre-execution procedures commencing upon receipt of a warrant of execution, post execution procedures, the responsibilities of a special unit to provide security for inmates awaiting execution, and the responsibilities of a command center. None of those procedures are challenged by Evans.

The EOM defines the term "Lethal Injection" as "[t]he administration of a lethal quantity of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent until a licensed physician pronounces death according to accepted standards of medical practice." That definition tracks the statutory language except that it omits the word "continuous" preceding "administration." Attached to, and presumably a part of, the EOM is a Lethal Injection Checklist, which prescribes in considerable detail the actual contents of the lethal concoction and the method of injecting it. That is the subject of Evans's complaint.

The Checklist specifies that the injection is to consist of (1) 120 cc/3 grams of sodium pentothal in two 60 cc syringes, (2)

50 cc/50mEq. of pancuronium bromide (Pavulon) in one 50 cc syringe, and (3) 50 cc/50mEq. of potassium chloride in one 50 cc syringe. Each of those drugs is administered at the rate of 1 to 1.5 ml/second, and each, in the dosage administered, is believed to be lethal on its own. Sodium pentothal is a sedative; Pavulon stops the breathing; potassium chloride stops the heart.

Apart from preparations, the execution process begins when the inmate is strapped to the execution table, an IV line is inserted into each arm, and a saline solution commences to run through the line into the inmate. The inmate is checked to observe for swelling or discoloration and to assure that the solution is flowing. At the appropriate signal, the first syringe of sodium pentothal is administered. The syringe is then removed and the second syringe of sodium pentothal is administered. That syringe is then removed, and the saline solution is allowed to run for ten seconds. At that point, the Pavulon is administered. The Pavulon syringe is then removed and, again, the saline solution is allowed to run for ten seconds. Finally, the potassium chloride is administered. That syringe is removed and the saline solution flows for another ten seconds.[15] When the EKG monitor indicates that no heart activity is occurring, the physician advises the execution team leader and the physician pronounces death. *See* EOM, Lethal Injection Checklist at 4–6.

Evans complains that this procedure deviates from the statute in three ways: first, he claims, the statute calls for the administration of two drugs, but the EOM adds a third, a second paralytic agent; second, the statute requires a continuous intravenous administration of an ultrashort-acting barbiturate, but the EOM calls for two "bursts" of sodium pentothal; and third, whereas CS § 3–906(c)(1) requires the Commissioner to select execution professionals who are "trained to administer the lethal injection," the EOM requires only the hiring of

---

**15.** It is not clear from the EOM whether all three lethal drugs are injected through one IV line and, if so, why a second line is inserted.

"trained" persons but does not specify what kind of training is required.

■ A short answer to this complaint is that the issue of whether the EOM is consistent with CS § 3–905 was presented in *Oken v. State*, 381 Md. 580, 851 A.2d 538 (2004) and rejected by us on the merits. In *Oken*, we held that "the method of execution intended to be implemented by the Division of Correction does not violate the provisions of Maryland Code (1999, 2003 Cum.Supp.) § 3–905 of the Correctional Services Article or constitute a cruel or unusual punishment...." *Id.* at 580–81, 851 A.2d at 538. Evans asks us either to ignore or overrule that clear, precedential holding because it was expressed in a *per curiam* opinion without any explanatory comment. He points out that the "truncated litigation" in *Oken* led a Federal District Court judge, in *Oken v. Sizer*, 321 F.Supp.2d 658 (D.Md.2004) to "doubt the quality, extensiveness, or fairness of procedures" in the case and to decline to give *res judicata* effect to our decision. He neglects to mention, however, which counsel has a clear ethical obligation to do, that two days later, the Supreme Court vacated the stay of execution ordered by the District Court judge (*Sizer v. Oken*, 542 U.S. 916, 124 S.Ct. 2868, 159 L.Ed.2d 290 (2004)) and, on remand, the District Court denied the requested stay and allowed execution of the death sentence against Oken to proceed.

Our ruling in *Oken* was in the form of a summary *per curiam* order because, like Evans, Oken waited more than 10 years, until the very eve of his scheduled execution, to present the claim. The Court did give fair consideration to it, however, as evidenced by the dissent filed by Chief Judge Bell. We would never have permitted that death sentence to be executed if we had any reason to believe that Oken had a legitimate claim. Because we have stayed the warrant of execution issued against Evans to consider the other issues raised by him, we shall respond in full to his argument.

■ The issue ultimately is one of statutory construction. Whether the Lethal Injection Checklist violates or is inconsis-

tent with CS § 3–905 depends on how that statute is properly construed. We can quickly dispose of two of Evans's claims. He argues that the EOM method of administering the "ultrashort-acting barbiturate" deviates from the statute in that it calls for administering the drug "in two separate bursts, where the [statute] calls for its 'continuous intravenous administration' until death." There is no such deviation. Under the EOM procedure, the barbiturate *is* administered continuously. It is inserted in advance into two 60 cc syringes, and, as soon as one is administered, that syringe is removed and the drug in the second syringe is injected. There is no flushing of saline solution between the two injections. The mere fact that DOC has chosen to administer the 120 cc of barbiturate in two syringes, the second injected immediately after the first, rather than in one 120 cc syringe, does not make the administration non-continuous.

The second argument that may be summarily disposed of is that DOC has not selected persons "trained to administer the lethal injection." Evans has offered utterly no evidence in this case to support that assertion but complains only that the EOM does not specify "what type of training is required." Neither does the statute.

The only argument worthy of more intensive consideration lies in the assertion that the statute specifies the administration of only one chemical paralytic agent, whereas the EOM calls for the administration of two—Pavulon and potassium chloride. The question is whether, when the Legislature directed that there be the administration of "*an* ultrashort-acting barbiturate or other similar drug in combination with *a* chemical paralytic agent" (emphasis added), it intended to preclude the use of more than one chemical paralytic agent—whether "a" or "an," as used in that statute, necessarily implies the singular.

As we have held so often, and most recently in *Oakland v. Mountain Lake Park*, 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006), and *Frederick v. Pickett*, 392 Md. 411, 427, 897 A.2d 228, 237 (2006), the prime objective in construing

statutes is to determine and implement the legislative intent. We look first to the language actually used by the Legislature, and if that language is clear and unambiguous, we need go no further. If the intent, as relevant to the issue at hand, is not so clear from the statutory language alone, however, we may consider relevant and reliable external indicators, including the legislative history of the statute.

The articles "a" or "an" are indefinite articles, in contrast to the definite article "the." They do *not*, however, necessarily imply the singular, but generally take their meaning in that regard from the context in which they are used. *See Deutsch v. Mortgage Securities Co.*, 96 W.Va. 676, 123 S.E. 793, 795 (1924) ("The indefinite article 'a' may sometimes mean one, where only one is intended, or it may mean one of a number, depending upon context."); *National Union Bank v. Copeland*, 141 Mass. 257, 4 N.E. 794, 795–96 (1886) ("[T]he particle 'a' is not necessarily a singular term. It is often used in the sense of 'any,' and is then applied to more than one individual object."); *Lewis v. Spies*, 43 A.D.2d 714, 350 N.Y.S.2d 14, 17 (1973) ("The indefinite article 'a' is not necessarily a singular term. It is often used to mean 'any' rather than 'one.'"). Most courts have construed "a" or "an" as meaning "any" and as not restricted to just one. *See Lindley v. Murphy*, 387 Ill. 506, 56 N.E.2d 832, 838 (1944) ("The article 'a' is generally not used in a singular sense unless such an intention is clear from the language of the statute."); *Chavira v. State*, 167 Tex.Crim. 197, 319 S.W.2d 115, 120 (1958) ("a" means the same as "any"); *First American Nat. Bank v. Olsen*, 751 S.W.2d 417, 421 (Tenn.1987) (same); *Application of Hotel St. George Corporation*, 207 N.Y.S.2d 529 (Sup.Ct.Kings Co.1960) (same); *State v. Snyder*, 149 Ohio St. 333, 78 N.E.2d 716, 718 (1948); *compare Harward v. Com.*, 229 Va. 363, 330 S.E.2d 89, 91 (1985).

It is evident, then, that whether the General Assembly intended to preclude the inclusion in the lethal mix of more than one paralytic agent cannot be determined, as a matter of law, from the language of the statute alone. The Legislature

did not say *"one* chemical paralytic agent," which, if that is what it intended, it could have done. We need to turn, then, to other indicia of intent, the most relevant and cogent of which, we think, is the legislative history of the statute.

Prior to the 1994 legislation, Maryland used the gas chamber—lethal gas—as the means of executing the death sentence. The switch to lethal injection was recommended by the Governor's Commission on the Death Penalty in its 1993 Report. *See The Report of the Governor's Commission on the Death Penalty, supra,* at xx and 214–18. The Commission noted that the historical method of execution in Maryland was hanging and that in 1955, the Legislature substituted lethal gas because that method was regarded as less painful and more dignified than either hanging or electrocution. The Commission added, however, that the national trend had more recently moved away from lethal gas because it was thought to kill by asphyxiation and that the suffocation or strangulation accompanying the asphyxiation could cause extreme pain for as long as twelve minutes. Maryland, it said, was the only State then to mandate that method. *Id.* at 215. The rejection of lethal gas had prompted at least 24 States to substitute lethal injection as the method of execution. The Commission advised that "[t]he injection of a fast-acting barbiturate or other lethal drug appears to cause death quickly without the pain associated with the slower death caused by lethal gas." *Id.* at 217.

A bill to substitute lethal injection for the gas chamber was introduced into the 1993 session of the General Assembly (Sen. Bill 203), just after the Governor's Commission had been appointed.[16] The bill passed the Senate but died in the House of Delegates. The Commission report, recommending the change, was filed in November, 1993, and two months later, companion bills nearly identical to Sen. Bill 203 were intro-

---

16. As noted, the Governor's Commission was not created to focus just on the method of execution. Most of the data used by the Commission in support of its recommendation to switch to lethal injection was already published and, indeed, was mentioned in the legislative documents accompanying Sen. Bill 203.

duced into the 1994 session as Administration Bills (House Bill 498 and Sen. Bill 304).

The Legislature was clearly aware from both the Commission report and from evidence presented to it in connection with the 1993 bill (S.B. 203) that more than 21 States (24 by the time the Commission report was released) had mandated lethal injection as the means of executing death sentences. A simple comparison shows that the Maryland statute is nearly identical to those that had been adopted earlier in nine other States. *See* ARK.CODE ANN. § 5–4–617(a); 725 ILL. COMP. STAT. ANN. 5/119–5(a)(1); MISS.CODE ANN. § 99–19–51; MONT.CODE ANN. § 46–19–103(3); N.M. STAT. ANN. § 31–14–11; N.C. GEN. STAT. § 15–187; OKLA. STAT. ANN. tit. 22, § 1014(A); S.D. CODIFIED LAWS § 23A–27A–32; WYO. STAT. ANN. § 7–13–904(a). We are informed, without contradiction by Evans, that in at least 24 of the States using lethal injection, the same three drugs called for in the EOM were prescribed, although not all of those States have statutes that specify the kinds of drugs to be used.[17] We are not aware of any case, and none has been cited to us by Evans, in which a court in any State with a statute similar to CS § 3–905 has held that the three-drug protocol is inconsistent with the governing statute.

More significant, at the hearing conducted by the House Judiciary Committee on House Bill 498, on March 3, 1994, the Committee asked the Commissioner of Correction to provide a description of the lethal injection process. Given that the *raison d'etre* for the change was that lethal injection was a

---

**17.** It appears that the use of an ultrashort-acting barbiturate and "neuromuscular blocking drugs" was first recommended in a letter by Dr. Samuel Deutsch, a professor of anesthesiology at the University of Oklahoma Health Sciences Center, to Oklahoma State Senator Dawson. *See* Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us,* 63 OHIO ST L.J. 63, 95–96 (2002). Professor Denno observes that "Oklahoma's lethal injection statute, which is representative of other state statutes, repeats nearly verbatim the terminology that Deutsch used in his letter to describe to Dawson the two main types of drugs that Deutsch recommended." *Id.* at 97. She notes that the typical lethal injection consists of the three chemicals, but is uncertain how the third drug—potassium chloride—got into the mix.

much more humane approach, an explanation of the process was surely a matter of interest to the Legislature. The Commissioner responded on March 8, and advised the Committee that the process would be just what is called for in the EOM-that the inmate would be strapped to a fixed gurney, that catheters would be placed in both arms and a saline solution administered until the command is given to commence the execution, that a quantity of sodium pentothal would then be administered, that the line would then be flushed with normal saline solution, that a quantity of Pavulon would then be administered followed by another flushing with saline solution, and that a quantity of potassium chloride would then be injected. The entire process, he said, would take 10 to 15 minutes. The Commissioner added that "[a] trained execution team would conduct all activities associated with the execution process" and that "[a] medical doctor would be available to confirm that death has occurred."

It is thus evident that the Legislature was well aware that, if it enacted the statute authorizing lethal injection, the statute would be implemented by the three-drug mixture. Following the receipt of that advice, the statute was enacted. There is no evidence that any member of the Legislature questioned whether the approach described by the Commissioner would be consistent with the statute. On this record, we conclude, as we did in *Oken*, that the EOM protocol is not inconsistent with the statute.

### C. Enforceability of EOM as a Regulation

Title 10, subtitle 1 of the State Government Article (SG), which is part of the Administrative Procedure Act, sets forth certain requirements for the adoption of regulations by Executive agencies subject to the statute. The Department of Public Safety and Correctional Services and DOC are subject to the statute. *Massey v. Dept. of Public Safety and Correctional Services, supra*, 389 Md. at 499, 886 A.2d at 587.

SG §§ 10–110 and 10–111 require that a unit desiring to adopt a regulation, other than as an emergency measure, publish the proposed regulation in the Maryland Register and

send a copy of it to the Joint Legislative Committee on Administrative, Executive, and Legislative Review (AELR Committee) for that Committee's review. Section 10–111(a) provides that a unit "may not adopt a proposed regulation" until that is done. Section 10–112 specifies that, in order to have a proposed regulation published in the Register, it must be accompanied by a notice that (1) states the economic impact of the proposed regulation on State and local government revenues and expenditures and on groups that may be affected by it, and (2) sets a date, time, and place for public hearing. A unit may not change the text of any regulation "unless it is proposed anew and adopted in accordance with the requirements of §§ 10–111 and 10–112. . . ." SG § 10–113.

Section 10–114 requires that, if the regulation is adopted, the unit must submit a notice of adoption for publication in the Maryland Register. SG § 10–117 provides that the effective date of a non-emergency regulation is the tenth calendar day after notice of adoption is published in the Maryland Register (unless a later effective date is specified). Thus, a unit may not adopt a regulation until there has been compliance with §§ 10–110 and 10–111, and a non-emergency regulation duly adopted does not become effective until ten days after notice of its adoption is published in the Register.

None of the procedures mandated by those statutes were followed by DOC prior to adopting or, from time to time, amending the EOM. None of the proposals were submitted to the AELR Committee, published in the Maryland Register, or subjected to public hearing. No notice of final adoption was ever submitted to or published in the Maryland Register. Thus, if the execution protocols challenged by Evans fall within the definition of, and thus constitute, a regulation as defined in SG § 10–101(g), they are ineffective.

Section 10–101(g)(1) defines a regulation as including, in pertinent part, a statement that has general application and future effect, is adopted to "detail or carry out a law that the unit administers" or "govern the procedure of the unit," and is in any form, including a standard, statement of interpretation, or statement of policy. Section 10–101(g)(2) exempts from

that definition a statement which otherwise would be included within it but which "concerns only internal management of the unit," or "does not affect directly the rights of the public or the procedures available to the public."

Evans contends that the actual execution protocols set forth in the EOM—those included in the Lethal Injection Checklist—constitute a regulation, as defined in SG § 10–101(g). The State responds that the EOM is not a regulation because it (1) does not have general application, (2) concerns only the internal management of DOC, and (3) does not directly affect the rights of the public. Those were the bases upon which the Secretary of DPSCS rejected Evans's administrative challenge. Largely for the reasons set forth in *Massey, supra,* we disagree with the State's response.

The State's argument to the contrary notwithstanding, there can be no legitimate doubt that the portions of the EOM that govern the method of and procedure for administering the lethal injection have general application and future effect, were adopted to detail or carry out a law that DOC administers, and govern the procedure of DOC. They have general application and future effect because they comprehensively govern the manner in which every death sentence is implemented. Unquestionably, they were adopted, and, indeed, it is their sole purpose and function, to carry out the mandates of CS §§ 3–905 and 3–906 and add details to the procedure that are unaddressed by the statute. They clearly are within the ambit of SG § 10–101(g)(1).

The question is whether the execution protocols fall within the exemptions set forth in § 10–101(g)(2). That was the issue in *Massey* as well—whether DPSCS directives that established the basis for administering inmate discipline fell within the subsection (g)(2) exemptions. We observed there that, although an exemption from some of the procedural requirements for adopting regulations that pertain only to the internal management of an agency had been part of the Model Administrative Procedure Act for about 50 years and was common in the various State laws, there was surprisingly little comment on the general meaning and scope of that exemption.

The available cases and commentary indicated that it was a "pragmatic and balanced" exemption. *Massey v. Dept. of Public Safety and Correctional Services, supra,* 389 Md. at 519, 886 A.2d at 598. On the one hand, applying the procedural requirements "too far into the internal workings of the agency would completely stifle agency activities if it were enforced," *id.* at 519, 886 A.2d at 598–99, quoting from Gary M. Haman and Robert P. Tunnicliff, *Idaho Administrative Agencies and the New Idaho Administrative Procedure Act,* 3 IDAHO L.REV. 61, 79 (1966), but on the other, "agencies could too easily subvert public rulemaking requirements if they could avoid those procedures for *anything* they called an internal directive to staff." *Massey v. Dept. of Public Safety and Correctional Services, supra,* 389 Md. at 519, 886 A.2d at 599, quoting from Arthur E. Bonfield, *The Iowa Administrative Procedure Act,* 60 IOWA L.REV. 731, 833 (1975). (Emphasis in original).

Bonfield, who seemed to be the most prolific commentator on this subject, viewed the internal management exemption as a "very narrowly drawn provision with several important qualifications" meant "to assure that matters of internal agency management that are purely of concern to the agency and its staff are effectively excluded from normal rule-making and rule-effectiveness requirements." *Massey v. Dept. of Public Safety and Correctional Services, supra,* 389 Md. at 520, 886 A.2d at 599, quoting from Arthur E. Bonfield, STATE ADMINIS-TRATIVE RULE MAKING § 6.17.2, at 402. The kinds of directives falling within the exemption, he concluded in his aforecited law review article, "face inwards" and do not "substantially affect any legal rights of the public *or any segment of the public.*" He gave as examples "purely internal personnel practices and directions." *Massey v. Dept. of Public Safety and Correctional Services, supra,* 389 Md. at 520, 886 A.2d at 599, quoting from 60 IDAHO L.REV. at 834. (Emphasis added). The rather meager case law fairly supported and applied those principles.

The real test of whether a DOC Directive (or other policy statement) is exempt from the APA requirements

because it concerns only the internal management of the agency and does not affect public rights is whether, given the nature and impact of the Directive, the Legislature intended that the agency be free to adopt, change, or abrogate the Directive at will, without any public input or legislative review. As noted, the APA requires that proposed regulations be submitted to the AELR Committee for its review. Although the Committee may not veto a proposed regulation, it may hold hearings, get public input, and object to the proposal. SG § 10–111.1(b) directs the Committee, in deciding whether to oppose a proposed regulation, to consider whether the regulation is in conformity with the statutory authority of the agency and whether it "complies with the legislative intent of the statute under which the regulation was promulgated."

The ability of the Committee to oppose the regulation is important, because if it *does* object, the unit has but three options: it may withdraw the proposed regulation, it may amend the regulation, which essentially requires starting the process anew, or it may submit the proposal to the Governor with a statement explaining why it refuses to withdraw or amend the proposal. *See Delmarva Power v. PSC*, 370 Md. 1, 27, 803 A.2d 460, 475 (2002). The Governor may consult with the Committee and the unit in an effort to resolve the conflict and, after notice to the presiding officers of the Senate and House of Delegates, may instruct the unit to withdraw or amend the regulation or may approve the regulation. A proposed regulation opposed by the Committee may not be adopted and is not effective unless approved by the Governor.

The importance of that measure of legislative oversight is highly relevant in considering whether an agency policy directive is of the kind intended by the Legislature to be exempt from that oversight as a matter of purely internal management. We may fairly take judicial notice that the whole issue of the death penalty, and particularly the method of its implementation, is of great interest to the Legislature. It has enacted detailed statutes governing capital punishment

and governing, in particular, the method and manner of executing death sentences, and it considers bills dealing with aspects of the death penalty at nearly every session.

Notwithstanding that it was advised in 1994 of how DOC intended to implement the lethal injection law if that law were enacted, we are unwilling to assume that the Legislature intended to leave to DOC, on its own and without any formal notice to the AELR Committee, without any opportunity for the Committee to object, without any oversight, unbridled authority to determine and then change at will, as a matter of internal management, how that statute is to be implemented.

In this case, DOC has decided to use two chemical paralytic agents. Using the canons of statutory construction applied by courts, *we* have concluded, as a matter of statutory construction, that the current protocol is consistent with the statute. Applying different standards allowable in a legislative context, the AELR Committee may have a different view, but even if that Committee agrees that the protocol is consistent, it may wish to object to it and direct DOC to consider some other one. Although the three-drug protocol is standard in States using lethal injections, it has been challenged in a number of cases and some believe that it is not as humane as it was purported to be. *See* Denno, *supra,* 63 OHIO ST. L.J. 63. Indeed, that issue appears to be currently pending in a proceeding instituted by Evans in the U.S. District Court. *See Evans v. Saar,* Civil No. 06–149 (U.S.Dist.Ct.D.Md.). Suppose DOC decides in the future to use three rather than two paralytic agents, or drop potassium chloride or Pavulon and use only the other agent, or use 80 cc or 150 cc of barbiturate rather than 120 cc, or 100 cc of Pavulon rather than 50 cc, or use one or more entirely different drugs? Those kinds of decisions do not constitute routine internal management, any more than the decision to adopt the current mix; they affect not only the inmates and the correctional personnel, but the witnesses allowed to observe the execution and the public generally, through its perception of the process.

Accordingly, we hold that those aspects of the EOM that direct the manner of executing the death sentence—the Lethal

Injection Checklist—constitute regulations under SG § 10–101(g) and, because they were not adopted in conformance with the requirements of the APA, are ineffective and may not be used until such time as they are properly adopted. To that extent, we shall reverse the ruling of the Circuit Court for Baltimore City. Although the question actually before us in No. 122 is whether the Circuit Court erred in denying a temporary restraining order, our resolution of the predominant legal issue presented by that question mandates, as a matter of law, that a final injunction issue, and we shall remand the case for that purpose.

**IN NOS. 107, 123, AND 124, JUDGMENT OF CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED, WITH COSTS; IN NO. 122, ORDER OF CIRCUIT COURT FOR BALTIMORE CITY DENYING TEMPORARY RESTRAINING ORDER VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENJOIN ENFORCEMENT OF LETHAL INJECTION CHECKLIST INCLUDED AS PART OF DIVISION OF CORRECTION EXECUTION OPERATIONS MANUAL UNTIL SUCH TIME AS THE CONTENTS OF THAT CHECKLIST, IN THEIR CURRENT OR ANY AMENDED FORM, ARE ADOPTED AS REGULATIONS IN ACCORDANCE WITH THE REQUIREMENTS OF THE ADMINISTRATIVE PROCEDURE ACT OR THE GENERAL ASSEMBLY EXEMPTS THE CHECKLIST FROM THE REQUIREMENTS OF THAT ACT; COSTS IN NO. 122 TO BE PAID BY APPELLEE**

GREENE, J., joins in Nos. 107 and 124 only.

BELL, C.J., dissents which GREENE, J., joins in Parts C and D only.

## APPENDIX

## PROCEDURAL HISTORY OF *STATE v. EVANS*

It is rare that we attach an Appendix to an Opinion. In most instances when we do so, it is for convenience—to display a plat, diagram, or other pictorial document as a

complement to the verbal description of it in the Opinion. We attach this Appendix, which describes, as succinctly as possible, the long, tortured history of this case, for two reasons. The first is to give a more complete context to some of the issues raised in these appeals. The second is to demonstrate the extraordinary lengths to which the State and Federal courts have gone, and continue to go, to protect the rights of Vernon Evans and to dispel any notion that he has not received the full measure of process and consideration that is due to any person accused of crime and, most particularly, to one who faces the death penalty.

Two separate juries—one in Worcester County and one more than a hundred miles away in Baltimore County—unanimously determined, eight years apart, that Evans should be put to death for the brutal murders he committed. Excluding the four pending appeals, Evans has had eleven appeals to this Court and has presented seven petitions to the United States Supreme Court. Depending on how one isolates or clusters his arguments, he has presented approximately one hundred complaints to the Circuit Courts in three counties and to us, many of them several times. He has had more than two dozen complaints considered and rejected by the U.S. District Court and the U.S. Court of Appeals for the Fourth Circuit and has several more now pending in the District Court. Throughout, he has been represented by able, experienced, competent counsel.

These appeals and the various proceedings described in this Appendix all arose from a double murder committed by Evans on April 28, 1983, more than 23 years ago. Evans was paid $9,000 by or on behalf of Anthony Grandison, who was then in jail awaiting trial on Federal narcotics charges, to kill David Piechowicz and his wife, Cheryl. Mr. and Ms. Piechowicz were slated to testify against Grandison in Federal court a week later. Evans went to the Warren House Motel in Baltimore County and, in cold blood, murdered Mr. Piechowicz and the woman he thought was Cheryl but who, in fact, was Cheryl's sister, Susan Kennedy.

Two prosecutions ensued—one Federal and one State. The Federal prosecution came first in time. In May, 1983, the Government charged Evans, Grandison, and two others with conspiracy to violate the civil rights of David and Cheryl Piechowicz (18 U.S.C. § 241) and with witness tampering (18 U.S.C. § 1512). In November, 1983, Evans and Grandison were convicted by a Federal jury on both counts and sentenced to life imprisonment. On appeal, Evans raised eight issues, all of which were found by the U.S. Court of Appeals for the Fourth Circuit to be without merit. *United States v. Grandison,* 780 F.2d 425 (4th Cir.1985).

One of the issues presented by both Evans and Grandison was that the Government used its peremptory challenges in a manner that was racially biased against African American jurors. While the case was pending on appeal, the Supreme Court granted *certiorari* in *Batson v. Kentucky,* 471 U.S. 1052, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985), but that case had not been decided by the time the Fourth Circuit court acted on the Grandison/Evans appeal, and the peremptory challenge issue was resolved against Evans under the rule established in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

*Batson* was decided by the Supreme Court shortly thereafter—*see Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)—and, in *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), *Batson* was declared to apply retroactively to cases still in litigation. In February, 1987, the Supreme Court vacated the Federal convictions in light of *Griffith* and remanded the cases for the District Court to consider the effect of *Batson.* In May, 1988, after an evidentiary hearing, the District Court found no purposeful discrimination in the Government's exercise of its peremptory challenges, denied Evans's and Grandison's motion for new trial, and reinstated the judgments, and in September, 1989, the U.S. Court of Appeals for the Fourth Circuit affirmed. *United States v. Grandison,* 885 F.2d 143 (4th Cir.1989). The

appellate court denied motions for rehearing, and, in May, 1990, the Supreme Court denied *certiorari. Grandison v. United States,* 495 U.S. 934, 110 S.Ct. 2178, 109 L.Ed.2d 507 (1990). That ended the Federal prosecution.

On June 30, 1983, the State prosecution commenced in Baltimore County with an indictment charging Evans and Grandison with two counts of first degree murder, one count of conspiracy to commit murder, and one count of using a handgun in the commission of a felony. Prior to trial, the cases against Evans and Grandison were severed. On September 7, 1983, Evans was served with a notice of the State's intention to seek the death penalty that listed two aggravating circumstances upon which the State intended to rely—that the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration (current Maryland Code, § 2–303(g)(1)(vi) of the Criminal Law Article (CL); former Ann.Code, 1957, Art. 27, § 413(d)(6)) and that the defendant committed more than one first degree murder arising out of the same incident (CL § 2–303(g)(1)(ix); former Ann.Code, 1957, Art. 27, § 413(d)(9)).

At Evans's request, his case was removed from Baltimore County to Worcester County, where it was assigned to Judge Cathell, then a judge of the Circuit Court. Prior to trial, but after his conviction on the Federal charges, Evans moved to dismiss the State indictment on the ground that his Federal convictions precluded a subsequent State prosecution under both Federal and State double jeopardy prohibitions. His principal argument was that the dual sovereignty principle, long and well established in both the State and Federal courts, was not applicable. The motion was denied and, in an interlocutory appeal, this Court affirmed that ruling. *Evans v. State,* 301 Md. 45, 481 A.2d 1135 (1984). **(CA–1).**[18] Evans's

---

**18.** In order to keep account of, and distinguish, the various proceedings in which Evans's complaints have been reviewed by a court, we shall label them by the court in which they were brought: CA (Maryland Court of Appeals); SC (United States Supreme Court); PC (State

petition for *certiorari* was denied by the Supreme Court. *Grandison v. Maryland,* 470 U.S. 1034, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985). (SC–1).

With that resolved, the case proceeded before a jury, which convicted Evans of the two murders and related offenses and sentenced him to death. He appealed, raising 17 issues. The first ten dealt with the trial as to guilt or innocence and the remaining seven pertained to the sentencing proceeding:

(1) An in-court identification by Calvin Harper should have been suppressed because it was tainted by a suggestive and unreliable pre-trial identification;

(2) He was entitled to a mistrial because of the State's failure to notify him of a photographic identification;

(3) Two State's witnesses—Calvin Harper and Charlene Sparrow—were incompetent witnesses because they had previously committed perjury;

(4) The trial court erred in denying his motion to compel a psychiatric examination of Charlene Sparrow, quashing a subpoena for her attendance at trial, and refusing to exclude her testimony at trial;

(5) The trial court erred in denying his motions for further removal from Worcester County and for a continuance in order to individually voir dire prospective jurors;

(6) The trial court erred in admitting certain documents as business records;

(7) The trial court erred in admitting a MAC–11 machine pistol as representative of the unrecovered weapon used in the murders;

(8) The trial court erred in excluding from the jury venire persons who stated that they would never vote to impose capital punishment;

Circuit Court considering post conviction petition, motion to correct illegal sentence, or other collateral attack); DC (U.S. District Court considering habeas corpus petition); C4 (U.S. Court of Appeals considering appeal from denial of habeas corpus by U.S. District Court).

(9) The State's use of peremptory challenges to exclude African–Americans was improper;

(10) A renewal of the double jeopardy argument he made in his earlier interlocutory appeal;

(11) The trial court erred in excluding evidence of a minimum parole release date; [19]

( 12) The trial court erred in refusing to instruct the jury that, if it found that the murders were contract murders, it must find as a mitigating factor that Evans was not the sole cause of the victims' deaths;

(13) The trial court erred in refusing to instruct the jury that any non-statutory mitigating factors it found to exist could be given as much weight as statutory mitigating factors;

(14) The death penalty law was unconstitutional in that it shifted the burden to defendants to prove the existence of mitigating factors;

(15) The trial court's instructions regarding reasonable doubt were deficient because they omitted to inform the jury that the State's proof must be "to a moral certainty;"

(16) Given that there were two murders and only one death penalty can be imposed, it was error to allow the jury, as to each murder, to rely on the aggravating factor that the defendant committed more than one offense of first degree murder arising out of the same incident; and

(17) Imposition of the death penalty in the case was disproportionate to sentences imposed in similar cases.

In a 42–page opinion examining each of those issues, this Court found no merit to them and affirmed. *Evans v. State,* 304 Md. 487, 499 A.2d 1261 (1985). **(CA–2).** It was in response to the last complaint, about disproportionality, that we observed that "[t]he murders giving rise to this prosecu-

---

**19.** At the time, State law did not afford the option of life without parole. Evans unsuccessfully sought to introduce evidence that, if convicted of all the offenses charged and given consecutive sentences, he would not have been eligible for parole until he had served 39 years in prison.

tion were as heinous as those in any case to come before us under the present capital punishment statute." *Id.* at 539, 499 A.2d at 1288. Evans's motion for reconsideration, in which he presented six issues, was denied, *Foster, Evans and Huffington v. State*, 305 Md. 306, 503 A.2d 1326 (1986) **(CA–3)**, and the Supreme Court denied *certiorari. Evans v. Maryland*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986). **(SC–2).**

In March, 1990, Evans filed his first petition under the Post Conviction Act in the Circuit Court for Worcester County. He raised 22 issues in the petition and added six more on the day of the hearing. Many of them had been, or could have been, raised in his direct appeal. In summary, they were that he was denied equal protection of the law or due process by or because:

(1) The State's racially discriminatory use of peremptory challenges;

( 2) The selection process for veniremen in Worcester County was unlawful in that the county had a 22% black population and the jury venire was only 19.85% black;

(3) There was an under-representation of minority and young persons on jury panels and as forepersons of jury panels;

(4) The excusing for cause of jurors who had reservations about the death penalty;

(5) The trial court's failure to sequester the jury and grant a postponement;

(6) The trial court's refusal to allow individual *voir dire;*

(7) The jury was "uninformed" because some members had never heard of him or Grandison;

(8) The jury was shown an orientation film (about which no specific complaint was made);

(9) He was not present at certain bench conferences that constituted critical stages of the trial;

(10) The court's refusal to question prospective jurors on drug usage as a mitigating factor;

(11) The fact that an Assistant U.S. Attorney, specially designated as an assistant State's Attorney, was part of the prosecution team;

(12) He was not advised of his right to a court trial at the guilt/innocence stage;

(13) He was not allowed to subject the State's witness, Charlene Sparrow, to a psychiatric examination;

(14) The State used perjured testimony of Sparrow and Calvin Harper;

(15) The State failed to disclose exculpatory grand jury testimony;

(16) The admission of a MAC–11 machine pistol;

(17) He was subjected to a suggestive lineup;

(18) He received ineffective assistance of counsel at both trial and sentencing;

(19) Because of his Federal convictions, the State prosecution violated his right against double jeopardy;

(20) Because of the Federal prosecutions, the State prosecution constituted cruel and unusual punishment in violation of the Eighth Amendment;

(21) He received ineffective assistance of counsel in his appeal;

(22) The trial court's instructions at sentencing and the sentencing form given to the jury unconstitutionally suggested that unanimity was required in order to find a mitigating factor, in contravention of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988);

(23) The State lost jurisdiction over Evans when he was transferred, for a time, to the U.S. Bureau of Prisons to serve his Federal sentences;

(24) Government agents who investigated the murders suppressed favorable evidence (that complaint was withdrawn but renewed in subsequent proceedings);

(25) The prosecutors made unfair and prejudicial comments regarding his failure to present alibi evidence;

(26) One juror was not a resident of Worcester County;

(27) He was not personally served with the State's notice of its intention to seek the death penalty; and

(28) During closing argument, the prosecutor made improper remarks concerning the effect of the murders on the victims' families.

On March 28, 1991, the post conviction court (Judge Eschenburg), in a 38-page memorandum opinion, addressed each of those issues and found merit in only one—No. 22. The court held that the sentencing form did, indeed, violate *Mills* and that the error was not ameliorated by the court's instructions to the jury. As that error affected only the sentencing, the court ordered a new sentencing hearing but denied the request for a new trial as to guilt or innocence. **(PC–1).**

Both Evans and the State filed an application for leave to appeal that decision. The State complained about the post conviction court's analysis and application of *Mills*. Evans complained about 19 of the other rulings not in his favor. In June, 1991, this Court denied both applications. *State v. Evans*, Misc. No. 8, Sept. Term 1991 (Order filed June 4, 1991). **(CA–4).** It does not appear that either side sought further review in the Supreme Court.

Prior to the new sentencing hearing, pursuant to Evans's request, the case was removed back to the Circuit Court for Baltimore County (Judge Kahl). On November 5, 1992, a jury in that court again sentenced Evans to death, and Evans appealed, raising twelve issues:

(1) Whether there was insufficient questioning of prospective jurors regarding their predisposition toward the death penalty;

(2) Whether the court erred in failing to ask a *voir dire* question relating to such predisposition exactly in the form he requested;

(3) The prosecutor impermissibly suggested to the jury that Evans would likely escape from prison and be a danger to society;

(4) The court erred in submitting a presentence investigation report to the jury without redacting Evans's initial refusal to speak to the investigator, in violation of his Fifth Amendment right against self-incrimination;

(5) The court erred in permitting victim impact evidence of any kind to be considered by the jury;

(6) The court erred in admitting Cheryl Piechowicz's victim impact statement because it was prejudicial;

(7) The court erred in refusing to instruct the jury that victim impact evidence is not an appropriate consideration in imposing sentence;

(8) The court erred in admitting certain autopsy photographs of the victims;

(9) The court erred in allowing the jury to see a docket entry from which it might infer that the jury at the guilt/innocence trial deliberated for less than two hours;

(10) The court erred in refusing two requested instructions on mitigating circumstances;

(11) The court erred in admitting a MAC–11 machine pistol at the sentencing hearing; and

(12) The evidence was insufficient to show that the aggravating factors relied on by the State outweighed mitigating factors and that the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

In February, 1994, in a 34-page opinion, the Court found no merit in any of these complaints and affirmed the judgments. *Evans v. State,* 333 Md. 660, 637 A.2d 117 (1994). **(CA–5).** Evans sought *certiorari* in the Supreme Court, which was denied. *Evans v. Maryland,* 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994). **(SC–3).**

On August 29, 1995, Evans filed a second petition for post conviction relief, in the Circuit Court for Baltimore County.

The petition raised 41 issues, many of which were clustered and presented in two or more different contexts, and most of which had been previously litigated:

(1) The State prosecution was precluded by double jeopardy;

(2) The State relinquished its authority over Evans when it moved him back to the Federal Bureau of Prisons to resume service of his Federal sentences;

(3) He received ineffective assistance of trial counsel in the re-sentencing proceeding. Trial counsel, he said, was ineffective in:

(a) Failing to call Roberta Weinstein and Darece Pinkney as witnesses to contest the State's evidence that he was a principal in the first degree in the murders;

(b) Submitting certain supplemental *voir dire* questions belatedly;

(c) Failing to challenge the State's alleged systematic exclusion of African–American jurors;

(d) Failing to ask specific, individual questions on *voir dire* going to juror predisposition toward the death penalty;

(e) Failing to request that the judge ask *voir dire* questions relating to racial bias;

(f) Belatedly making a *Batson* argument;

(g) Incompetently cross-examining Charlene Sparrow;

(h) Failing to interview and present witnesses from the Federal prison in Marion, Illinois to offer testimony regarding how Evans positively affected their lives;

(i) Failing to properly investigate Evans's parole eligibility and projected release date if he received life sentences;

(j) Failing to ask the sentencing judge to formulate a proper response to two questions from the jury relating to the effect of life sentences;

(k) Failing to object to the court's instruction concerning the jury's consideration of Evans's allocution; and

(*l*) Agreeing to removal of the re-sentencing from Worcester County to Baltimore County;

(4) He received ineffective assistance of appellate counsel in the re-sentencing proceeding, in that appellate counsel:

(a) Failed to raise the issue of ineffective assistance of trial counsel;

(b) Failed to complain that the re-sentencing jury did not represent a fair cross-section of the community;

(c) Failed to complain about the trial judge's attempt to "rehabilitate" jurors who showed a bias in favor of the death penalty;

(d) Failed to illustrate the deficient *voir dire* by omitting to point out that certain jurors were not asked certain questions;

(e) Failed to complain about the court's striking of jurors for cause after denying follow-up questions sought by defense counsel;

(f) Failed to complain about the trial court's failure to conduct individual *voir dire* as to racial attitudes;

(g) Failed to complain about the trial court's refusal to bifurcate the re-sentencing proceeding;

(h) Failed to raise a *Batson* issue relating to the State's peremptory strikes of African–American jurors; and

(i) Failed to complain that the death penalty is unconstitutional because it is imposed disproportionately on African–Americans in cases involving white victims;

(5) The sentencing jury did not represent a fair cross-section of the community because of systematic exclusion of racial minorities from jury panels;

(6) The re-sentencing court erred in conducting *voir dire* generally;

(7) It erred specifically in failing to conduct adequate *voir dire* into racial attitudes;

(8) The court erred in relying on jury instructions to compensate for inadequacies in *voir dire;*

(9) The court erred in allowing concerns of judicial economy to outweigh a constitutionally sufficient *voir dire;*

(10) The court erred in failing to bifurcate the sentencing proceeding;

(11) The court erred in denying Evans's *Batson* challenge;

(12) The court failed to correct prosecutorial misconduct during closing and rebuttal argument;

(13) The court failed to redact a portion of the presentence investigation report;

(14) The death penalty constitutes excessive punishment;

(15) The death penalty is unconstitutional because it is imposed disproportionately on African–Americans involving white victims (this was repeated in several different contexts);

(16) Evans was denied effective assistance of counsel at his first post conviction proceeding;

(17) He was denied equal protection of the law because post conviction counsel was ineffective in presenting a *Batson* complaint;

(18) The death penalty is unconstitutional because it is imposed disproportionately on males;

(19) The trial court erred in refusing to allow Charlene Sparrow to undergo a psychiatric examination to determine her competence to testify;

(20) The prosecutor engaged in a pattern of using peremptory challenges to strike jurors on the basis of race; and

(21) Trial counsel was deficient in failing to present evidence of that pattern.

On January 24, 1997, in a 26–page memorandum opinion, the Circuit Court (Judge Smith) discussed each of those complaints, found that most of them had previously been litigated and that none had merit, and denied the petition. **(PC–2).** Evans filed an application, and then a 37–page

amended application, for leave to appeal, which this Court considered and denied. *See Evans v. State,* 345 Md. 524, 693 A.2d 780 (1997). **(CA–6).** He then sought review by the Supreme Court, which, in November, 1997, also was denied. *See Evans v. Maryland,* 522 U.S. 966, 118 S.Ct. 411, 139 L.Ed.2d 314 (1997). **(SC–4).**

On November 3, 1997, Evans filed a petition for habeas corpus in the U.S. District Court, raising 24 issues, several of which had sub-parts-essentially the issues previously raised in the State courts:

(1) The prosecutor's use of peremptory challenges at the guilt phase trial in 1984—the *Batson* claim;

(2) Ineffective assistance of counsel at resentencing because of:

(a) Failure to call witnesses Weinstein and Pinkney to testify; and

(b) Failure to call an expert on Federal parole to testify that Evans would not begin serving his State sentences for at least 30 years;

(3) The prosecutor's use of peremptory challenges at the guilt phase trial in violation of *Swain v. Alabama, supra,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759;

(4) The venire in Worcester County in 1984 did not reflect a fair cross-section of the community, with respect to the petit jury;

(5) The venire in Baltimore County in 1983 did not reflect a fair cross-section of the community with respect to the grand jury;

(6) The trial court in the guilt phase erred in not permitting individual *voir dire;*

(7) The trial court erred in not removing the case from Worcester County because of adverse publicity;

(8) A pretrial identification of Evans by Calvin Harper was unduly suggestive and tainted his in-court identification;

(9) The trial court erred in refusing to order a psychiatric examination of Charlene Sparrow;

(10) The re-sentencing jury in Baltimore County did not reflect a fair cross-section of the community;

(11) *Voir dire* with respect to the re-sentencing jury was inadequate and the court erred in refusing to strike certain jurors for cause;

(12) Appellate counsel in Evans's direct appeal was ineffective in failing to contest Judge Kahl's failure to strike those jurors for cause;

(13) The re-sentencing court failed to provide adequate *voir dire* with respect to the racial attitudes of prospective jurors;

(14) The re-sentencing court erred in refusing to bifurcate the re-sentencing proceeding, to deal first with principalship and then with aggravating and mitigating factors;

(15) The re-sentencing court failed to give an adequate response to a jury note regarding the nature and length of other sentences imposed on Evans;

(16) Counsel at the re-sentencing were ineffective by failing to produce evidence of Evans's good behavior in prison;

(17) Counsel was also ineffective in eliciting a damaging response from Charlene Sparrow on cross-examination;

(18) The re-sentencing court erred in allowing allocution too close to the time it instructed the jury regarding Evans's right not to testify;

(19) Re-sentencing counsel was ineffective in failing to object to the timing of the allocution;

(20) The re-sentencing court erred in failing to redact a statement in the pre-sentence investigation report that Evans had initially refused to speak with the investigator;

(21) There was improper argument from the prosecutor;

(22) In light of his Federal convictions, the State prosecution was barred by double jeopardy principles;

(23) Maryland relinquished authority over Evans by returning him to Federal custody; and

(24) The death penalty is unconstitutional because it constitutes excessive punishment and is disproportionately imposed on African–Americans who murder white victims.

In a 36–page opinion, the District Court (Judge Legg) considered each of those complaints, found that many had previously been litigated, concluded that there was no merit to any of them, and denied the petition. *See Evans v. Smith,* 54 F.Supp.2d 503 (D.Md.1999). **(DC–1).** After the court denied a motion for rehearing, Evans appealed to the U.S. Court of Appeals for the Fourth Circuit.

While the appeal to the Fourth Circuit court was pending, Evans filed a motion in the Circuit Court for Baltimore County to reopen his 1995 post conviction proceeding to add a claim that the State withheld an FBI report recounting an agent's interview with one Janet Bannister. Regarding that report as exculpatory evidence, Evans claimed a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court (Judge Smith) denied the motion on the grounds that Evans's affidavit and petition were insufficient to show that the State had failed to provide the exculpatory material, that, even if it had, Evans failed to show that he was prevented from raising that claim in his first post conviction proceeding, and that Bannister's statement was insufficient in any event to support a reasonable probability that the outcome of the re-sentencing proceeding would have been any different. *See Evans v. State,* No. 83–CR–2339 (Circ. Ct. for Baltimore County, October 20, 1999). **(PC–3).** Evans filed an application for leave to appeal that decision, which this Court denied. *See Evans v. State,* Misc. No. 18, Sept. Term 1999. **(CA–7).**

In February, 2000, Evans filed a second petition for habeas corpus in the U.S. District Court, raising only the *Brady* claim. He sought leave from the Fourth Circuit court to file that petition as a successive petition and asked that the District Court treat it as a motion to reopen his original

habeas corpus petition. (DC–2). The Fourth Circuit court dealt with that issue in the appeal from the District Court judgment which, in July, 2000, it affirmed, finding no merit in any of Evans's claims. *See Evans v. Smith,* 220 F.3d 306 (4th Cir.2000). (C4–1). Evans sought review in the Supreme Court, which was denied. *Evans v. Smith,* 532 U.S. 925, 121 S.Ct. 1367, 149 L.Ed.2d 294 (2001). (SC–5).

In May, 2000, while the Federal appeal was still pending, Evans filed in the Circuit Court for Baltimore County a Motion to Correct Illegal Sentence and a Motion for New Trial. The first motion was based on an amendment to the death penalty law that took effect very shortly after the murders were committed. The amendment removed intoxication as a specific statutory mitigating factor and permitted a jury to find it as a mitigator under the catchall provision for mitigating factors. Evans claimed that constituted an unlawful *ex post facto* law. The motion for new trial was based on supposedly newly discovered evidence in the form of FBI interview reports that would allegedly impeach the testimony of two State's witnesses that he was the person who actually shot the victims. Those motions were initially denied, but, while an appeal to the Court of Special Appeals from that ruling was pending, the court rescinded its order and scheduled a hearing. The appeal was subsequently dismissed.

In April, 2001, Evans filed a second motion in the Circuit Court to reopen the 1995 post conviction proceeding, claiming that, under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the 1983 indictment that triggered the State prosecution was Constitutionally deficient because it did not allege either principalship or the aggravating factors upon which the State intended to rely. The motion also asked that execution of the death sentence be stayed pending completion of a legislatively commissioned study of the implementation of the death penalty (the Paternoster Study). A month later, before any ruling on that motion, Evans filed a second Motion to Correct Illegal Sentence and/or Motion for New Sentencing Based on Mistake

and Irregularity. That motion was also based on *Apprendi*. On October 12, 2001, the court denied the motion to reopen the post conviction proceeding (Judge Turnbull) **(PC–4)**, and, on December 14, 2001, this Court denied Evans's application for leave to appeal that ruling. **(CA–8)**.

On July 18, 2003, following an evidentiary hearing and consideration of supplemental briefs, Judge Kahl entered two orders denying the Motion for New Trial and the Motion to Correct Illegal Sentence. **(PC–5)**. Evans appealed, and, in a 37–page opinion, we affirmed, holding that (1) the shift of intoxication to a catchall mitigator did not constitute an *ex post facto* law, and (2) the FBI reports, even if newly discovered, failed to create a substantial possibility that a jury would find that Evans was not the shooter. *See Evans v. State*, 382 Md. 248, 855 A.2d 291 (2004). **(CA–9)**. Evans moved for reconsideration, which was denied. **(CA–10)**. As usual, he then sought review by the Supreme Court and that too was denied. *Evans v. Maryland*, 543 U.S. 1150, 125 S.Ct. 1325, 161 L.Ed.2d 113 (2005). **(SC–6)**.

Upon the denial of *certiorari* by the Supreme Court, the Circuit Court for Baltimore County issued a warrant of execution. That prompted a new round of proceedings. On February 28, 2005, Evans filed a Motion to Stay Warrant of Execution and a Motion to Correct Illegal Sentence, arguing that (1) his sentence was illegal because it emanated from a pattern of racial and geographic discrimination in the implementation of the death sentence in Maryland, and (2) the indictment that triggered the prosecution was Constitutionally defective under *Apprendi v. New Jersey, supra,* and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In March, Evans filed a separate motion to correct illegal sentence and supplemented the pending one, complaining that use of a preponderance of the evidence standard in the balancing of aggravating and mitigating factors violated various provisions of the Maryland Constitution.

A week later, the court entered an order denying all motions **(PC–6)**, and Evans appealed. We affirmed, holding,

first, that a motion to correct illegal sentence was not the appropriate vehicle to raise a selective prosecution claim based on the by-then-completed Paternoster Study, and second, that none of his *Apprendi/Ring* arguments had merit. *Evans v. State,* 389 Md. 456, 886 A.2d 562 (2005). **(CA–11).** His motion for reconsideration was also denied. **(CA–12).** For the seventh time, Evans sought *certiorari* in the Supreme Court, which was denied. *Evans v. Maryland,* — U.S. —, 126 S.Ct. 1442, 164 L.Ed.2d 141 (2006). **(SC–7).**

In August, 2005, Evans filed another Motion to Correct Illegal Sentence in the Circuit Court for Baltimore County, raising two issues: (1) that his attorneys at his 1992 re-sentencing hearing were Constitutionally ineffective because of their failure to investigate substantial mitigating evidence relating to his background; and (2) his death sentence was imposed by a jury selected in violation of the equal protection clause. The first complaint was based on *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) and *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). The second—essentially a *Batson* challenge—is based as well on *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). On December 15, 2005, Judge Kahl entered an order denying the motion, concluding that, under controlling decisions of this Court, those complaints, even if valid, did not make the sentence illegal. **(PC–7).** On December 29, 2005, Evans appealed. That appeal is now before us as No. 107.

On December 20, 2005, Evans filed a third motion to reopen the 1995 post conviction proceeding. That motion was based entirely on the Paternoster Study which, according to Evans, showed that the Baltimore County State's Attorney's Office engaged in unconstitutional race-based selective prosecution. On January 19, 2006, that motion was denied (Judge Turnbull). **(PC–8).** Evans filed an application for leave to appeal, which we granted and is now before us as No. 123.

On January 23, 2006, Evans filed a fourth motion to reopen the 1995 post conviction proceeding in order to present the

*Wiggins* and *Miller–El* issues presented in the motion to correct illegal sentence. On February 2, 2006, the Circuit Court denied that motion (Judge Turnbull) **(PC–9)** and Evans filed an application for leave to appeal, which we granted. That is No. 124.

On January 20, 2006, Evans, along with the National Association for the Advancement of Colored People, the American Civil Liberties Union Foundation of Maryland, and Maryland Citizens Against State Executions, filed a separate action in the Circuit Court for Baltimore City seeking to enjoin the Division of Correction from using lethal injections to inflict the death penalty under its current execution protocol on the grounds that (1) the execution protocol materially conflicts with the State's death penalty statute; (2) the protocol was not adopted in conformance with the Administrative Procedure Act; and (3) several of the regulations conflict with the specific directives of the Warrant of Execution filed in this case by Judge Turnbull. On January 31, 2006, the Circuit Court denied preliminary injunctive relief **(PC–10),** and Evans and the other plaintiffs appealed to the Court of Special Appeals. We granted *certiorari* on our own initiative (No. 122), stayed the warrant of execution that had been issued, and consolidated the four appeals. **(CA–13, 14, 15, and 16).**

Contemporaneously, on January 19, 2006, Evans filed an action in the U.S. District Court, complaining that the execution protocols of the Division of Correction create a risk that he will be conscious during the execution process and accordingly will suffer unnecessary pain. *See Evans v. Saar,* Civil No. 06–149 (U.S. Dist. Ct. D. Md.). He asked for a declaratory judgment that the Division's protocols violate the Eighth and Fourteenth Amendments and a permanent injunction barring the Division from using those protocols to carry out an execution against him. On February 1, 2006, the court denied Evans's motions for temporary restraining order and preliminary injunction. Evans appealed to the Court of Appeals for the Fourth Circuit, but when this Court stayed the outstanding warrant of execution pending resolution of the appeals now

before us, he dismissed that appeal, and the case has been tried but remains open in the District Court. **(DC–3).**

In December, 2005, Evans commenced an administrative challenge to the execution protocols by filing a request for administrative remedy with the warden of the Maryland Penitentiary. When the warden denied that request, Evans appealed to the Commissioner of Corrections. The Commissioner rejected the appeal on February 27, 2006, and Evans filed a complaint with the Inmate Grievance Office (IGO). On June 2, 2006, an administrative law judge, acting for the IGO, concluded that (1) the execution protocols are not inconsistent with § 3–905 of the Correctional Services Article, (2) portions of them do constitute a regulation under the Administrative Procedure Act and are ineffective because they were not adopted in conformance with that Act, and (3) there was a material dispute of fact as to whether the condition of Evans's veins will render the execution protocols, as to him, violative of the Eighth Amendment prohibition against cruel and unusual punishment. The Secretary of Public Safety and Correctional Services rejected the second determination on June 27, and on July 26, 2006, Evans filed a petition for judicial review in the Circuit Court for Baltimore City. **(PC 11).**

BELL, Chief Judge, dissenting.

Vernon Evans, Jr. challenges the judgments of the Circuit Court for Baltimore County denying: his motion, filed, pursuant to Maryland Rule 4–435(a) and premised on the holdings in *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), and *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*"Miller–El II"*), to correct an illegal sentence (Appeal # 107) and his Motion to Reopen Post–Conviction Proceeding, premised on these decisions (Appeal # 123) and on the findings of a study of the Maryland capital punishment system by University of Maryland Professor Raymond Paternoster, and request, in connection therewith, for discovery (Appeal # 124), and the challenge

by Evans and others [1] to the judgment of the Circuit Court for Baltimore City denying their motion for preliminary injunctive relief, to enjoin his execution, and all other executions, by lethal injection under the current protocol, which they alleged was improperly promulgated and was materially in conflict with Maryland Code (1999, 2006 Cum.Supp.) § 3–905 of the Correctional Services Article (Appeal # 122). The majority finds merit only in the argument that the execution protocol was not properly promulgated. 396 Md. 256, 271–72, 914 A.2d 25, 34 (2006). As to this aspect of Appeal No. 122, it reverses the judgment of the Circuit Court for Baltimore City and remands the case to that court for issuance of a "final" injunction, *id.* at 341–42, 914 A.2d at 75–76 enjoining its use "until either (1) it is adopted as a regulation in accordance with the Administrative Procedure Act, or (2) the Legislature exempts it from the requirements of that Act." *Id.* at 271–72, 914 A.2d at 34.

I do not disagree with the majority's resolution of the "regulation" issue. On the other hand, I cannot agree with its other holdings and, indeed, take strong exception to them. Accordingly, as to each of them, I dissent.

### A.

Maryland Rule 4–345, SENTENCING—REVISORY POWER OF COURT, provides, as relevant, "[t]he court may correct an illegal sentence at any time." To be sure,

> "as a general rule, a Rule 4–345(a) motion to correct an illegal sentence is not appropriate where the alleged illegality 'did not inhere in [the defendant's] sentence.' *State v. Kanaras,* [357 Md. 170, 185, 742 A.2d 508, 517 (1999) ]. A motion to correct an illegal sentence ordinarily can be granted only where there is some illegality in the sentence itself or where no sentence should have been imposed. *See, e.g., Ridgeway v. State,* 369 Md. 165, 171, 797 A.2d 1287,

---

1. The other parties involved are The National Association for the Advancement of Colored People, The American Civil Liberties Union, and Maryland Citizens Against State Executions.

1290 (2002); *Holmes v. State*, 362 Md. 190, 763 A.2d 737 (2000); *Moosavi v. State*, 355 Md. 651, 662–663, 736 A.2d 285, 291 (1999). On the other hand, a trial court error during the sentencing proceeding is not ordinarily cognizable under Rule 4–345(a) where the resulting sentence or sanction is itself lawful. *Randall Book Corp. v. State*, 316 Md. 315, 323, 558 A.2d 715, 719 (1989) ('[W]hile improper motivation may justify vacation of the sentence, it does not render the sentence illegal within the meaning of Rule 4–345. Appellant did not raise this contention on direct appeal and may not do so here'). *See also Hill v. United States*, 368 U.S. 424, 430, 82 S.Ct. 468, 472, 7 L.Ed.2d 417, 422 (1962)."

*Evans v. State*, 382 Md. 248, 278–79, 855 A.2d 291, 309 (2004). There is, however, as the *Evans* Court itself acknowledged, "an exception to the above-summarized principles," "where, in a capital sentencing proceeding, an alleged error of constitutional dimension may have contributed to the death sentence, at least where the allegation of error is partly based upon a decision of the United States Supreme Court or of this Court rendered after the defendant's capital sentencing proceeding." *Id.* It cited as an example of the exception, *Oken v. State*, 378 Md. 179, 835 A.2d 1105 (2003), *cert. denied*, 541 U.S. 1017, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004), which it summarized:

"[*Oken*] was a Rule 4–345 proceeding to correct an illegal or irregular sentence. The defendant Oken argued, relying on recent Supreme Court cases,[2] that a constitutional error in the capital sentencing proceeding contributed to the death

---

2. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (in which the Supreme Court ruled that any fact that increased the penalty for a crime above the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (in which the Supreme Court held that an Arizona statute pursuant to which, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty, violates the Sixth Amendment right to a jury trial in capital prosecutions).

sentence. Section 2–303(i) of the Maryland death penalty statute provides that the trier of facts 'shall determine by *a preponderance of the evidence* whether the aggravating circumstances under subsection (g) of this section outweigh the mitigating circumstances.' (Emphasis added). In *Oken*, the case was presented to the sentencing jury under this 'preponderance of the evidence' standard. The defendant Oken had raised no objection to this in the sentencing proceeding or in a prior post conviction proceeding. In the Rule 4–345 proceeding, however, Oken argued that the preponderance of the evidence standard violated due process and that a 'beyond a reasonable doubt' standard was constitutionally required. This Court, in the Rule 4–345 proceeding, resolved the merits of the constitutional issue, with the majority holding that application of the 'preponderance of the evidence' standard was constitutional. *See also Oken v. State*, 367 Md. 191, 195, 786 A.2d 691, 693 (2001), *cert. denied*, 535 U.S. 1074, 122 S.Ct. 1953, 152 L.Ed.2d 855 (2002), where the Court decided the merits of a similar challenge by the defendant Oken."

*Id.* at 279–280, 855 A.2d at 309.

Concluding that the case presented by Evans was in the same posture—he claimed, relying chiefly on *Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000), a United States Supreme Court opinion filed after his 1992 capital sentencing proceeding, that a provision of the Maryland death penalty statute was unconstitutionally applied to him at his capital sentencing proceeding and that this alleged error may have resulted in the death sentence—we decided the merits of that claim. *Id.* at 280, 855 A.2d at 309–310.

More recently, this Court, in *Baker v. State*, 389 Md. 127, 883 A.2d 916 (2005), applied the historic approach to illegal sentence review. There, the defendant, under sentence of death, which had been affirmed on direct appeal, filed, pursuant to Rule 4–345(a), a Motion to Correct an Illegal Sentence, as well as a Motion to Reopen the Post–Conviction Proceeding, and a Petition for Post-Conviction Relief. 389 Md. at 131, 883 A.2d at 918. The defendant principally relied on a Uni-

versity of Maryland study of the Maryland Capital punishment system conducted by Professor Raymond Paternoster of the University of Maryland, 389 Md. at 131, 883 A.2d at 918, the same study relied upon which Evans relies in the instant case, albeit for a different legal purpose. Contending that study's statistical findings establish that Maryland's death penalty was sought more frequently depending on the racial combinations of the accused and the victim and depending on the geographic location of the prosecuted charge, the defendant argued that the death penalty statute was applied to him unconstitutionally. 389 Md. at 132, 883 A.2d at 918–919.

Relying on the constitutionality of Maryland's death penalty statute under the Eighth and Fourteenth Amendments, citing *Gregg v. Georgia*, 428 U.S. 153, 168–69, 96 S.Ct. 2909, 2922–23, 49 L.Ed.2d 859, 871–72 (1976) and *Baker v. State, (Baker II)*, 367 Md. 648, 676, 790 A.2d 629, 646 (2002) and the lack of direct and specific evidence in the record to "suggest that Baker's death sentence was surrounded by impropriety of any kind," citing *Baker v. State, (Baker I)*, 332 Md. 542, 571, 632 A.2d 783, 797 (1993), the Court pronounced Baker's death sentence to be itself lawful, validly imposed, and, thus "not illegal under the pre-*Oken* general analytical principles governing motions brought under Rule 4–345(a)." *Baker v. State (Baker III)*, 389 Md. 127, 137–38, 883 A.2d 916, 922 (2005). Acknowledging *Oken* and *Evans*, and the exception they represent, but noting the distinction between them and the case under review, the Court concluded that the historic approach, and not the exception, applied to Baker's case. With regard to the exception, the Court observed:

> "In a capital sentencing context, a motion to correct an illegal sentence enables the court to re-evaluate the initial sentence to ensure that it is not illegal, as that term has been defined in our cases considering Maryland Rule 4–345(a), its predecessors, and the common law. It is not an opportunity for the parties to litigate or re-litigate factual issues, but rather a vehicle to demonstrate, particularly in the case of the constitutional decision exception, that newly declared common law causes a penalty that was legal when

administered now to be illegal as a matter of constitutional law."

*Id.* at 140, 883 A.2d at 924 (footnote omitted). Thus, the Court reasoned: "because Baker relies almost exclusively upon the Paternoster Study, rather than a 'new' judicial decision bearing on relevant constitutional law, to establish the argued illegality in his sentence, his arguments do not fall within the exception recognized in *Oken* and *Evans.*" *Id.* at 138, 883 A.2d at 922–23.

Subsequently, in *Evans v. State,* 389 Md. 456, 462–63, 886 A.2d 562, 565 (2005), the Court confirmed its *Baker* decision, holding that "a statistical analysis conducted by Raymond Paternoster, a Professor of Criminology and Criminal Justice at the University of Maryland, which Evans claims establishes a pattern of racial and geographic discrimination in the implementation of the death penalty in Maryland," is not "an appropriate vehicle to raise this issue." Like *Baker,* however, it recognized, and did not disavow, the exception to the "historic" approach this Court has recognized:

"We acknowledged in *Baker* that, in *Oken v. State,* 378 Md. 179, 184–86, 835 A.2d 1105, 1108, 1157–58 (2003), *cert. denied,* 541 U.S. 1017, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004), and in *Evans v. State, supra,* 382 Md. at 279, 855 A.2d at 309, we had recognized a limited exception to that general principle and had entertained a motion under Rule 4–345(a) where 'in a capital sentencing proceeding, an alleged error of constitutional dimension may have contributed to the death sentence, at least where the allegation of error is partly based upon a decision of the United States Supreme Court or of this Court rendered after the defendant's capital sentencing proceeding.' "

*Id.* at 463–64, 886 A.2d at 566, *quoting Baker, supra,* 389 Md. at 136, 883 A.2d at 921, in turn *quoting Evans, supra,* 382 Md. at 279, 855 A.2d at 309.

It is Evans' contention that the decisions in *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d

360 (2005), and *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) are new "interpretations" of relevant constitutional precedents, *Wiggins* and *Rompilla* of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Miller–El* of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), supporting his argument that an error may have contributed to the imposition of his sentence of death, and, therefore, require correction of that illegal sentence. In other words, Evans contends that the death sentence he received, although legal when imposed, is, in light of these decisions now illegal. Accordingly, a Rule 4–345(a) motion is appropriate. I agree.

## 1.

At his 1992 resentencing, Evans' counsel presented a mitigation case. It consisted only of the testimony of six family members, the essence of which was that Evans grew up in a stable and supportive family. No professionals were called to provide mitigating evidence or an expert opinion with respect to Evans' background or pre-criminal justice system involvement. Aside from testifying that they loved him and hoped that his life would be spared, they painted a picture of a home-life and environment that was happy and stable and of a family that was supportive of him. The testimony described family outings and family dinners, playful children and nurturing and concerned parents, who guided them through their young years. The testimony also reflected these relatives' disbelief and astonishment that Evans had not accepted this lifestyle and, instead, had rejected it and his upbringing, favoring a life of drugs and violence.

In preparing the mitigation case they would present, counsel did not commission a social history report to be prepared and, thus, none was prepared. Although they retained a mitigation specialist, she was not made a part of the defense team and was not asked to conduct an investigation of Evans' background or family history. As a result, the mitigation specialist conducted almost no investigation, she never met Evans and spoke to just a few of his family members. No one on the defense team, or on its behalf, reviewed, critically, the

pertinent social services records pertaining to Evans and, so, the picture painted by the mitigation testimony was neither questioned nor critically analyzed.

This is to be contrasted with the investigation and preparation undertaken by new counsel, after the *Wiggins* and *Rompilla* cases, discussed *infra*, were decided by the United States Supreme Court. Counsel retained a mitigation specialist and charged her with conducting an investigation of Evans' family and psychosocial history. Having received her report, the findings of which were different from the picture painted by the mitigation case presented at resentencing and, indeed, was in direct conflict with it,[3] counsel retained the services of a psychologist to evaluate Evans. She concluded, after reviewing the social history report prepared by the mitigation specialist, interviewing Evans and reviewing records, that Evans met, and had done so since age 9, the criteria for Post Traumatic Stress Disorder, Chronic and Severe Depressive Disorder, and Generalized Anxiety Disorder, which, after numerous missed opportunities to intervene, left Evans vulnerable to the criminal forces on the City streets.

In *Wiggins*, the defendant was convicted of capital murder. Prior to his capital sentencing proceeding, his attorneys un-

---

**3.** This is not surprising. The mitigation specialist interviewed Evans and twenty-nine of his family members, as well as a childhood friend and a one-time next door neighbor. She spent some thirty hours interviewing Evans and collected and reviewed a number of D.O.C.uments and records, school, medical and prison, relating to him. As a result the mitigation specialist produced a 51 page report, with a nine (9) page summary, in which she concluded that Evans "grew up in a toxic household characterized by chronic conflict, predictable violence, and hopeless despair." Specifically, she reported frequent and severe beating of Evans, during his childhood, by his father, abandonment on two occasions, the absence of expressions of parental love or approval, that he was singled out for harsh treatment, that he attempted suicide at age ten, for which he was never treated and of which the family never spoke, that he was sexually assaulted when he was eleven and verbally and physically harassed at school and in the neighborhood and that he was exposed to pervasive crime and violence in his neighborhood. In addition, the mitigation specialist concluded that Evans and his family were adversely impacted by a significant history of untreated mental-health and substance abuse problems and violence.

successfully sought to bifurcate those proceedings, intending to prove that Wiggins was not directly responsible for the victim's death and, if that failed, to present a mitigation defense. 539 U.S. at 515, 123 S.Ct. at 2532, 156 L.Ed.2d at 481. The motion to bifurcate was denied and, although counsel informed the jury in opening statement that it would hear about Wiggins' "difficult" life,[4] *id.* at 515, 123 S.Ct. at 2532, 156 L.Ed.2d at 481, they did not produce, or attempt to produce, any such evidence. *Id.* Indeed, despite proffering to the court the mitigation case it would have presented had its bifurcation motion been granted, no evidence or information was offered as to Wiggins' life history or family background.[5] *Id.* at 515–

---

**4.** In addition to mentioning that Wiggins had a clean record, counsel told the jury: "You're going to hear that Kevin Wiggins has had a difficult life. It has not been easy for him. But he's worked. He's tried to be a productive citizen, and he's reached the age of 27 with no convictions for prior crimes of violence and no convictions, period. . . . I think that's an important thing for you to consider." *Wiggins v. Smith,* 539 U.S. 510, 515, 123 S.Ct. 2527, 2532, 156 L.Ed.2d 471, 481 (2003).

**5.** The Supreme Court was not at all sure that Wiggins's counsel "did . . . focus exclusively on Wiggins's direct responsibility for the murder." After referencing counsel's opening statement and noting specially that she did not "follow up" the proffer with details of Wiggins' history, the Court observed:

"At the same time, counsel called a criminologist to testify that inmates serving life sentences tend to adjust well and refrain from further violence in prison—testimony with no bearing on whether petitioner committed the murder by his own hand. . . . Far from focusing exclusively on petitioner's direct responsibility, then, counsel put on a half-hearted mitigation case, taking precisely the type of 'shotgun' approach the Maryland Court of Appeals concluded counsel sought to avoid. . . . When viewed in this light, the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."

*Wiggins v. Smith,* 539 U.S. 510, 526–27, 123 S.Ct. 2527, 2538, 156 L.Ed.2d 471, 488(2003), *quoting Wiggins v. State,* 352 Md. 580, 609, 724 A.2d 1, 15 (1999). In the passage to which the Court referred, this Court stated:

"[Counsel] understood that some lawyers use what he regarded as a 'shotgun approach,' attacking everything and hoping that 'something sticks.' He was not of that view, however, preferring to concentrate his defense. He did not, therefore, have any detailed background

16, 123 S.Ct. at 2532, 156 L.Ed.2d at 481. The mitigation case proffered did not involve "any evidence of [Wiggins'] life history or family background," *id.* at 516, 123 S.Ct. at 2532, 156 L.Ed.2d at 481, although the State made funds available to investigate those matters. *Id.* at 517, 123 S.Ct. at 2533, 156 L.Ed.2d at 482. The proffer was simply that he had limited intellectual ability, a childlike emotional state, exhibited no aggressive patterns, had a capacity for empathy and desired to function in the world, all of which would be supported by psychological reports and expert testimony. *Id.* at 516, 123 S.Ct. at 2532, 156 L.Ed.2d at 481. Wiggins was sentenced to death, and this Court, on direct appeal, affirmed. *Wiggins v. State*, 324 Md. 551, 597 A.2d 1359 (1991), *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

Seeking post-conviction relief, Wiggins argued that his trial counsel's failure to investigate his life history or family background and then present mitigating evidence of his dysfunctional background was ineffective assistance of counsel. He relied primarily on *Strickland*. Under that case, in order to prove ineffective assistance of counsel, a defendant must show that counsel's performance was deficient, that it fell below an objective standard of reasonableness defined by prevailing professional norms, and that this deficiency prejudiced the defendant. *Strickland*, 466 U.S. at 687–688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

In support of his ineffective assistance of counsel argument, Wiggins' post conviction counsel presented expert testimony by a forensic social worker who "chronicled [Wiggins'] bleak life history." 539 U.S. at 516, 123 S.Ct. at 2533, 156 L.Ed.2d at 482. The testimony was from the social history report, characterized by the Court as "elaborate," 539 U.S. at 516, 123 S.Ct. at 2531, 156 L.Ed.2d at 481, the social worker prepared from social service, medical, school records and interviews

---

reports prepared, although funds may have been available for that purpose. He expressed some concern that that kind of information might prove counterproductive."
*Id.* at 609, 724 A.2d at 15–16.

with Wiggins and numerous family members, and it provided "evidence of the severe physical and sexual abuse [Wiggins] suffered at the hands of his mother and while in the care of a series of foster parents." 539 U.S. at 516, 123 S.Ct. at 2533, 156 L.Ed.2d at 482. Acknowledging the failure to investigate Wiggins' family background or life history, trial counsel defended on the basis that, "well in advance of trial," they had decided, upon re-trial, to concentrate on "retrying the factual case," 539 U.S. at 517, 123 S.Ct. at 2533, 156 L.Ed.2d at 482, and disputing Wiggins' direct responsibility for the murder. 539 U.S. at 517, 123 S.Ct. at 2533, 156 L.Ed.2d at 482. The trial court denied post-conviction relief, concluding, "when the decision not to investigate . . . is a matter of trial tactics, there is no ineffective assistance of counsel." 539 U.S. at 517–518, 123 S.Ct. at 2533, 156 L.Ed.2d at 482.

This Court affirmed. *Wiggins v. State,* 352 Md. 580, 724 A.2d 1 (1999). It agreed with the trial court that counsel's decision to concentrate on principalship was "a deliberate, tactical decision." 352 Md. at 608, 724 A.2d at 15. Moreover, the Court concluded that Wiggins' trial counsel knew of Wiggins' unfortunate childhood; after all, they had available to them the PSI report prepared by Parole and Probation and the social services report that detailed, *albeit* not as graphically as the petitioner's social worker's social history, instances of physical and sexual abuse, an alcoholic mother, foster care placements and borderline retardation. Thus, the Court stated that "counsel *did* investigate and *were* aware of [Wiggins'] background." 352 Md. at 610, 724 A.2d at 16. Therefore, it reasoned, Wiggins' counsel "made a reasoned choice to proceed with what they thought was their best defense." 352 Md. at 610, 724 A.2d at 16.

The United States District Court for the District of Maryland granted relief on Wiggins' federal habeas petition, holding that Maryland's rejection of his ineffective assistance of counsel claim was an unreasonable application of clearly established federal law. *Wiggins v. Corcoran,* 164 F.Supp.2d 538, 557 (D.Md.2001). The Fourth Circuit Court of Appeals reversed, holding that trial counsel's strategic decision to focus

on establishing that Wiggins was not directly responsible for the murder was a reasonable one. *Wiggins v. Corcoran*, 288 F.3d 629, 639–640 (4th Cir.2002). The United States Supreme Court reversed. It held that the actions of Wiggins' counsel at sentencing violated his Sixth Amendment right to effective assistance of counsel. 539 U.S. at 519, 123 S.Ct. at 2534, 156 L.Ed.2d at 483.

In the Supreme Court, Wiggins complained, as had Strickland, about his counsel's decision to limit their investigation of the availability of mitigation evidence. The Supreme Court held that trial counsel's decision not to expand their investigation beyond the PSI and DSS records, records of which they were already aware, "fell short of the professional standards that prevailed in Maryland ..."—standard practice, at that time was to prepare a social history report, *Wiggins*, 539 U.S. at 524, 123 S.Ct. at 2536, 156 L.Ed.2d at 486,—and the scope of the investigation they undertook was unreasonable in light of what the DSS records revealed about Wiggins' mother's alcoholism, her treatment of him and his siblings, his foster care placements, emotional difficulties, etc., and the fact that counsel had uncovered no evidence indicating that a mitigation case would be, or could be, unproductive. 539 U.S. at 525, 123 S.Ct. at 2537, 156 L.Ed.2d at 487. Indeed, the Court was satisfied that the record of the sentencing proceeding, because it demonstrated that counsel never abandoned mitigation as a tactic and, in fact, put one on, albeit a "half hearted" attempt, "underscore[d] the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526, 123 S.Ct. at 2537, 156 L.Ed.2d at 487.

This Court did not escape the Supreme Court's criticism. In fact, we were reminded that the reasonableness of an attorney's investigation can not be determined by assessing, alone, what the attorney knows; a reviewing court needs also to consider, and determine, whether the known information would lead a reasonable attorney to investigate further, and that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to

sentencing strategy." *Id.* at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488. Accordingly, the Court admonished:

"The Maryland Court of Appeals' application of *Strickland's* governing legal principles was objectively unreasonable. Though the state court acknowledged petitioner's claim that counsel's failure to prepare a social history 'did not meet the minimum standards of the profession,' the court did not conduct an assessment of whether the decision to cease all investigation upon obtaining the PSI and the DSS records actually demonstrated reasonable professional judgment. . . . The state court merely assumed that the investigation was adequate. In light of what the PSI and the DSS records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible. The Court of Appeals' assumption that the investigation was adequate . . . thus reflected an unreasonable application of *Strickland.* 28 U.S.C. § 2254(d)(1). As a result, the court's subsequent deference to counsel's strategic decision not 'to present every conceivable mitigation defense,' . . . despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation, was also objectively unreasonable. As we established in *Strickland,* 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' "

*Id.* at 527–28, 123 S.Ct. at 2538–39, *quoting Wiggins,* 352 Md. at 609–610, 724 A.2d at 16 and *Strickland,* 466 U.S. at 690–691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

Further, the Supreme Court determined that this Court had misapplied the standards articulated in *Strickland.* 539 U.S. at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488. While cautioning that its decision did not mean that *Strickland* required counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing, and that *Strickland* does not require counsel to present mitigating evidence at sentencing in

every case, the Supreme Court re-asserted the principle that strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation. 539 U.S. at 533, 123 S.Ct. at 2541, 156 L.Ed.2d at 492. It held, ultimately, that "[i]n deferring to counsels' decision not to pursue a mitigation case despite their unreasonable investigation, the Maryland Court of Appeals unreasonably applied *Strickland.*" 539 U.S. at 534, 123 S.Ct. at 2542, 156 L.Ed.2d at 492

In addition, the Supreme Court concluded that counsels' failure to investigate and, then, present mitigating evidence prejudiced Wiggins to the extent that a jury, confronted with such evidence, may have returned a different sentence. 539 U.S. at 536, 123 S.Ct. at 2543, 156 L.Ed.2d at 494.

*Rompilla* is also pertinent on the question of the specific application to defense counsel of the reasonable competence standard required by the Sixth Amendment, 545 U.S. 374, 377, 125 S.Ct. 2456, 2460, 162 L.Ed.2d 360, 369, and instructive, as it teaches, *inter alia,* that more is required of counsel by way of investigating the possibility of mitigating evidence than simply interviewing and relying on the defendant and his family members. 545 U.S. at 381–82, 125 S.Ct. 2456, 2462–63, 162 L.Ed.2d at 372. There, the Supreme Court held "that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Id.* at 377, 125 S.Ct. at 2460, 162 L.Ed.2d at 369.

To oppose the evidence presented by the State to justify the death sentence it sought against the defendant—proof of the aggravating factors that the murder was committed in the course of another felony and by torture and that the defendant's significant history of felony convictions indicated the use or threat of violence—counsel for Rompilla offered rela-

tively brief testimony by five of the defendant's family members. Those witnesses argued, in effect, for reasonable doubt, and begged the jury for mercy, on the basis of their belief that the defendant was innocent and a good man, and, in the case of his 14-year-old son, that he loved his father and would visit him in prison. Although the jury found the latter to be a mitigating factor, along with rehabilitation being possible, it sentenced the defendant to death. 545 U.S. at 378, 125 S.Ct. at 2460–61, 162 L.Ed.2d at 370.

In preparing their mitigating case, trial counsel consulted three sources: Rompilla, his family members and three mental health workers. They got little, if anything, of substance from Rompilla regarding his background, who responded to questions concerning his schooling and childhood by saying they were "normal," except for his dropping out of school in the 9th grade and, in some instances, by sending counsel off on false leads. 545 U.S. at 381, 125 S.Ct. at 2462, 162 L.Ed.2d at 371–372. Similarly, little of substance was developed by the family members. Although counsel developed a rapport with them, counsel did not have the feeling that they knew Rompilla that well, since he spent a great deal of time incarcerated. And, "because the family was 'coming from the position that [Rompilla] was innocent ... they weren't looking for reasons for why he might have done this.'" 545 U.S. at 382, 125 S.Ct. at 2463, 162 L.Ed.2d at 372. The three mental health witnesses, likewise, revealed "nothing useful." 545 U.S. at 382, 125 S.Ct. at 2463, 162 L.Ed.2d at 372. Trial counsel did not consult school records, records of Rompilla's juvenile and adult incarcerations, police reports available during pre-trial discovery, or anything that might have reflected that Rompilla had a dependence on alcohol. 545 U.S. at 382, 125 S.Ct. at 2463, 162 L.Ed.2d at 372.

The post-conviction court rejected Rompilla's claims that his trial counsel had rendered ineffective assistance by their failure to investigate and then present, at sentencing, mitigation evidence concerning Rompilla's childhood, mental capacity, health, and alcoholism. 545 U.S. at 378, 125 S.Ct. at 2461, 162 L.Ed.2d at 370. On the contrary, it held that the trial counsel

had done enough to investigate the possibilities of a mitigation case. The Supreme Court of Pennsylvania agreed and affirmed. *Commonwealth v. Rompilla,* 539 Pa. 499, 653 A.2d 626 (1995). The Federal District Court granted habeas relief, finding ineffective assistance of counsel. Trial counsel, the court determined, in preparing the mitigation case, had failed to investigate "pretty obvious signs" that Rompilla had a troubled childhood and suffered from mental illness and alcoholism, and instead had relied unjustifiably on Rompilla's own description of an unexceptional background. 545 U.S. at 379, 125 S.Ct. at 2461, 162 L.Ed.2d at 370. The Third Circuit Court of Appeals reversed, concluding that there was nothing unreasonable about the State Supreme Court's application of *Strickland,* opining that defense counsel, who had attempted to uncover mitigation evidence from Rompilla, certain family members, and three mental health experts, *Rompilla v. Horn,* 355 F.3d 233 (3rd Cir.2004), had gone far enough and done enough. 355 F.3d at 252.

The Supreme Court granted certiorari and reversed. It held that, even when a capital defendant and his family members have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the trial's sentencing phase. 545 U.S. at 385–386, 125 S.Ct. at 2465, 162 L.Ed.2d at 374–375. Thus, Rompilla's counsels' failure to examine a court file on Rompilla's prior rape and assault conviction, a crime similar to the one with which he was charged, was deficient. 545 U.S. at 385–386, 125 S.Ct. at 2465–2466, 162 L.Ed.2d at 375.

Further,

"[n]o reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim's testimony. Nor would a reasonable lawyer compare possible searches for school reports, juvenile records, and evidence of drinking habits to the opportunity to take a look at a file disclosing what the

prosecutor knows and even plans to read from in his case. Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there."

545 U.S. at 389, 125 S.Ct. at 2467, 162 L.Ed.2d at 376–377.

The majority asserts that *Wiggins* and *Rompilla* are a mere re-applications of *Strickland* to the facts of those cases, and, as such, are not new interpretations of a Constitutional principle. 396 Md. at 275–76, 276, 914 A.2d at 36, 36–37. To the majority, those cases apparently are mere error correction, having absolutely no precedential value and informing not one future review of ineffective assistance of counsel, even when they are directly on point. Matter-of-factly, therefore, the majority dismisses *Wiggins* and *Rompilla,* and especially their analysis:

"Nothing in *Wiggins* or *Rompilla* changed, in any way, those standards adopted in *Strickland.* The *Wiggins* Court expressly relied on and applied the *Strickland* standards and simply concluded, based on its view of the factual record in that case, that, given the information they had regarding Wiggins's childhood, counsel's failure to broaden the scope of their investigation into possible mitigating factors in a death penalty case was both deficient and prejudicial under the *Strickland* standards. Indeed, the Court began its discussion of the ineffective assistance claim by expressly noting that '[w]e established the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington* . . . .' *Wiggins v. Smith, supra,* 539 U.S. at 521, 123 S.Ct. at 2535, 156 L.Ed.2d at 484.

\* \* \*

"Like in *Wiggins,* the *Rompilla* Court expressly applied the standards enunciated in *Strickland* to find deficient and prejudicial performance by counsel. No new or different interpretation of *Strickland* was announced. Indeed Justice O'Connor, the author of the Opinion in *Strickland,* noted in *Rompilla* that the decision 'simply applies our longstanding

case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland v. Washington....*' (O'Connor, J., Concurring)."
*Id.* at 276, 914 A.2d at 36–37.[6]

To be sure, neither *Wiggins* nor *Rompilla* purports to change the established legal principles governing ineffective assistance of counsel claims announced in *Strickland.* See *Wiggins,* 539 U.S. at 521, 123 S.Ct. at 2535, 156 L.Ed.2d at 484; *Rompilla,* 545 U.S. at 380, 125 S.Ct. at 2462, 162 L.Ed.2d at 371. They are, indeed, concerned, and seriously so, with not simply the application of the principles well established in *Strickland,* and sought to be clarified by its progeny, but with the proper and reasonable application of those principles. Thus, these cases are not mere error correction or exercises in futility.[7]

Federal habeas review is permitted, in fact, only when the federal law as to which review is sought is "clearly established" by Supreme Court precedents at the time the state court decision is filed. 28 U.S.C. § 2254,[8] as amended by the

---

6. This is the only basis on which the majority rejects the applicability of Rule 4–345(a) to this case. The majority offers no other analysis, nor does it address, or even acknowledge, whether the Supreme Court's determination that this Court, in *Wiggins,* and the Pennsylvania Supreme Court, in *Rompilla,* had "objectively unreasonably" applied *Strickland,* could impact other cases in which that very issue may have been, or could have been, raised.

7. It is worth reminding ourselves of what the *Wiggins's* Court emphasized with regard to the responsibility of the reviewing court when the adequacy of investigation is at issue:

"In assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."
539 U.S. at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488, *citing Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

8. 28 U.S.C. § 2254(d), provides:

"Antiterrorism and Effective Death Penalty Act of 1996."
The Court made clear, in *Wiggins*, the scope of that provision:
> "In order for a federal court to find a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.... The state court's application must have been 'objectively unreasonable.'"

*Wiggins*, 539 U.S. at 520–21, 123 S.Ct. at 2535, 156 L.Ed.2d at 484.

Having granted certiorari to review the application of "clearly established Federal law" as it had determined it, and having decided that the state court had applied the law objectively unreasonably, I would be surprised, and I suspect the Supreme Court would be more so, to learn that a state court found previously to have misapplied the "clearly established Federal law," was not expected to consider the decision so concluding, and apply it in cases, involving the same issue, that arise subsequently, and that neither are the many other state courts that will be called on to apply it. After all, the point of appellate review is to instruct bench and bar as to the law and to provide precedents that they must follow. It makes no sense, not to mention that it trivializes, I believe, the Supreme Court's review function, to permit a court that has been educated as to the proper application of a well-established legal precedent of the Supreme Court, one that the Court has determined has been misapplied "objectively unreasonably," to avoid having to apply that precedent on the merits, when the issue to which it relates is raised in the context of a proceeding, sanctioned by that court, in this

---

"(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
"(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

instance, whether to consider illegal sentences or to provide other discretionary relief, simply because the error, the effect of which is just as prejudicial, is not characterized as a "new interpretation" of that Supreme Court precedent. I am sorry, but to me, pointing out that a particular interpretation, and, therefore, application, of a precedent is "objectively unreasonable," has the same feel and effects the same result, if it does not amount to the same thing.

In *Wiggins*, where counsel purported to be pursuing a strategy that did not include mitigation, presenting only a "half hearted" case and neglecting to do a social history report, this Court was instructed that deferral to counsel's tactical decision relating to mitigation was objectively unreasonable because available information made it reasonable for counsel to have conducted more of an investigation and the Court was required, before deferring to the counsel's decision, to evaluate the knowledge counsel had with that in mind. In this case, counsel presented a mitigation case, *albeit*, it was not a particularly strong one. They too did not do a social history report, accepting, in total, the representations and assurances of Evans and his family members as to the accuracy of the picture that they "painted" for the jury. If there was a deficiency in performance in *Wiggins*, where the mitigating case, if a priority at all, was only secondary, there certainly was a deficiency in this case, where the mitigation case, such as it was, was presented and it was the defense's primary focus. This is especially the case in light of *Rompilla's* recognition, and teaching, that counsel's investigative responsibilities extend beyond, and are not co-extensive with, what he or she learns from the client and his or her family. 545 U.S. at 383, 125 S.Ct. at 2463, 162 L.Ed.2d at 373.

This latter point is critically important, as this case and *Rompilla* demonstrate: presenting a mitigation case without an adequate and full investigation, or without considering how what is presented can be used against the defendant and whether it may have the opposite effect, very well may aggravate, rather than mitigate, the defendant's case. As Evans points out, the prosecution all but adopted the picture

Evans' mitigation case painted, telling the jury, agreeing with Evans, that his family was "a wonderful group of people," "an excellent support system," who "brought him up right." Proceeding from that premise, it made the point that, viewed from that perspective, Evans' actions were aggravated, "after all, they were always there, always there. Anytime he walked over and asked for help, he had help."

*Wiggins* and *Rompilla* are constitutional decisions that can be, and logically should be, applied in connection with a Rule 4–345(a) motion to challenge an illegal sentence. Both holdings establish the boundaries of reasonable application in which a reviewing court, evaluating *Strickland* claims, must confine its analysis. They make clear that any sentence that is the result of an "objectively unreasonable" application of the guiding principles, clearly established ones announced by the Supreme Court, is illegal and thus reversible.

### 3.

A similar analysis applies to Evans' jury empanelment argument. Evans was tried in 1984, prior to the decision in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). His jury consisted of ten whites and two African-Americans, exclusive of alternates, of which there were two, one white and the other African–American. Although only 31% of the jury pool were African–American, the prosecution used 80% of its peremptory strikes to exclude African–Americans from the jury venire. When, at the end of jury selection, the prosecutor's use of his peremptory strikes was challenged, he responded by indicating that he had exercised his strikes on the basis of the venireperson's "background, age, occupation, what was learned during voir dire at the bench and in open court." Although the trial court denied Evans' objection, it subsequently acknowledged, and, in effect, endorsed, that the prosecutor's strikes may have been raced-based, noting "it's logical to presume that perhaps [the prosecutor] was trying to get a jury which roughly reflects the composition of a cross-section of the county." This is consistent with what the prosecutor told the trial court with regard to the racial

composition of the County, "that 22% of the county population was African American and three of the jurors—two regular jurors and one alternate—were black, which constituted 21.4% of the panel." The trial transcript reflects that the prosecutor only questioned one of the eight African–Americans he struck and that he did not strike similarly situated white jurors.

A similar pattern was evident in *Miller–El II*. There, Dallas County prosecutors used 10 of their 14 peremptory strikes to strike black jurors, in the process striking 91% (10 of 11) of the eligible, qualified black venire members during jury selection for petitioner Miller–El's capital murder trial. 545 U.S. at 241, 125 S.Ct. at 2325, 162 L.Ed.2d at 214. Miller–El's objection under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the predecessor to *Batson*, was overruled, and he was convicted, the trial court finding no systemic exclusion of blacks. 545 U.S. at 236, 125 S.Ct. at 2322, 162 L.Ed.2d at 211. After *Batson* was decided, Miller–El's objection was reviewed in light of that case, but the trial court found that the strikes were race-neutral and that no racially motivated strikes occurred. That decision was affirmed by the Texas Court of Criminal Appeals, the federal district court denied Miller–El habeas relief, *Miller–El v. Johnson*, Civil No. 3:96–CV–1992–H, 2000 WL 724534 (N.D.Tex., June 5, 2000), and the Fifth Circuit affirmed that decision. The Supreme Court granted certiorari and reversed. 545 U.S. at 237, 125 S.Ct. at 2323, 162 L.Ed.2d at 212. Focusing on, as Evans characterizes it, "the strong statistical disparity in the State's use of peremptory strikes against African Americans," the Court noted:

"The numbers describing the prosecution's use of peremptories are remarkable. Out of 20 black members of the 108–person venire panel for Miller–El's trial, only 1 served. Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution. *Id.* [*Miller–El v. Cockrell*, 537 U.S. 322, 331, 123 S.Ct. 1029, 1036, 154 L.Ed.2d 931, 946 (2003)]. The prosecutors used their peremptory strikes to exclude 91% of the eligible African–American venire members.... Happenstance is unlikely to

produce this disparity.' *Id.,* at 342, 537 U.S. 322, 123 S.Ct. 1029."

545 U.S. at 240–41, 125 S.Ct. at 2325, 162 L.Ed.2d at 214. The Court also was guided by the circumstances surrounding each strike, including the disparity of treatment of African American and white venire members. The extensive comparative analysis undertaken by the Court, *see id.* at 545 U.S. at 239–252, 125 S.Ct. at 2325–32, 162 L.Ed.2d at 213–221, made this fact evident and caused it to note that some of the proffered explanations for striking African Americans applied with equal force to some of the white venire members who were not challenged. The Court concluded: "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Id.* at 241, 125 S.Ct. at 2326, 162 L.Ed.2d at 215. Another circumstance determined to be significant was whether the prosecutor engaged, during voir dire, in meaningful voir dire on the "post hoc" reason for a strike; if he or she did not, the Court concluded, that was an indicia of implausibility. *Id.* at 244, 125 S.Ct. at 2328, 162 L.Ed.2d at 217. Finally, the Court looked to see, and found, evidence of past discrimination by the prosecutor's office. *Id.* at 253–265, 125 S.Ct. at 2332–2339, 162 L.Ed.2d at 222–229.

Every aspect of this analysis applies to Evans' case, in spades. Statistically, the numbers are as "remarkable." The applicability of the explanations for striking blacks to some of the non-challenged whites is just as evident. The dearth of the voir dire in relation to the "post hoc" explanations is just as lacking. In this case, however, there is the, at least, tacit, finding by the trial court that the strikes were race-based. That it may have seen this finding as benign does not matter; it buttresses the case for error and, thus, illegal sentence review.

The majority responds to *Miller–El* as it does to *Wiggins* and *Rompilla,* that it makes no new pronouncement, it is not a new interpretation, simply an application of *Batson.* This case is an habeas case and, therefore, was decided under 28 U.S.C.

§ 2254, *see supra* note 8 at 387–88, 914 A.2d at 103. As such, what I said in support of the applicability of *Wiggins* and *Rompilla* to a Rule 4–345(a) review applies equally to this case. I will add what Evans notes as to the significance of habeas cases, a comment that also applies to the *Wiggins* and *Rompilla* discussion:

> "The import of the Court's decision is underscored by the fact that Miller–El obtained relief on federal habeas review, which is subject to a deferential standard under which 'factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary,' and factual determinations will not be overturned 'unless objectively unreasonable in light of the evidence presented in the state-court proceeding.' "

(*Quoting Miller–El I*, 537 U.S. at 324, 123 S.Ct. at 1041, 154 L.Ed.2d at 952).

### B.

Maryland Code (2001, 2006 Cum.Supp.) § 7–102 of the Criminal Procedure Article provides:

> "(a) Subject to subsection (b) of this section, §§ 7–103[9] and 7–104[10] of this subtitle and Subtitle 2 of this title, a convicted person may begin a proceeding under this title in the circuit court for the county in which the conviction took place at any time if the person claims that:

---

9. Maryland Code (2001, 2005 Supp.) § 7–103 of the Criminal Procedure Article provides, as relevant:
 " § 7–103. Number and time of filing of petitions
 "(a) For each trial or sentence, a person may file only one petition for relief under this title."

10. Maryland Code (2001, 2005 Supp.) § 7–104 of the Criminal Procedure Article provides, as relevant:
 " § 7–104. Reopening postconviction proceeding
 "The court may reopen a postconviction proceeding that was previously concluded if the court determines that the action is in the interests of justice."

"(1) the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State;

"(2) the court lacked jurisdiction to impose the sentence;

"(3) the sentence exceeds the maximum allowed by law; or

"(4) the sentence is otherwise subject to collateral attack on a ground of alleged error that would otherwise be available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy.

"(b) A person may begin a proceeding under this title if:

"(1) the person seeks to set aside or correct the judgment or sentence; and

"(2) the alleged error has not been previously and finally litigated or waived in the proceeding resulting in the conviction or in any other proceeding that the person has taken to secure relief from the person's conviction."

Our approach to petitions to reopen post conviction proceedings under this provision was most recently highlighted in *Gray v. State,* 388 Md. 366, 879 A.2d 1064 (2005). In *Gray,* the defendant had been convicted of second-degree murder and use of a handgun in the commission of a violent crime. 388 Md. at 368, 879 A.2d at 1065. He filed a "Petition to Reopen Post Conviction Proceedings" pursuant to § 7–104 of the Criminal Procedure Article. 388 Md. at 369, 879 A.2d at 1065. The trial court denied the petition, finding it not to be in the interest of justice to do so. 388 Md. at 369, 879 A.2d at 1065. After the Court of Special Appeals affirmed that decision, *Gray v. State,* 158 Md.App. 635, 857 A.2d 1176 (2004), this Court granted certiorari to determine whether the Circuit Court was required to provide a written statement supporting its denial of relief. 388 Md. at 369, 879 A.2d at 1065.

In holding that no such statement was required by the Circuit Court, we explained that § 7–104 allows a court to reopen a post-conviction proceeding that was previously concluded, " 'if the court determines that the action is in the interests of justice.' " 388 Md. at 382, 879 A.2d at 1073, *citing*

§ 7–104 (emphasis removed). That requires the exercise of discretion. Therefore, in analyzing whether a trial court's denial of a petition to reopen a post conviction proceeding was an abuse of discretion, we explained:

"Abuse of discretion is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways. . . . [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. *The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.* That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of untenable grounds, violative of fact and logic, and against the logic and effect of facts and inferences before the court."

388 Md. at 383–384, 879 A.2d at 1073–1074, *citing Dehn v. Edgecombe,* 384 Md. 606, 628, 865 A.2d 603, 616 (2005) (Emphasis added, internal quotations omitted).

The majority acknowledges that this standard should be applied to Evans' motion to reopen the 1995 post-conviction proceeding. 396 Md. at 277–79, 914 A.2d at 37–38. The majority then states that, because *Wiggins, Rompilla,* and *Miller–El II* were not abuse of discretion cases, their mandates do not apply to an abuse of discretion evaluation in the case *sub judice.* 396 Md. at 278–79, 914 A.2d at 38.

I cannot agree. The petitioner does not assert that *Wiggins, Rompilla,* and *Miller–El II are* abuse of discretion cases, and § 7–104 does not require that the precedents relied upon *be* abuse of discretion cases. Evans' point is that, given the three Supreme Court decisions, albeit rendered on habeas review, where a decision on the merits had to be made, this Court, on its review of the trial court denials in this case, could

conclude, and should so conclude, that the trial court abused its discretion.

In *Wiggins* and *Rompilla*, the Supreme Court held that this Court and the Supreme Court of Pennsylvania, respectively, had objectively and unreasonably applied its holding in *Strickland*. 539 U.S. at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488. The Court drew the same conclusion with regard to the Texas Court of Criminal Appeals application of its holding in *Batson*. Those are definitive rulings by the Supreme Court, made only after determining that its well established precedent was not, apparently, so well understood as to be applied reasonably, even if incorrectly and erroneously. I am surprised to learn that Supreme Court decisions may be disregarded whenever the standard to be applied by a trial court is discretionary, that even when properly and timely raised, they summarily can be rejected as applicable, even before the trial court undertakes an, and, therefore, without any, analysis specific to the case or facts and circumstances. In fact, at the least, some level of case specific analysis must be made if the trial court is to exercise discretion; unless the court considers the argument on the merits, in light of the facts of the defendant's case, it cannot properly and logically exercise discretion. Just as important, such an analysis should be required so that any review by this Court of the issue is meaningful.

Unless an analysis on the merits is required and this Court seriously reviews the discretionary decision, we pay only lip service to the availability of the remedy of reopening postconviction proceedings, and what I lamented earlier is absolutely true:

> "It makes no sense, not to mention that it trivializes, I believe, the Supreme Court's review function, to permit a court that has been educated as to the proper application of a well-established legal precedent of the Supreme Court, one that the Court has determined has been misapplied 'objectively unreasonably,' to avoid having to apply that precedent on the merits, when the issue to which it relates is raised in the context of a proceeding, sanctioned by that court, in this instance, whether to consider illegal sentences

or to provide other discretionary relief, simply because the error, the effect of which is just as prejudicial, is not characterized as a 'new interpretation' of that Supreme Court precedent. I am sorry, but to me, pointing out that a particular interpretation, and therefore, application, of a precedent is 'objectively unreasonable,' has the same feel and effects the same result, if it does not amount to the same thing."

## C.

Evans, in No. 124, claims that *United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), mandates that he be entitled to discovery in order appropriately and effectively to present his selective prosecution claims. The majority, in turn, holds that there is no such mandate. 396 Md. at 319, 914 A.2d at 62. I disagree.

In *Armstrong,* the Supreme Court considered the showing that a defendant must make to be entitled to discovery on a claim that the prosecuting attorney singled him out for prosecution based on race. 517 U.S. at 458, 116 S.Ct. at 1483, 134 L.Ed.2d at 694. Crucial to Armstrong's claim was the theory that the government had declined to prosecute defendants of other races that were similarly situated. 517 U.S. at 458, 116 S.Ct. at 1483, 134 L.Ed.2d at 694.

Armstrong and a colleague had been arrested for conspiring to possess with the intent to distribute more than 50 grams of cocaine base (crack), conspiring to distribute the same, and for federal firearms offenses. 517 U.S. at 458, 116 S.Ct. at 1483, 134 L.Ed.2d at 694–695. In response to the indictment, Armstrong filed a motion for discovery, alleging selective prosecution based on race. 517 U.S. at 459, 116 S.Ct. at 1483, 134 L.Ed.2d at 695. The allegation stated that in every one of the 24 cases that contained similar charges as the ones brought against Armstrong, the defendant was black. 517 U.S. at 459, 116 S.Ct. at 1483, 134 L.Ed.2d at 695. The District Court granted the motion, instructing the government to produce information regarding the criteria for deciding

when to prosecute cases in which it had charged both firearms and cocaine offenses. 517 U.S. at 459, 116 S.Ct. at 1484, 134 L.Ed.2d at 695. When the government refused to comply, the District Court dismissed the case, and the Ninth Circuit Court of Appeals affirmed.

In reversing, the Supreme Court held:

"The requirements for a selective-prosecution claim draw on 'ordinary equal protection standards.' ... The claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.' ... To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."

517 U.S. at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699 (citations omitted).

Moreover,

"Having reviewed the requirements to prove a selective-prosecution claim, we turn to the showing necessary to obtain discovery in support of such a claim. If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim."

517 U.S. at 468, 116 S.Ct. at 1488, 134 L.Ed.2d at 701.

In discussing of what a correspondingly rigorous standard for discovery should consist, and the test for such a showing, "colorable basis" or "substantial threshold showing," employed by the Courts of Appeals, the Supreme Court remarked:

"The Court of Appeals held that a defendant may establish a colorable basis for discriminatory effect without evidence that the Government has failed to prosecute others who are

similarly situated to the defendant.... We think it was mistaken in this view.

\* \* \* \*

"In the present case, if the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently than respondents. For instance, respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court. We think the required threshold-a credible showing of different treatment of similarly situated persons-adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution."

517 U.S. at 469–470, 116 S.Ct. at 1488–1489, 134 L.Ed.2d at 701–702 (citations omitted). Therefore, under *Armstrong,* a credible showing of different treatment of similarly situated persons will justify discovery by the defendant.

The majority cites *Armstrong* for the proposition that:

"To establish a selective prosecution claim, . . ., the claimant must demonstrate that the prosecutorial policy ' "had a discriminatory effect and that it was motivated by a discriminatory purpose," ' *id.* at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699, quoting from *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556 (1985), and to establish a discriminatory effect in a race case, *'the claimant must show that similarly situated individuals of a different race were not prosecuted.' United States v. Armstrong, supra,* 517 U.S. at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699. (Emphasis added)."

396 Md. at 319–20, 914 A.2d at 62–63.

The majority, having used *Armstrong* to establish the elements of selective prosecution, never returns to Evans' argument that *Armstrong* requires only a *threshold showing* of selective prosecution in order to obtain discovery. Instead, the majority explains that, because *Armstrong* was not a

death penalty case, and did not involve a statistical analysis like in the case *sub judice*, Evans is not entitled to relief. 396 Md. at 321–22, 914 A.2d at 63–64. It is clear, however, that neither of these factors makes any difference in reviewing whether discovery is warranted in a selective prosecution claim.

In Armstrong's case, there was no showing—the study he submitted failed to identify individuals who were not black and could have been prosecuted for similar offenses, but were not so prosecuted. 517 U.S. at 470, 116 S.Ct. at 1489, 134 L.Ed.2d at 702. The Dr. Paternoster statistical analysis in the case *sub judice*, however, is significantly more in depth than the study conducted in *Armstrong*, and, as such, *does* satisfy the *Armstrong* standard. Accordingly, it does mandate the relief the Evans seeks.

The Paternoster study provides substantial evidence that the Baltimore County State's Attorney's Office singled out black defendants from similarly situated white defendants when choosing against whom to seek the death penalty. The study reflects that the State's Attorney will seek the death penalty 83% of the time when the defendant is black and the victim is white, but will seek the death penalty only 60% of the time with respect to all other racial combinations. These two statistical findings, alone, trigger the mandate of *Armstrong*. While they do not mean that selective prosecution definitively has been established, merely that discovery is warranted, I do not see how, in light of the immense body of evidence presented by Dr. Paternoster, the threshold has not been satisfied.

This case is unlike *Belmontes v. Brown*, 414 F.3d 1094 (9th Cir.2005), a case cited by the majority, 396 Md. at 321–22, 914 A.2d at 63–64. That case involved the merits of the selective prosecution claim that the defendant brought against the State. The Ninth Circuit Court of Appeals rejected the claim, concluding that the State had produced evidence that adequately rebutted it. 414 F.3d at 1128–29. It explained:

"While we think that Belmontes' statistics provide a strong showing of intentional discrimination, we need not decide

whether, in a discriminatory charging case, statistics standing alone can make out a prima facie case. Assuming *arguendo* that they can and that Belmontes has made out a prima facie case, here the State has provided evidence that is sufficient to overcome that showing. In his deposition, the prosecutor stated that when he decided to pursue a death sentence against Belmontes, he had reason to believe that prior to the McConnell murder Belmontes had shot and killed Jerry Howard. In short, the prosecutor asserted that he pursued a death penalty against Belmontes, not because of McConnell's death alone, but because he believed that Belmontes had actually committed more than one murder. Moreover, the evidence in the record is sufficient to provide a good faith basis for such belief. Thus, there appears to be a legitimate, race-neutral reason for a prosecutor to seek a death sentence in this particular case, and therefore sufficient evidence to rebut the inference of discrimination raised by Belmontes' statistical study. More important, Belmontes does not challenge the state's assertion that the prosecutor's explanation is sufficient to rebut his prima facie case."

*Id.*

That case, in short, is inapposite and, if anything seems to support the threshold showing required in this case. In any event, I reiterate, the merits of the selective prosecution claim are not yet on the table; this is *a threshold inquiry into whether discovery is warranted.* I believe that Evans has satisfied the burden.

### D.

Evans, in No. 122, contests two items involving the State's Division of Correction (D.O.C.), the department that carries out lethal injections. Since I do not disagree with the majority's disposition of the "regulation" issue, I need only address the issue as to which I dissented in *Oken v. State,* 381 Md. 580, 851 A.2d 538 (2004), Evans' contention that the D.O.C. protocols are inconsistent with Maryland Code (1999, 2003 Cum.

Supp., 2005 Supp.) § 3–905 of the Correctional Services Article.

In *Oken v. State*, 381 Md. 580, 851 A.2d 538, this Court, in a *per curiam* order, denied Oken's Motion for Stay of Warrant of Execution and Supporting Exhibits, rejecting his challenge to the method of execution the Division of Correction intended use in putting him to death. He had argued that that method violated § 3–905 of the Correctional Services Article, and constituted cruel and unusual punishment.

The majority concludes that in the case *sub judice*, like in *Oken*, the Execution Operations Manual (EOM), which governs the aspects in which a death sentence by lethal injection is implemented, is not inconsistent with § 3–905. 396 Md. at 336, 914 A.2d at 72–73.

Maryland § 3–905 provides:

"(a) The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent until a licensed physician pronounces death according to accepted standards of medical practice.

"(b)

"(1) The administration of the lethal substances required by this section is not the practice of medicine.

"(2) Notwithstanding any other law, a pharmacist or pharmaceutical supplier may dispense drugs, without a prescription, to the Commissioner or the Commissioner's designee to carry out this section."

The statute clearly requires the D.O.C. to use two substances, a barbiturate or similar drug, and a chemical paralytic agent. It also describes "the manner of inflicting the penalty of death," how they are to be used in combination: "continuous intravenous administration," in combination, until death is pronounced.

The method currently employed by the D.O.C. is not at all consistent with this statutory requirement. It involves the

use of three different chemicals—two syringes of sodium pentothal, a sedative, and one syringe each of both pancuronium bromide and potassium chloride, both lethal agents. The process as described by the majority, 396 Md. at 330–31, 914 A.2d at 69, clearly describes the use of two "bursts" of the barbiturate, and two chemical paralytic agents. This significant departure from what the statute authorizes disturbs me. As I stated in *Oken*, 381 Md. at 582, 851 A.2d at 539 (Bell, C.J., dissenting),

> "'Continuous intravenous administration' of a quick acting barbiturate, 'in combination' with a paralytic agent, is, I submit, vastly different from the intravenous administration, successively, of a barbiturate, a paralytic agent and potassium chloride, each discrete administration being separated by a saline flushing of the line."

It seems clear to me that the statutory language is clear and unambiguous. This is not, as the majority characterizes, an issue of statutory construction, 396 Md. at 332, 914 A.2d at 70. We've held, most recently in *Kilmon v. State*, that "[i]f the statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as written...." 394 Md. 168, 172, 905 A.2d 306, 308 (2006). *See also Chow v. State*, 393 Md. 431, 443, 903 A.2d 388, 395 (2006), *Mackey v. Compass Marketing, Inc.*, 391 Md. 117, 141, 892 A.2d 479, 493 (2006), *Collins v. State*, 383 Md. 684, 689, 861 A.2d 727, 730 (2004).

The majority states that because the Legislature did not say "*one* chemical paralytic agent," when it clearly could have done so, this renders the actual meaning of the words "an" and "a" ambiguous, and thus, an exploration of legislative intent is required.[11] The statute is so clear, no legislative

---

11. The majority's discussion of "a" and "an" as indefinite articles, as opposed to "the," which they claim is a definite article, is without merit. While it is true that if I ask someone to give me "the book" as opposed to "a book," the use of the word "the" necessarily implies a specific object, and the use of the word "a" may imply an indefinite object, this does not change that "a" refers to something singular. While the majority has cited cases which state that the article "a" can

digging is necessary. Indeed, even if there were ambiguities, the benefit of any ambiguity would be given to the defendant. As I explained in *Oken*,

> "In any event, this statute is highly punitive, indeed, given the intended result of its implementation, it could not be more so. As a result, even if it were ambiguous, the rule of lenity would apply, that is, the benefit of the ambiguity would be required to be given to the defendant."

381 Md. at 582–83, 851 A.2d at 539, *citing Melton*, 379 Md. at 488–89, 842 A.2d at 753.

It is of little consequence that other States with similar statutes employ the same three chemicals with no legal challenge; we should only be concerned with Maryland law. The statute authorizes two chemicals, and three are used. This clearly violates § 3–905. The majority claims that "the Legislature was well aware that, if it enacted the statute authorizing lethal injection, the statute would be implemented by the three-drug mixture.... There is no evidence that any member of the Legislature questioned whether the approach described by the Commissioner would be consistent with the statute." 396 Md. at 336, 914 A.2d at 72–73. As I stated in *Oken*, 381 Md. at 583, 851 A.2d at 540 (Bell, C.J., dissenting):

> "... [F]or me, the critical question is whether the procedure comports with, is consistent with, or is the procedure contemplated by, the statute. Because I conclude that it is not and, in fact, is violative of the statute, I dissent."

Judge GREENE authorizes me to state he joins in Parts C and D only of this dissent.

---

be interpreted as "more than one" in certain contexts, it is indeed the *context* which is most relevant. Under the plain language of § 3–905, the words "an" and "a" cannot be understood to refer to anything except for single items.

Assuming the "ambiguity," the question remains, how does one explain that which is not ambiguous, the manner of inflicting death, the continuous injection, as opposed to "short bursts." There certainly is nothing ambiguous about that. The majority's strained "ambiguity" approach serves to completely vary the statute.